IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT R. TOLAN, MARIAN TOLAN, | § | |
| BOBBY TOLAN, AND | § | |
| ANTHONY COOPER, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | Civil No. 4:09-1324 |
| | § | |
| JEFFREY WAYNE COTTON; | § | |
| JOHN C. EDWARDS; | § | |
| RANDALL C. MACK, CHIEF OF POLICE; | § | |
| BYRON HOLLOWAY, ASSISTANT | § | |
| CHIEF OF POLICE; CYNTHIA SIEGEL, | § | |
| MAYOR; BERNARD SATTERWHITE, | § | |
| CITY MANAGER; THE CITY OF | § | |
| BELLAIRE; AND THE BELLAIRE | § | |
| POLICE DEPARTMENT, | § | |
| | § | |
| Defendants. | § | JURY TRIAL DEMANDED |

## PLAINTIFFS' ORIGINAL COMPLAINT

Robert Tolan, Marian Tolan , Bobby Tolan, and Anthony Cooper file this original complaint,

complaining of: (i) Jeffrey Wayne Cotton; (ii) John C. Edwards; (iii) Randall C. Mack, Chief of the

Bellaire Police Department; (iv) Byron Holloway, Assistant Chief of the Bellaire Police Department;

(v) Cynthia Siegel, Mayor of Bellaire; (vi) Bernard Satterwhite, City Manager of Bellaire; (vii) The

City of Bellaire; and (viii) the Bellaire Police Department as follows:

### Parties

1.    Robert R. Tolan is an individual residing in Harris County, Texas.

2.    Marian Tolan is an individual residing in Harris County, Texas.

3.    Bobby Tolan is an individual residing in Harris County, Texas.

4.    Anthony Cooper is an individual residing in Harris County, Texas.

5.      Jeffrey Wayne Cotton is an individual who may be served at the Bellaire Police Department headquarters, 5110 Jessamine, Bellaire, Texas 77401, or wherever he may be found. He is being sued in his individual and official capacities.

6.      John C. Edwards is an individual who may be served at the Bellaire Police Department headquarters, 5110 Jessamine, Bellaire, Texas 77401, or wherever he may be found. He is being sued in his individual and official capacities.

7.      Randall C. Mack is the Chief of Police of the Bellaire Police Department, and as such is a final policymaker, and may be served with citation at the Bellaire Police Department headquarters, 5110 Jessamine, Bellaire, Texas 77401, or wherever he may be found. He is being sued in his individual and official capacities.

8.      Byron Holloway is the Assistant Chief of Police of the Bellaire Police Department, and as such is a final policymaker, and may be served with citation at the Bellaire Police Department headquarters, 5110 Jessamine, Bellaire, Texas 77401, or wherever he may be found. He is being sued in his individual and official capacities.

9.      Cynthia Siegel is the Mayor of the City of Bellaire, Texas, and as such is a final policymaker, and may be served with citation at City Hall, 7008 S. Rice Avenue, Bellaire, Texas 77401, or wherever she may be found. She is being sued in her individual and official capacities.

10.     Bernard Satterwhite is the City Manager for the City of Bellaire, Texas, and as such is a final policymaker, and may be served with citation at City Hall, 7008 S. Rice Avenue, Bellaire, Texas 77401, or wherever he may be found. He is being sued in his individual and official capacities.

11.     The City of Bellaire is an incorporated city in the State of Texas and may be served

by delivery of citation to Siegel as its Mayor at City Hall, 7008 S. Rice Avenue, Bellaire, Texas 77401.

12.      The Bellaire Police Department is a department of the City of Bellaire that may be served by delivery of citation to Mack as its Chief of Police at Bellaire Police Department Headquarters, 5110 Jessamine, Bellaire, Texas 77401.

## Jurisdiction and Venue

13.      This Court has personal jurisdiction over defendants because they reside in Texas or are subdivisions of the State of Texas.  This Court has subject matter jurisdiction over these claims under 28 U.S.C. §§ 1331 and 1367 and supplemental jurisdiction over claims made under the Texas Tort Claims Act.  Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## Facts

### A.  Background

14.      Robert, Marian, and Bobby Tolan have lived in Bellaire, Texas for fifteen years. Bobby, a retired Major League Baseball player, works in a shop on the west side of Houston. Marian is active in her church and community.

15.      The Tolans are the only African-American residents of their block.

16.      Bellaire is nearly ninety percent white.

17.      Anthony is Robert's cousin, but is more like a brother.  Anthony lives with the Tolans at their home on Woodstock in Bellaire.

18.      Robert–who everyone calls Robbie–was a star baseball player at Bellaire High School.  After graduating in 2003, Robbie played for Prairie View A & M.  After college, Robbie

was signed by the Washington Nationals.  He played in the Nationals' minor league system in 2007 and 2008.

19.     After being released by the Nationals, Robbie played for a few weeks for the Texas City Toros.  Robbie asked for and was given a release by the Toros.

20.     During the off-season, Robbie worked as a waiter at a Houston seafood restaurant.

21.     On December 31, 2008, Robbie was looking forward spending New Year's Eve with his family and friends when Jeffrey Cotton, a Bellaire Police officer, without justification, attempted to kill him by shooting him in the chest.

### B.  The Attack on the Tolans

22.     On December 31, 2008, at approximately 2:00 o'clock a.m., Robbie and Anthony were returning to their home at 804 Woodstock, Bellaire, Harris County, Texas 77401.  They had spent the majority of the evening out and stopped at Jack-In-The-Box on their way home.

23.     As he always did, Robbie parked his car on the street directly in front of his home.

24.     Anthony, who was sitting on the passenger side, had misplaced his wallet and was looking around his seat for it.

25.     As Robbie opened the his door, he saw headlights on his door.  He looked at Anthony and attempted to point out the car, but Anthony was distracted by his search for his wallet.

26.     The headlights Robbie noticed belonged to a police car being driven by Edwards, who is white. Edwards passed Robbie and Anthony and pulled into the cul-de-sac at the end of Woodstock. Edwards drove around the cul-de-sac and stopped his car facing Robbie's from the opposite side of the street.

27.     Robbie exited the car.  Anthony searched for his wallet in the car.

-4-

28.     Not finding it, Anthony abandoned the search and walked with Robbie toward their front door.

29.     Robbie and Anthony were not drunk or under the influence of drugs.

30.     Robbie and Anthony were unarmed.

31.     Robbie and Anthony were carrying their cell phones, keys, fast food, and unopened bottles of champagne in a bag.

32.     Robbie and Anthony were near their front door when Edwards approached them with his gun drawn.

33.     Edwards, gun drawn, ordered Robbie and Anthony to the ground.

34.     Robbie was standing in front of his front door.  Anthony was next to him.

35.     Edwards did not identify himself as a police officer.

36.     Almost immediately after Edwards first confronted Robbie and Anthony, Cotton, who is white, arrived on the scene.

37.     Robbie and Anthony asked why they were being told to get on the ground.  Edwards replied that they had a report of a stolen car.

38.     Bobby and Marian, Robbie's parents and Anthony's aunt and uncle, heard the commotion from inside their home and exited their front door to determine what was going on.

39.     Bobby and Marian were wearing pajamas.

40.     Bobby told Robbie and Anthony to get on the ground and be quiet and to let Marian and Bobby handle the situation.

41.     Bobby addressed Edwards and said, "This is our son and our nephew.  That is our car, it is not stolen, and we live here."

-5-

42.     Edwards pointed his gun at Bobby and ordered him to spread his arms and lean up against his Suburban in his driveway.  Bobby immediately complied.

43.     Marian protested that there must be a misunderstanding.

44.     Marian told Robbie and Anthony to be quiet and let her take care of the situation.

45.     Robbie and Anthony laid on the ground in compliance with Edwards' instructions.

46.     Marian told the officers that the car they believed was stolen belonged to her son, Robbie.

47.     Marian told the officers that she, her husband, Robbie, and Anthony lived at the home that Marian and Bobby had just exited.

48.     Marian told the officers that Robbie parked his car outside the family home "every night."

49.     Marian told the officers that the Tolan family had lived in their home for 15 years.

50.     In response, Cotton ordered Marian to get against the wall.  When she responded that "This is a big mistake and we have never experienced anything like this in our home," Cotton grabbed Marian by her right arm and threw her against the Tolans' garage door.

51.     Cotton gripped Marian so hard, she suffered bruises on her arm.

52.     Hearing his mother slam against the garage door, Robbie, still on the ground, turned around and said to Cotton (who was approximately fifteen to twenty feet away from Robbie), "Get your fucking hands off my mom."

53.     Robbie did not stand up.

54.     Robbie did not reach for anything.

55.     Robbie did not have anything in his hands.

-6-

56.   Robbie did not move his hands in any way that might have suggested that he was reaching for something.

57.   Robbie's arms remained outstretched, as previously instructed by Edwards.

58.   Hearing Robbie's protest, Cotton said nothing.

59.   Immediately after Robbie told Cotton to stop assaulting his mother, Cotton drew his gun and shot Robbie in the chest.

60.   Cotton shot Robbie with a .45 caliber bullet.

61.   Cotton was carrying a taser.

62.   Robbie was knocked backward from the force of the bullet.

63.   Cotton's bullet entered Robbie's body just under his right nipple.  From there, it traveled downward, piercing and collapsing his right lung and finally boring into (and nearly liquefying) his liver.

64.   The angle of the bullet demonstrates that Robbie Tolan was on the ground and that Cotton was standing when the gun was fired.

## C. The Aftermath of the Shooting

65.   Marian, who was next to Cotton when he shot Robbie, saw the fire from Cotton's pistol.  She also saw her son fall backward from the force of the bullet and saw smoke rising from his chest.  She thought that he was on fire.

66.   Anthony also saw Cotton shoot Robbie.

67.   Robbie, Anthony, Bobby, and Marian each heard one gunshot.  Later, after Robbie Tolan had been taken to the hospital, a relative who had arrived following the shooting and was kept down the block from what had become a crime scene, heard two loud noises.

68. Two additional and unexplained bullet holes were later found in the eave of the Tolans' porch.

69. On at least two occasions since the night of the shooting, unknown persons have attempted to dig the bullets out of the Tolans' home without either notice to or consent from any of the Tolans.

70. The Bellaire Police Department has neither sought nor received a warrant to retrieve the bullets lodged in the eave of the Tolans' home.

71. After shooting Robbie, Cotton called an ambulance. Meanwhile, officers of the Bellaire Police Department (who were white and had arrived en masse) handcuffed Anthony, separated Bobby, Marian, and Anthony and placed them in the backs of separate police cars.

72. The defendants did not have a reasonable suspicion that any violation or crime had been committed by Robbie which might have justified detaining and seizing him.

73. The defendants did not have a reasonable suspicion that any violation or crime had been committed by Marian which might have justified detaining and seizing her.

74. The defendants did not have a reasonable suspicion that any violation or crime had been committed by Anthony which might have justified detaining and seizing him.

75. The defendants did not have a reasonable suspicion that any violation or crime had been committed by Bobby which might have justified detaining and seizing him.

76. The BPD officers would not allow any of Robbie's family members to care for him.

77. The Tolans asked, but were not permitted to accompany Robbie to the hospital.

78. Despite repeated requests by Robbie's family, none of the BPD officers on the scene would tell them whether he was dead or alive.

79.     Not only were Robbie's family members not permitted to comfort him on his way to the hospital, their forced separation at the hands of the Bellaire Police meant that they were not permitted to comfort each other.

80.     In the back seat of one of the cars, Marian–who had no idea whether her son was dead or alive–prayed aloud.  A white female BPD officer told her to be quiet.  Marian responded that she was praying for her son.  The BPD officer told her to "keep it down."

81.     While they were being detained, at least two members of Robbie's family heard the dispatcher say over the BPD radio that "the car isn't stolen."

82.     Having committed no crime and having just witnessed the attempted murder of an innocent member of their family, and having no idea whether Robbie was dead or alive–because, despite repeated requests, no officer of the Bellaire Police Department would tell them–Bobby, Marian, and Anthony were held captive in the backs of separate police cars for about forty-five minutes.

83.     Anthony was released after Bobby and Marian were released.

84.     Anthony, was forced by the BPD to involuntarily give statements to the BPD.

85.     After their release from confinement, Anthony asked a BPD officer where everyone was.  The BPD officer responded, "Your family is gone."

86.     Meanwhile, Robbie never lost consciousness.  An EMT who arrived on the scene asked Robbie what had happened.

87.     Cotton, who was standing nearby, said to the EMT, "Don't worry about what happened to him."

88.     As he was being wheeled into an ambulance, Robbie heard Cotton say to other

officers on the scene, "We have to get our stories straight."

89.     Each of Robbie Tolan's family members saw the officers huddled together at the end of the driveway.

90.     Robbie was taken to the Acute Trauma Unit at Ben Taub Hospital and underwent emergency surgery to save his life.  The doctors saved Robbie but were unable to remove the bullet from his body.  They are unsure whether it will ever be removed.

91.     Robbie is lucky to be alive.  He lives with pain every day.  He is not the professional athlete he once was, and his future as a professional baseball player is unknown.

**The Coverup**

92.     The Bellaire Police Department engaged in a coverup that began immediately after Robbie was shot by Cotton.  The officers on the scene conferred to "get their stories straight." Sergeant Cotton attempted to prevent the paramedics who were treating Robbie from learning what had happened to Robbie.

93.     Although tasked with dispassionately investigating the assault on the Tolans and the shooting of Robbie, on the very day Robbie was shot, Assistant Chief Byron Holloway, who is white, speaking on behalf of the City of Bellaire and the BPD, announced to the media the conclusion of the investigation.  Holloway said that allegations of racial profiling are "not going to float," even though he had no facts with which to support that conclusion.

94.     The City released a statement alleging that Robbie had an altercation with Cotton and that resulted in his shooting, which is untrue.

95.     The City of Bellaire and Bellaire Police Department later claimed that the investigation was not complete and that they could not comment on the incident and the racial

motivations behind it; although Holloway, a final policymaker, had foreclosed that conclusion ab initio.

96.     Bellaire's own records apparently reveal that immediately after Cotton shot Robbie, an officer of the Bellaire Police Department entered several license plate numbers to find the combination that would generate a report of a stolen car that would provide cover to the defendants.

97.     At a Bellaire City Council meeting several days after Robbie was shot, and while the Tolan family and many friends and relatives were in attendance, Bellaire City Manager Bernard Satterwhite stated that everyone should wait until the investigation is complete before making any judgments; but his tone and his words did not conceal his contempt for the public statements made on behalf of the Tolan family and he sent a not-so-veiled message that Cotton was his friend and that he had reached the conclusion that any allegations of racism or misconduct in connection with this incident were not to be believed.  Satterwhite, who is white, made it clear that only he could decide to take any action against Cotton or any other member of the police department.  He sent a clear message that he intended to make sure that it was business as usual in Bellaire.

### D.  The Antecedents of the Shooting

98.     The Bellaire Police Department's history, pattern, custom, and practice of racial profiling, false arrests and detention, and racial harassment has been known by the greater community for years.  The City has received complaints and has done nothing to prevent this conduct, resulting in a de facto racial profiling and discrimination policy.

99.     The Bellaire Police Department's written racial profiling policy is inadequate.  One of the stated purposes of the written policy is to protect the police officers from racial profiling accusations.  The City of Bellaire and the BPD require that complainants make a trip to the Bellaire

Police Station, which discourages any citizen from making a complaint.  There is no procedure as to whom within the department conducts the investigation, leaving open the possibility that an officer will investigate his own conduct or an officer will be investigating the conduct of one of his co-workers.

100.    There is no racial data collected if no citation is issued, leaving open the possibility that police officers can stop, detain, question, and harass minorities without giving a citation and thereby creating no data to track the police officers' activities.  Pedestrian and traffic stops are only logged by the police officers if the audio-visual equipment in their police cars and motorcycles are inoperable at the beginning of their shift.

101.    This inadequate written racial profiling policy has resulted in the intrusion into the lives of the citizens of Bellaire and other Houston area communities, and it and the de facto policy led to the stopping and questioning of Robbie Tolan and Anthony Cooper at gunpoint which in turn created the situation whereby Robbie was shot.

102.    Bellaire's written racial profiling policy–written for no reason other than to provide itself cover when sued–is weak and utterly ineffective.  To the extent that Bellaire denies racially profiling as a matter of policy, its policies, practices, customs, and procedures have created a de facto policy to racially profile and discriminate.

103.    The assault on the Tolan family which nearly took Robbie's life is the logical consequence of the Bellaire Police Department's odious and illegal pattern, practice, custom, and de facto policy of harassing minorities, treating minorities as second-class citizens, stopping minorities without cause, arresting minorities without cause, detaining, searching, and seizing minorities without cause, using unreasonable and unjustifiable force on minorities, and

discriminating against minorities.

104.    The Bellaire Police Department's written policy on use of force is not the de facto policy of the Bellaire Police Department.  The de facto policy is that which Officer Edwards employed when he decided to follow and approach Robbie Tolan and Anthony Cooper for no reason other than they were driving through Bellaire late at night and are African-American.

105.    Bellaire's de facto policy was also observed by Edwards when he approached Robbie and Anthony without announcing or identifying himself as a police officer with his gun drawn and flashlight in their faces.  The Bellaire Police Department has a pattern, practice, history, and custom of using excessive force against minorities, including approaching them with guns drawn when there is no justifiable reason to do so.

106.    The Bellaire Police Department did not provide adequate training to Cotton and Edwards in the use of deadly force and the use of nondeadly force.

107.    The Bellaire Police Department did not provide adequate training to Cotton and Edwards on proper arrest and confrontation techniques.

108.    The Bellaire Police Department did not provide adequate training to Cotton and Edwards on appropriate methods and techniques to control situations similar to the one created by Edwards and Cotton in the Tolans' front yard on December 31, 2008.

109.    The defendants knew or should have known that the training was inadequate or nonexistent.

110.    Texas law requires a peace officer to demonstrate weapons proficiency at least annually.  The City of Bellaire has utterly failed to comply with this critical training requirement. The last time Bellaire required Sergeant Cotton to demonstrate weapons proficiency was more than

ten years prior to his attempt to kill Robbie Tolan.

111.    African-American residents and homeowners in Bellaire have experienced being pulled over by police officers who use various pretexts for detaining them: Their inspection stickers were expired (when they were not), lights above their license plates were out (when they were not), or that they were not wearing seat belts (when they were).

112.    An unidentified former civilian employee of the Bellaire Police Department reports frequently hearing officers of the BPD begin their shifts by saying they would "get ten niggers today," or "ten Mexicans today."  When suspects were brought to the station, this former employee said that they were arrested for being "NIB" (nigger in Bellaire) or "MIB" (Mexican in Bellaire).

113.    Numerous citizens have come forward to report incidences involving harassment of, threats against, wrongful arrest of, and illegal detention of minorities in Bellaire.  Bellaire police officers have a pattern, practice, and custom of approaching any African-American male found within the city limits and asking them some variation of, "What are you doing here?"

114.    Just this past December, a Bellaire police officer approached a African-American citizen at his home in Bellaire who was on his roof putting up his Christmas lights.  The officer asked the resident whether the "owner" knew what he was doing.

115.    An African-American doctor who lives in Bellaire drives a BMW.  He was pulled over so many times without cause by the BPD that he complained and had a meeting with policy-making officers of the BPD.  At that meeting, the doctor complained about his harassment at the hands of the BPD.  The officer of the BPD promised that it would stop and it did, proving that Bellaire's harassment and profiling of minorities is its de facto policy and is within its control.

116.    African-Americans and Hispanics have been arrested by Bellaire police officers

-14-

claiming that there were warrants issued for their arrest, only to be released the next morning and given the explanation that the BPD had made a "mistake."  One of those falsely arrested and forced to spend the night in jail was professional baseball player Jose Cruz, Jr.

117.    Finally, within the last five years and at night, an officer of the BPD pulled over an African-American resident of Bellaire.  The resident, a African-American man of some prominence, had recently been the subject of positive media attention for charity work he had done.  The African-American resident had been driving along Evergreen Street, a major Bellaire thoroughfare.  The resident pulled over on a less-traveled side street.  The BPD officer approached the resident, who remained in his car with his window rolled down.  The BPD officer's badge number and nameplate were covered with black tape.  The officer was carrying a publication featuring a photo of the resident.  The officer said to the resident, "You may think you're hot shit, but you're still just a nigger to us and we're watching you."  At that point, the officer threw the publication into the resident's car, returned to his car and drove off.  Terrified, the African-American man moved out of Bellaire shortly thereafter.

118.    It is believed that the Bellaire Police Department falsifies, destroys, or fails to keep records regarding citations, police stops, arrests, and charges in order to cover up its racist de facto policies.

119.    Officer Cotton has been indicted for his assault on Robbie.

**First Cause of Action**

**Assault**
**(All Plaintiffs and All Defendants)**[1]

120.     Plaintiffs adopt and reassert paragraphs 1 through 118 above as if fully set out herein.

121.     By shooting and attempting to kill Robbie Tolan and manhandling Marian Tolan, Sergeant Cotton committed assault against the plaintiffs.

122.     As a result of the assault on Robbie, Robbie has suffered severe physical injury–namely, Sergeant Cotton's bullet penetrated Robbie's chest and traveled through his torso, piercing a lung and his liver and cracking his ribs.  The bullet remains lodged in his body.  Robbie's physical condition has been severely affected.  Robbie was a professional athlete and is now unable to play baseball.  The gunshot has caused him excruciating pain.

123.     Marian Tolan suffered bruises on her arm as a result of Sergeant Cotton's illegal use of force against her.

124.     Officers Edwards and Cotton pointed guns at Anthony Cooper, Bobby Tolan, Robbie Tolan and Marian Tolan, threatening their lives. That threat was made without justification.

**Second Cause of Action**
**Battery**
**(Robbie Tolan and Marian Tolan and All Defendants)**

125.     Plaintiffs adopt and reassert paragraphs 1 through 118 above as if fully set out herein.

126.     By shooting and attempting to kill Robbie Tolan and manhandling Marian Tolan, Sergeant Cotton committed battery against the plaintiffs.

127.     As a result of the battery on Robbie, Robbie has suffered severe physical injury – namely, Sergeant Cotton's bullet penetrated Robbie's chest and traveled through his torso, piercing

---

[1]For clarity, the specific plaintiffs asserting particular causes of action and the defendants against whom they are made are identified parenthetically.

a lung and his liver and cracking his ribs.  The bullet remains lodged in his body.  Robbie's physical

condition has been severely affected.  Robbie was a professional athlete and is now unable to play

baseball.  The gunshot has caused him excruciating pain.

128.    Marian Tolan suffered bruises on her arm as a result of Sergeant Cotton's illegal use

of force against her.

### Third Cause of Action
### Bystander Injury
### (Marian Tolan and Anthony Cooper and All Defendants)

129.    Plaintiffs adopt and reassert paragraphs 1 through 118 above as if fully set out herein.

130.    Marian Tolan was within Sergeant Cotton's line of fire when he shot Robbie Tolan.

Marian Tolan, Robbie's mother, might have been struck by the bullet herself.  She watched her son

absorb Sergeant Cotton's gunshot.  As one might expect when a mother watches her only child shot

by a police officer, Marian Tolan has suffered severe emotional distress as a result.

131.    Anthony Cooper, who is a close relative and is more like a brother than a cousin to

Robbie, was laying next to Robbie Tolan when he was shot.  He too witnessed Robbie's shooting

and might have been shot himself.  Anthony Cooper has suffered severe emotional distress as a

result.

### Fourth Cause of Action
### False Arrest/Illegal Detention/False Imprisonment
### (All Plaintiffs and All Defendants)

132.    Plaintiffs adopt and reassert paragraphs 1 through 118 above as if fully set out herein.

133.    The plaintiffs were illegally seized and detained by the defendants.

134.    The defendants arrested, seized, and detained the plaintiffs in violation of clearly

established law and constitutional protections.

135.    The defendants' detention of and assault upon the plaintiffs were discriminatory in nature and were motivated by a discriminatory purpose.  More specifically, although the Bellaire Police Department has been called to the homes of innocent white citizens and peacefully resolved late-night confusion, the Tolans were treated differently–and far more harshly–because they are African-Americans.  None of the Tolans committed any act or did any thing which could reasonably justify their stop, seizure, detention, and imprisonment.

136.    The assault on the Tolans is the logical consequence of the City of Bellaire and the Bellaire Police Department's policy of racially profiling and discriminating against those traveling through Bellaire and those of non-white heritage who live and/or work there.

**Fifth Cause of Action**
**Excessive Force in Violation of the Fourth Amendment**
**(All Plaintiffs and All Defendants)**

137.    Plaintiffs adopt and reassert paragraphs 1 through 118 above as if fully set out herein.

138.    The defendants, acting under color of law and in concert with one another, unlawfully arrested, assaulted, used force against, seized, and detained the plaintiffs without probable cause, or reasonable suspicion that any violation or crime had been committed.  Those actions violate the plaintiffs' rights to due process, to equal protection, give rise to plaintiffs' claims pursuant to the Fourth Amendment applicable to the State's by the Fourteenth Amendment to the Constitution of the United States and 42. U.S.C. § 1983, and their counterparts in the Texas Constitution.

139.    The defendants violated Robbie Tolan's, Anthony Cooper's, Marian Tolan's, and Bobby Tolan's constitutional rights.  Those rights–to due process, equal protection, and to not be racially profiled, to be free from excessive force, and not to be detained without probable cause or reasonable suspicion, among others–were clearly established at the time of the shooting.

140.    Nothing Robbie Tolan or any of the other plaintiffs did posed an immediate threat to the safety of the defendants or others.  The plaintiffs were not actively resisting arrest or attempting to evade arrest by flight.  Officers Cotton and Edwards' conduct was objectively unreasonable, resulted from their lack of training, and comported with Bellaire's illegal de facto policies.

141.    Robbie Tolan presented no physical threat to either Sergeant Cotton or the public.

142.    Edwards' advance on Robbie Tolan and Anthony Cooper with no identification of himself as a police officer, with his gun drawn and flashlight in their eyes, was an unnecessary use of force that escalated the incident from the beginning.  The defendants' command that Robbie Tolan and Anthony Cooper get on the ground and that Bobby Tolan – in his pajamas – stand spread eagle against his car at gunpoint, constitute excessive force by Edwards and Cotton and are the natural result of the de facto policies of the defendants to discriminate against and mistreat minorities.  Marian Tolan attempted to explain to Officers Cotton and Edwards that the car being driven by Robbie Tolan was not stolen.  It was nearly two o'clock in the morning.  Marian Tolan and Bobby Tolan came outside their home in pajamas.  Robbie Tolan and Anthony Cooper were at the front door.  Marian Tolan told Officers Edwards and Cotton that the home they had just exited in their pajamas was theirs, that they had lived there fifteen years, that Robbie was their son and Anthony their nephew, that their purported suspicion about Robbie's car being stolen was flatly wrong.  In response, Officer Cotton grabbed Marian Tolan by the arm and threw her against her garage door.

143.    As a result, Marian Tolan suffered an injury which resulted directly and only from the use of force that was clearly excessive to the need (especially since there was no need at all), and

the force used was objectively unreasonable. The use of force violated clearly established law.

144.    Upon hearing the assault on his mother, Robbie, who was laying face-down on the porch as instructed, turned and told Cotton to stop hurting his mother.  In response to this non-threatening action, Cotton said nothing and drew his weapon and fired on Robbie, striking him in the chest.

145.    As a result, Robbie Tolan suffered an injury which resulted directly and only from the use of force that was clearly excessive to the need (again, since there was no need at all), and the force used was objectively unreasonable and violation of clearly established law.

146.    As described above, Robbie Tolan's "crime" was to turn his body while detained on the ground and to tell Sergeant Cotton to unhand his mother.  Robbie Tolan was fifteen to twenty feet away from Sergeant Cotton at the time.

147.    Robbie Tolan did nothing which could have placed a reasonable officer in fear for his life or the life of anyone else.  The force used was clearly excessive to the need and was objectively unreasonable and violated clearly established law.

148.    Having sustained a bullet wound to the chest, Robbie Tolan has suffered an injury.

149.    Having been assaulted, Marian Tolan has sustained an injury.

150.    Having been falsely detained and denied the right to know whether their loved one was dead or alive, Anthony Cooper, Marian Tolan, and Bobby Tolan have suffered injury.

151.    The City of Bellaire and the Bellaire Police Department failed to adequately train and failed to reprimand both Officer Cotton and Officer Edwards.

152.    In the case of Sergeant Cotton, the City of Bellaire and the Bellaire Police Department failed to renew his firearms training for at least ten years, despite the requirement that

it be done annually.

153.    In addition, as all defendants are aware and for which they are all liable, Sergeant Cotton should never have been hired as an officer in the first place.

154.    From the time of his hiring by Bellaire, Officer Cotton was ineligible to serve as a peace officer in the State of Texas.

155.    Despite his ineligibility to serve as a peace officer, the defendants not only hired and retained Officer Cotton for ten years, he was promoted to Sergeant.

156.    Officer Cotton has previously been found by the City of Bellaire and the Bellaire Police Department to have lied to investigators during the course of an investigation into a car accident in which he was involved.  Cotton was nevertheless permitted to remain an officer of the Bellaire Police Department.

157.    Officer Cotton's lack of training led to the assault on the Tolan family.

158.    The City of Bellaire and the Bellaire Police Department engage in unconstitutional racial profiling and discrimination as a matter of policy.  Mayor Siegel, City Manager Satterwhite, Chief Mack, and Assistant Chief Holloway are responsible for Bellaire's policy of racially profiling and discriminating against nonwhites.

159.    Following the shooting of Robbie Tolan, the City of Bellaire commissioned an independent report detailing the racial makeup of those stopped while driving in Bellaire.  The report showed that a majority of those stopped by the Bellaire Police Department were minorities. At a meeting of the Bellaire City Council at which the report was presented by its author, members of the City Council, all of whom are white, the Mayor, who is white, and City Manager posed self-serving questions intended to lead the author to conclude that racial profiling does not take place in

the city.  The author of the report declined to reach that conclusion.

160.    City officials' questions to the author of the racial profiling report–which were solely intended to lead the author to exonerate the city–further evidence the city's knowledge of its policy of racial profiling and evidence a desire to conceal it, even in the face of overwhelming evidence.

161.    African-Americans are twelve times more likely to be stopped by the Bellaire Police Department than whites.

162.    Bellaire is nearly ninety percent white.

163.    The majority of those stopped while driving in Bellaire are nonwhites.

164.    The defendants–all of them–are aware of and have to varying degrees formulated and implemented Bellaire's illegal policy of racial profiling.  African-Americans, Hispanics, and other people of minority descent have been targeted by Bellaire's discriminatory policy.  It is this policy which led to the assault on the Tolan family.

165.    Officer Edwards lacked reasonable suspicion that any violation or crime had been committed in order to stop Robbie Tolan and Anthony Cooper.

166.    The car in which Robbie Tolan and Anthony Cooper were driving was not stolen.

167.    Officer Edwards had no reason to believe that it was stolen.

168.    Robbie Tolan and Anthony Cooper were followed and stopped by Officer Edwards because they are African-Americans driving on the public roads of Bellaire.

**Sixth Cause of Action**
**Civil Rights Violation–Fourteenth Amendment**
**(All Plaintiffs and All Defendants)**

169.    Plaintiffs adopt and reassert paragraphs 1 through 118 above as if fully set out herein.

170.    Defendants, acting under color of law and in concert with one another, unlawfully

stopped, seized, and searched plaintiffs without reasonable suspicion that any violation or crime had been committed or was likely to be committed, in violation of the Fourth Amendment guarantee against unreasonable searches and seizures. The nature of the assault on the plaintiffs was objectionally unreasonable. Those actions, which violate the plaintiffs' rights to due process and equal protection, give rise to plaintiffs' claim pursuant to the Fourth Amendment applicable to the states by the Fourteenth Amendment to the Constitution of the United States, and 42 U.S.C. § 1983, and their counterparts in the Texas Constitution.

171.     Defendants' acts were the direct and proximate cause of injury to the plaintiffs. They were intentional and wilful in violation of the plaintiffs' legal and constitutional rights, without good faith, and with reckless disregard and callous indifference to plaintiffs' civil rights.

172.     The defendants, acting under color of law and in concert with one another, unlawfully arrested, assaulted, and detained the plaintiffs without probable cause.

173.     The defendants violated Robbie Tolan's, Anthony Cooper's, Marian Tolan's, and Bobby Tolan's constitutional rights. Those rights–to due process, to equal protection, to not be racially profiled, to be free from excessive force and not to be detained without probable cause or reasonable suspicion, among others–were clearly established at the time of the shooting.

174.     Nothing Robbie Tolan or any of the other plaintiffs did posed an immediate threat to the safety of the defendants or others. None of the plaintiffs were actively resisting arrest or attempting to evade arrest by flight. Officers Cotton and Edwards conduct was objectively unreasonable, but was a result of their lack of training and in compliance with Bellaire's illegal de facto policies, and its failure to reprimand.

175.     Robbie Tolan presented no physical threat to either Sergeant Cotton or the public.

176.     As described above, Robbie Tolan's "crime" was to turn his body while detained on the ground and to tell Sergeant Cotton to unhand his mother.  Robbie Tolan was fifteen to twenty feet away from Sergeant Cotton at the time.

177.     Robbie Tolan did nothing which could have placed a reasonable officer in fear for his life or the life of anyone else.  The force used was clearly excessive to the need, was objectively unreasonable and violated clearly established law.

178.     Having sustained a bullet wound to the chest, Robbie Tolan has suffered an injury.

179.     Having been assaulted, Marian Tolan has sustained an injury.

180.     Having been falsely detained and denied the right to know whether their loved one was dead or alive, Anthony Cooper, Marian Tolan, and Bobby Tolan have suffered injury.

181.     The City of Bellaire and the Bellaire Police Department failed to adequately train and reprimand both Officer Cotton and Officer Edwards.

182.     In the case of Sergeant Cotton, the City of Bellaire and the Bellaire Police Department failed to renew his firearms training for at least ten years, despite the requirement that it be done annually.

183.     In addition, as all defendants are aware and for which they are all liable, Sergeant Cotton should never have been hired as an officer in the first place.

184.     From the time of his hiring by Bellaire, Officer Cotton was ineligible to serve as a peace officer in the state of Texas.

185.     Despite his ineligibility to serve as a peace officer, the defendants not only hired and retained Officer Cotton for ten years, he was promoted to Sergeant.

186.     Officer Cotton has previously been found by the City of Bellaire and the Bellaire

Police Department to have lied to investigators during the course of an investigation into a car accident in which he was involved. Cotton was nevertheless permitted to remain an officer of the Bellaire Police Department.

187.    Officer Cotton's lack of training led to the assault on the Tolan family.

188.    The City of Bellaire and the Bellaire Police Department engage in unconstitutional racial profiling and discrimination as a matter of de facto policy. Mayor Siegel, City Manager Satterwhite, Chief Mack, and Assistant Chief Holloway are responsible for Bellaire's de facto policy of racially profiling and discriminating against nonwhites.

189.    Following the shooting of Robbie Tolan, the City of Bellaire commissioned an independent report detailing the racial makeup of those stopped while driving in Bellaire. The report showed that a majority of those stopped by the Bellaire Police Department were minorities. At a meeting of the Bellaire City Council at which the report was presented by its author, members of the City Council, the Mayor, and City Manager posed self-serving questions intended to lead the author to conclude that racial profiling does not take place in the city. The author of the report declined to reach that conclusion.

190.    City officials' questions to the author of the racial profiling report–which were solely intended to lead the author to exonerate the city–further evidence the city's knowledge of its policy of racial profiling and evidence a desire to conceal it, even in the face of overwhelming evidence.

191.    African-Americans are twelve times more likely to be stopped by the Bellaire Police Department than whites.

192.    Bellaire is nearly ninety percent white.

193.    The majority of those stopped while driving in Bellaire are nonwhites.

194.     The defendants–all of them–are aware of and have to varying degrees formulated and implemented Bellaire's illegal policy of racial profiling.  African-Americans, Hispanics, and other people of minority descent have been targeted by Bellaire's discriminatory de facto policy.  It is this de facto policy which led to the assault on the Tolan family.

195.     Officer Edwards lacked probable cause or reasonable suspicion that a violation or crime had been committed to stop Robbie Tolan and Anthony Cooper.

196.     The car in which Robbie Tolan and Anthony Cooper were driving was not stolen.

197.     Officer Edwards had no reason to believe that it was stolen.

198.     Robbie Tolan and Anthony Cooper were followed and stopped by Officer Edwards because they are African-Americans driving on the public roads of Bellaire.

**Seventh Cause of Action**
**Negligence**
**(All Plaintiffs and All Defendants)**

199.     Plaintiffs adopt and reassert paragraphs 1 through 118 above as if fully set out herein.

200.     The City of Bellaire negligently hired, retained, and promoted Sergeant Cotton inasmuch as he is not qualified to be a peace officer in Texas.

**Eighth Cause of Action**
**Intentional Infliction of Emotional Distress**
**(All Plaintiffs and All Defendants)**

201.     Plaintiffs adopt and reassert paragraphs 1 through 118 above as if fully set out herein.

202.     After attempting to kill Robbie Tolan, and after Robbie had been taken by ambulance to Ben Taub Hospital, officers of the Bellaire Police Department placed Anthony Cooper, Marian Tolan, and Bobby Tolan in separate police vehicles parked in front of the Tolans' home.

203.     Neither Anthony Cooper, Marian Tolan nor Bobby Tolan were permitted to

-26-

accompany Robbie to the hospital.

204.    Despite repeated requests, none of the officers of the Bellaire Police Department on scene would advise Anthony, Marian or Bobby whether Robbie was dead or alive.

205.    Marian Tolan prayed loudly while in the back seat of a Bellaire Police Department vehicle.

206.    A female officer of the Bellaire Police Department told Marian to be quiet.  Marian responded that she was praying for her son's life.  The officer responded by telling Marian to "keep it down."  As a result of watching her son's shooting, being detained by the Bellaire Police Department without cause, the department's refusal to tell her whether her son was dead or alive, and her admonishment to shut up while praying for her son, Marian Tolan has suffered severe emotional distress.

207.    Bobby Tolan had also done nothing illegal and given the Bellaire Police Department no reasonable suspicion to believe that he had.  Nevertheless, Bobby was held hostage by the Bellaire Police Department, whose officers refused to divulge to him whether his only child was dead or alive.  While sitting in the car, Bobby heard a police dispatcher say over the radio that "the car isn't stolen."  Bobby has suffered severe emotional distress as a result.

208.    Anthony Cooper was handcuffed in the back of one of the Bellaire Police Department vehicles.  He was the last person to be released by the Bellaire Police Department.  Upon his release, when he asked an officer of the Bellaire Police Department where everyone was, he was told that his family had left and that he – Anthony – was "all alone" with the group of people who had just attempted to kill his cousin.

209.    Sergeant Cotton has since admitted that while the Tolans were held captive and

unaware of whether Robbie was dead or alive, he–Cotton–received "updates" on Robbie's condition from a "detective on the scene."

### Jury Trial Demanded

210.    Plaintiffs demand trial by jury.

### Damages

211.    Following trial, plaintiffs request that they be awarded all actual, incidental, direct, consequential, economic, special, nominal, general, and emotional damages, costs of court, reasonable and necessary attorney's fees, and pre- and post-judgment interest.  The plaintiffs also seek punitive and exemplary damages against the defendants.

### Conclusion

212.    Robbie Tolan, Marian Tolan, Bobby Tolan, and Anthony Cooper respectfully request that the Court grant judgment for them against Jeffrey Wayne Cotton; John C. Edwards; Randall C. Mack, Chief of Police; Byron Holloway, Assistant Chief of Police; Cynthia Siegel, Mayor; Bernard Satterwhite, City Manager; The City of Bellaire; and the Bellaire Police Department for their damages, attorneys' fees, costs of court, pre- and post-judgment interest; and grant all other relief to which they may be justly entitled.

Respectfully submitted,


By:   /s/ Geoffrey Berg
         Geoffrey Berg
         Texas Bar No. 00793330
         David Berg
         Texas Bar No. 02187000
         BERG & ANDROPHY
         3704 Travis Street
         Houston, Texas 77002
         713.529.5622
         713.529.3785 - fax

         George R. Gibson
         Texas Bar No. 00793802
         Marvin Nathan
         Texas Bar No. 14817000
         NATHAN SOMMERS JACOBS,
         A Professional Corporation
         2800 Post Oak Boulevard, 61st Floor
         Houston, Texas 77056-6102
         713.960.0303
         713.892.4840 - fax

         ATTORNEYS FOR PLAINTIFFS