**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **ROBERT R. TOLAN, MARIAN TOLAN,** | § | |
| **BOBBY TOLAN, AND** | § | |
| **ANTHONY COOPER,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:09-1324** |
| | § | |
| **JEFFREY WAYNE COTTON;** | § | |
| **JOHN C. EDWARDS;** | § | |
| **RANDALL C. MACK, CHIEF OF** | § | |
| **POLICE; BYRON HOLLOWAY,** | § | |
| **ASSISTANT CHIEF OF POLICE;** | § | |
| **CYNTHIA SIEGEL, MAYOR;** | § | |
| **BERNARD SATTERWHITE, CITY** | § | |
| **MANAGER; THE CITY OF BELLAIRE;** | § | |
| **AND THE BELLAIRE POLICE** | § | |
| **DEPARTMENT,** | § | |
| | § | |
| **Defendants.** | § | **JURY TRIAL DEMANDED** |

**DEFENDANTS', EDWARDS AND COTTON, MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE JUDGE OF SAID COURT:

Defendants, Officer John Edwards and Sergeant Jeffrey Cotton, come now and file this

motion for summary judgment and they would respectfully show the Court as follows:

**BASIS FOR DISMISSAL**

1.     The Court should grant summary judgment in favor of Officer John Edwards and

Sergeant Jeffrey Cotton because the evidentiary record establishes that a jury could not

reasonably find that a Plaintiff was subjected to any constitutional deprivation or, even if so, that

Officer Edwards or Sergeant Cotton is not insulated from liability by their qualified immunity.

## TABLE OF CONTENTS

BASIS FOR DISMISSAL ............................................................................................ 1

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ..................................................................................... iii

TABLE OF EXHIBITS ............................................................................................ xiii

SUMMARY OF EVIDENTIARY RECORD ............................................................. 2

APPLICABLE MOTION STANDARDS .................................................................. 12

ARGUMENTS AND AUTHORITIES ..................................................................... 17

    I.     Officer Edwards and Sergeant Cotton are Entitled to Qualified Immunity .......... 17

        A.    There was No Unconstitutional Conduct ................................................ 18

            1.    There was No Violation of 14th Amendment Rights .................... 18

                    a.    Claims of Alleged Use of Excessive Force During an Investigative Detention or Arrest are not Cognizable Under the 14th Amendment ................................................ 19

                    b.    Claims of Alleged Unconstitutional Seizure During an Investigative Detention or Arrest are not Cognizable Under the 14th Amendment ................................................ 20

                    c.    There was No Denial of Equal Protection ......................... 20

            2.    There was No Violation of 4th Amendment Rights ...................... 23

                    a.    There was No Unconstitutional Detention ........................ 23

                          (1)    Reasonable Suspicion Existed to Briefly Detain the Plaintiffs to Investigate the Stolen Vehicle Report ................................................................. 25

                          (2)    Reasonable Suspicion Existed to Briefly Detain the Plaintiffs After the Shooting Occurred .......... 28

(3)    Officer Edwards and Sergeant Cotton Did Not Detain the Plaintiffs After the Shooting Occurred....................................................29

(4)    An Allegation of Use of Force Does Not Create a Separate Unconstitutional Detention Claim........30

b.    There was No Unconstitutional Use of Force...................30

(1)    Bobby Tolan was Not Subjected to Excessive Force ....................................................................30

(2)    Cooper was Not Subjected to Excessive Force......31

(3)    Marian Tolan was Not Subjected to Excessive Force ....................................................................31

(4)    Robbie Tolan was Not Subjected to Excessive Force ....................................................................35

B.    Officer Edwards and Sergeant Cotton's Conduct was Objectively Reasonable ................................................................................52

1.    Officer Edwards and Sergeant Cotton Did Not Deprive any Plaintiff of a Clearly Established Right ...........................54

a.    Plaintiffs Cannot Identify a Clearly Established Right they Claim Either Officer Violated........................54

b.    Officer Edwards and Sergeant Cotton Followed Applicable Training Standards ...........................................56

c.    Officer Edwards and Sergeant Cotton Followed Applicable Legal Standards ................................................57

d.    Plaintiffs Actions Were Unlawful......................................58

2.    An Officer Could Reasonably Have Believed that Officer Edwards' And Sergeant Cotton's Conduct was Lawful ...............................59

II.    Plaintiffs' Claims Against Officer Edwards and Sergeant Cotton in their *Official Capacity* are Duplicative and Should be Dismissed...............................60

CONCLUSION AND PRAYER ....................................................................61

CERTIFICATE OF SERVICE ........................................................................68

# TABLE OF AUTHORITIES

## Federal Cases

*Albright v. Oliver,*
    510 U.S. 266, 272, 114 S. Ct. 807, 812 (1994)................................................ 21

*Allen v. Thomas,*
    388 F.3d 147, 149 (5th Cir. 2004) ..................................................................... 22

*Anderson v. Creighton,*
    483 U.S. 635, 641, 107 S. Ct. 3034, 3039-40 (1987) ......................... 37, 54, 58

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 247-48, 106 S. Ct. 2505, 2512 (1986) ................................ 14, 15

*Anderson v. Pasadena Independent School District,*
    184 F.3d 439, 443 (5th Cir. 1999) ..................................................................... 61

*Baker v. McCollan,*
    443 U.S. 137, 145, 99 S. Ct. 2689, 2695 n.3 (1979)........................................ 19

*Ballard v. Burton,*
    444 F.3d 391, 402-03 (5th Cir. 2006) ............................................................... 16

*Beck v. Texas State Board of Dental Exam'rs,*
    204 F.3d 629, 633 (5th Cir. 2000) ..................................................................... 15

*Bell v. Irwin,*
    321 F.3d 637, 639-40 (7th Cir. 2003) ............................................................... 52

*Bennet v. Pippin,*
    74 F.3d 578, 584 (5th Cir. 1996) ....................................................................... 62

*Blanford v. Sacramento County,*
    406 F.3d 1110, 1115-16 (9th Cir. 2005) ..................................................... 51, 52

*Boeing Co. v. Shipman,*
    411 F.2d 365, 375 (5th Cir. 1969), overruled on other grounds by *Gautreaux v. Scurlock Marine Inc.*, 107 F.3d 331, 339 (5th Cir. 1997)................................................ 13

*Brousseau v. Haugen,*
    543 U.S. 194, 125 S. Ct. 596 (2004).............................................. 53, 54, 56, 60

*Brown v Nations Bank Corp.,*
    188 F.3d 579, 591 (5th Cir. 1999) ..................................................................... 20

*Bryan v. City of Madison,*
    213 F.3d 267, 276 (5th Cir. 2000) .................................................. 22, 23, 24

*Burns-Toole v. Byrne,*
    11 F.3d 1270, 1274 (5th Cir. 1994) ................................................... 15

*Cady v. Dombrowski,*
    413 U.S. 433, 447, 93 S. Ct. 2523, 2531 (1973) ................................... 52

*Champagne v. Jefferson Parish Sheriff's Office,*
    188 F.3d 312, 314 (5th Cir. 1999) ..................................................... 30

*Chavez v. Illinois State Police,*
    251 F.3d 612, 635-36 (7th Cir. 2001) ................................................. 22

*Checki v. Webb,*
    785 F.2d 534, 538 (5th Cir. 1986) ..................................................... 37

*Cole v. Bone,*
    993 F.2d 1328, 1333 (8th Cir. 1993) .................................................. 24

*Collier v. Montgomery,*
    569 F.3d 214, 219 (5th Cir. 2009) ................................................. 36, 53

*Collins v. Harker Heights,*
    503 U.S. 115, 129, 112 S. Ct. 1061, 1071 (1992) .............................. 19, 21

*Conn v. Gabbert,*
    526 U.S. 286, 293, 119 S. Ct. 1292, 1296 (1999) .................................. 20

*County of Sacramento v. Lewis,*
    523 U.S. 833, 842, 118 S. Ct. 1708, 1714 n.5 (1998) .......................... 19, 37

*Cronn v. Buffington,*
    150 F.3d 538, 544-45 (5th Cir. 1998) ................................................. 30

*Crumley v. City of St. Paul,*
    324 F.3d 1003, 1007-08 (8th Cir. 2003) .............................................. 32

*Daniels v. Williams,*
    474 U.S. 327, 106 S. Ct. 662 (1986) .................................................. 36

*Davidson v. Cannon,*
    474 U.S. 344, 106 S. Ct. 668 (1986) .................................................. 36

*DeShaney v. Winnebago County Department of Social Services,*
  489 U.S. 189, 196, 109 S. Ct. 998, 1003 (1989) ........................................................ 19

*Dunn v. Denk,*
  79 F.3d 401, 403 (5th Cir. 1996) ......................................................................... 32

*Edwards v. Woods,*
  51 F.3d 577, 580 (5th Cir. 1995) ......................................................................... 22

*Eversley v. Mbank,*
  843 F.2d 172, 173-174 (5th Cir. 1988) ............................................................... 13

*Felton v. Polles,*
  315 F.3d 470, 477 (5th Cir. 2002) ....................................................................... 54

*Flores v. Cameron County,*
  92 F.3d 258, 261 (5th Cir. 1996) ......................................................................... 62

*Flores v. City of Palacios,*
  381 F.3d 391, 403 (5th Cir. 2004) ....................................................................... 31

*Fraire v. City of Arlington,*
  957 F.2d 1268, 1273 (5th Cir. 1992) ............................................................. 13, 48

*Freeman v. Gore,*
  483 F.3d 404, 411 (5th Cir. 2007) ....................................................................... 32

*Gardenshire v. Schubert,*
  205 F.3d 303, 319 (6th Cir. 2000) ....................................................................... 22

*Garner v. Memphis Police Department,*
  8 F.3d 358, 365 (6th Cir. 1993) ........................................................................... 53

*Gibson v. Rich,*
  44 F.3d 276, 277-78 n.7 (5th Cir. 1995) ............................................................. 13

*Glenn v. City of Tyler,*
  242 F.3d 307, 314 (5th Cir. 2001) ................................................................. 32, 54

*Goodson v. City of Corpus Christi,*
  202 F.3d 730, 736 (5th Cir. 2000) ....................................................................... 24

*Graham v. Connor,*
  490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989) .............................................. 39

*Hafer v. Melo*,
    502 U.S. 21, 25, 112 S. Ct. 358, 361 (1991)............................................................. 62

*Hannula v. City of Lakewood*,
    907 F.2d 129, 132 n.3 (10th Cir. 1990) ................................................................. 32

*Hare v. City of Corinth*,
    135 F.3d 320, 326 (5th Cir. 1998) ....................................................................... 54

*Harlow v. Fitzgerald*,
    457 U.S. 800, 817-18, 102 S. Ct. 2727, 2738 (1982) .............................................. 18, 55

*Hathaway v. Bazany*,
    507 F.3d 312, 320 (5th Cir. 2007) ...................................................................... 50, 58

*Herrera v. Millsap*,
    862 F.2d 1157, 1160 (5th Cir. 1989) ..................................................................... 37

*Hill v. Carroll County*,
    587 F.3d 230, 237 (5th Cir. 2009) ....................................................................... 33

*Illinois v. Lafayette*,
    462 U.S. 640, 647, 103 S. Ct. 2605, 2610 (1983)..................................................... 52

*Illinois v. Lidster*,
    540 U.S. 419, 426-27, 124 S. Ct. 885 (2004) .......................................................... 30

*International Shortstop, Inc. v. Rally's, Inc.*,
    939 F.2d 1257, 1263 (5th Cir. 1991) ..................................................................... 14

*Jewett v Anders*,
    521.F.3d 818, 823-27 (7th Cir. 2008) ...............................................................25, 35

*Johnson v. Glick*,
    481 F.2d 1028, 1033, cert. denied, 414 U.S. 1033, 94 S. Ct. 462 (1973)....................... 33

*Johnson v. Morel*,
    876 F.2d 477, 479-80 (5th Cir. 1989) (en banc) ..................................................... 36

*Johnson v. Rodriguez*,
    110 F.3d 299, 311 (5th Cir. 1997) ....................................................................... 22

*Jones v. City of Jackson*,
    203 F.3d 875, 880 (5th Cir. 2000) ....................................................................... 24

*Jones v. Greninger,*
    188 F.3d 322, 325 (5th Cir. 1999) ................................................................ 22

*Kentucky v. Graham,*
    473 U.S. 159, 167, 105 S. Ct. 3099, 3106 (1985) ......................................... 62

*Kipps v. Caillier,*
    197 F.3d 765, 768 (5th Cir.), cert. denied, 531 U.S. 816 (2000) ..................... 18

*Lewis v. City of West Palm Beach,*
    561 F.3d 1288, 1292 (11th Cir. 2009) .......................................................... 54

*Linbrugger v. Abercia,*
    363 F.3d 537, 542-43 (5th Cir. 2004) ............................................... 16, 17, 39

*Little v. Liquid Air Corp.,*
    37 F.3d 1069, 1075 (5th Cir. 1994) .............................................................. 14

*Lockett v. New Orleans City,*
    607 F.3d 992 (5th Cir. 2010) ....................................................................... 38

*Longoria v. Texas,*
    473 F.3d 586, 593 (5th Cir. 2006) ............................................................... 32

*Mace v. City of Palestine,*
    333 F.3d 621, 622-23 (5th Cir. 2003) .......................................................... 51

*Malley v Briggs,*
    475 U.S. 335, 341, 106 S. Ct. 1092, 1096 (1986) ......................................... 60

*Mangieri v. Clifton,*
    29 F.3d 1012, 1017 (5th Cir. 1994) .............................................................. 40

*Manis v. Lawson,*
    585 F.3d 839, 844 (5th Cir. 2009) ......................................................... 49, 58

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
    475 U.S. 574, 106 S. Ct. 1348 (1986) .......................................................... 12

*McClendon v. City of Columbia,*
    305 F.3d 314, 323 (5th Cir. 2002) ............................................................... 18

*McCoy v. City of Monticello,*
    342 F.3d 842, 847 (8th Cir. 2003) ............................................................... 36

*McKee v. City of Rockwall*,
    877 F.2d 409, 413 (5th Cir. 1989) ................................................................. 23

*Meadours v. Ermel*,
    483 F.3d 417, 422 (5th Cir. 2007) ................................................................. 32

*Medina v. Cram*,
    252 F.3d 1124, 1128 (10th Cir. 2001) .......................................................... 16

*Mendenhall v. Riser*,
    213 F.3d 226, 230 (5th Cir. 2000) ..................................................... 55, 58, 60

*Monell v. New York City Department of Social Services*,
    436 U.S. 658, 690, 98 S. Ct. 2018, 2035 n. 55 (1978)................................. 62

*Montoute v. Carr*,
    114 F.3d 181, 184 (11th Cir. 1997) ............................................................... 60

*Mouille v. City of Live Oak*,
    977 F.2d 924, 928 (5th Cir. 1993) ..................................................... 25, 26, 30

*Muehler v. Mena*,
    544 U.S. 93, 108, 125 S. Ct. 1465, 1476 (2005)........................................... 16

*Murphy v. Kellar*,
    950 F.2d 290, 292 (5th Cir. 1992) ........................................................... 30, 31

*Neague v. Cynkar*,
    258 F.3d 504, 508 (6th Cir. 2001) ................................................................. 32

*Ontiveros v. City of Rosenberg*,
    564 F.3d 379, 382 (5th Cir. 2009) ................................... 31, 33, 37, 48, 58, 59

*Ornelas v. United States*,
    517 U.S. 690, 699-700, 116 S. Ct. 1657, 1663 (1996) .............................. 15, 39

*Outb v. Strauss*,
    11 F.3d 488, 492 (5th Cir.), *cert. denied*, 511 U.S. 1127 (1994)...................... 22

*Pfannstiel v. City of Marion*,
    918 F.2d 1178, 1183 (5th Cir. 1990) ............................................................. 25

*Piazza v. Mayne*,
    217 F.3d 239, 246 (5th Cir. 2000) ................................................................. 25

*Pierce v. Smith,*
    117 F.3d 866, 871 n.5 (5th Cir. 1997) ..................................................... 38, 54

*Reese v. Anderson,*
    926 F.2d 494, 500-01 (5th Cir. 1991) ................................................ 50, 51, 58

*Reeves v. Sanderson Plumbing Products, Inc.,*
    530 U.S. 133, 151, 120 S. Ct. 2097, 2110 (2000) ......................................... 13

*Roberts v. City of Shreveport,*
    397 F.3d 287, 292 (5th Cir. 2005) ................................................................ 30

*Rochin v. California,*
    342 U.S. 165, 172, 72 S. Ct. 205, 209-10 (1952) ........................................ 20

*Rolf v. City of San Antonio,*
    77 F.3d 823, 828 (5th Cir. 1996) ............................................................ 22, 23

*S.W.S. Erectors, Inc. v. Infax, Inc.,*
    72 F.3d 489, 494 (5th Cir. 1996) ................................................................ 13

*Salas v. Carpenter,*
    980 F.2d 299, 304-06 (5th Cir. 1992) ..................................................... 15, 55

*Sanchez v. Swyden,*
    139 F.3d 464, 466 (5th Cir. 1998) ................................................................ 58

*Saucier v. Katz,*
    533 U.S. 194, 121 S. Ct. 2151 (2001) ..................................................... 53, 54

*Scott v. Harris,*
    __ U.S. __, 127 S. Ct. 1776, 1779 (2007) ................................................... 13

*Sherrod v. Berry,*
    856 F.2d 802, 807 (7th Cir. 1988) ......................................................... 16, 44

*Shinn ex rel. Shinn v. College Station Independent School District,*
    96 F.3d 783, 786 (5th Cir.) *cert. denied,* 520 U.S. 1211 (1997) ...................... 38

*Simmons v. McElveen,*
    846 F.2d 357 (5th Cir. 1988) ....................................................................... 37

*Sorrenson v. Ferrie,*
    134 F.3d 325, 328 (5th Cir. 1998) ................................................................ 59

*Stroik v. Ponseti,*
  35 F.3d 155, 158 (5th Cir. 1994) ............................................................... 17, 39

*Stults  v. Conoco, Inc.,*
  76 F.3d 651, 656 (5th Cir. 1996) ............................................................... 12

*Swint v. Chambers County Commission,*
  514 U.S. 35, 42, 115 S. Ct. 1203, 1208 (1995)........................................ 18

*Tarver v. City of Edna,*
  410 F.3d 745, 751-52 (5th Cir. 2005) ....................................................... 32

*Tennessee v. Garner,*
  471 U.S. 1, 11-12, 105 S. Ct. 1694, 1701 (1985) ................................. 49, 53, 58

*Terry v. Ohio,*
  392 U.S. 1, 9, 88 S. Ct. 1868, 1873 (1968)........................................ 24, 26, 28

*Texas v. Brown,*
  460 U.S. 730, 742, 103 S. Ct. 1535 (1983)............................................... 25

*Turner v. Houma Municipal Fire and Police Civil Service Board,*
  229 F.3d 478, 483 (5th Cir. 2000) ............................................................. 62

*U.S. v Campbell,*
  178 F.3d 345, 349-50 (5th Cir. 1999) ....................................................... 25

*U.S. v. Banks,*
  540 U.S. 31, 39, 124 S. Ct. 521, 527 (2003)........................................ 16, 39

*U.S. v. Sanders,*
  994 F.2d 200, 210 (5th Cir. 1993) ............................................................. 25

*U.S. vs. Stewart,*
  388 F.3d 1079, 1084 (7th Cir. 2004) ........................................................ 29

*United States v. Armstrong,*
  517 U.S. 456, 465, 116 S. Ct. 1480, 1487 (1996)................................... 22

*United States v. De Leon,*
  930 F.2d 396, 398-400 (5th Cir. 1991) (en banc) .................................... 29

*United States v. Hensley,*
  469 U.S. 221, 235, 105 S. Ct. 675, 684 (1985)........................................ 25

*United States v. Ibarra-Sanchez,*
    199 F.3d 753, 759 n.5 (5th Cir. 1999) ............................................................ 25

*United States v. Michelletti,*
    13 F.3d 838, 840 (5th Cir. 1994) ..................................................................... 25

*United States v. Sharpe,*
    470 U.S. 675, 686-87, 105 S. Ct. 1568, 1575-76 (1985) ................................... 52

*Vance v. Nunnery,*
    137 F.3d 270, 274 (5th Cir. 1998) ................................................................... 60

*Walker v. City of Orem,*
    451 F.3d 1139, 1148 (10th Cir. 2006) ............................................................. 30

*Wallace v. Texas Tech Univ.,*
    80 F.3d 1042, 1048 (5th Cir. 1996) ................................................................. 13

*Washington v. Allstate Ins. Co.,*
    901 F.2d 1281, 1286 (5th Cir. 1990) ............................................................... 15

*Whatley v. Philo,*
    817 F.2d 19, 20 (5th Cir. 1987) ................................................................. 15, 55

*Will v. Michigan Department of State Police,*
    491 U.S. 58, 71, 109 S. Ct. 2304, 2312 (1989) ................................................ 61

*Wilson v. Layne,*
    526 U.S. 603, 615, 119 S. Ct. 1692, 1799 (1999) ............................................ 58

*Young v. City of Killeen,*
    775 F.2d 1349, 1353 (5th Cir. 1985) .................................................... 48, 58, 62

*Young v. Prince George's County,*
    355 F.3d 751, 755 (4th Cir. 2004) ................................................................... 32

## Federal Rules

Fed.R.Civ.P. 33 .................................................................................................... 57

Fed.R.Civ.P. 56(a) ............................................................................................... 12

Fed.R.Civ.P. 56(c) ......................................................................................... 13, 14

Fed.R.Civ.P. 56(e) ............................................................................................... 14

## TABLE OF EXHIBITS

EXHIBIT 1      Recording of Sgt. Cotton's statement made at the scene of the occurrence;

EXHIBIT 2      Relevant excerpts of Sgt. Cotton's deposition testimony;

EXHIBIT 3      Recording of Off. Edwards' statement made at the scene of the occurrence;

EXHIBIT 4      Relevant excerpts of Off. Edwards' deposition testimony;

EXHIBIT 5      Relevant excerpts of recording from Sgt. Cotton's police vehicle;

EXHIBIT 6      Relevant excerpts of recording from Off. Edwards' police vehicle;

EXHIBIT 7      Relevant excerpts of recording from Corp. Delk's police vehicle;

EXHIBIT 8      Relevant excerpts of recording from Off. Palmire's police vehicle;

EXHIBIT 9      Video recording depicting the scene of the occurrence;

EXHIBIT 10     Relevant photographs of the scene of the occurrence;

EXHIBIT 11     Relevant excerpts from Bellaire Police Dept. *Mobile Data Log Report*;

EXHIBIT 12     Bellaire Police Dept. *CAD Operations Report*;

EXHIBIT 13     Record of Texas Crime Information Center regarding stolen vehicle;

EXHIBIT 14     Diagrams of scene of occurrence;

EXHIBIT 15     Relevant excerpts of Robbie Tolan's deposition testimony;

EXHIBIT 16     Relevant excerpts of Anthony Cooper's deposition testimony;

EXHIBIT 17     Relevant excerpts of Marian Tolan's deposition testimony;

EXHIBIT 18     Relevant excerpts of Bobby Tolan's deposition testimony;

EXHIBIT 21     Anthony Cooper's responses to Officer Edwards' interrogatory nos. 3 & 5;

EXHIBIT 22     Robert Tolan's responses to Officer Edwards' interrogatory nos. 4 & 5;

EXHIBIT 23     Bobby Tolan's responses to Officer Edwards' interrogatory nos. 6 & 7;

EXHIBIT 24     Marian Tolan's responses to Officer Edwards' interrogatory no. 5;

EXHIBIT 25      Plaintiffs' response to Defendants' request for admission no. 19;

EXHIBIT 26      Relevant excerpts of Dr. William Lewinski's deposition testimony;

EXHIBIT 27      Declaration of Dr. William Lewinski;

EXHIBIT 28      Relevant excerpts of Albert Rodriguez's deposition testimony;

EXHIBIT 29      Declaration of Lieutenant Albert Rodriguez;

EXHIBIT 30      Verification of summary judgment evidence; and

EXHIBIT 31      Report and declaration of Corporal Chris Delk.

## SUMMARY OF EVIDENTIARY RECORD

2.      At approximately 1:50 a.m. on December 31, 2008, Officer John Edwards was on duty serving as a City of Bellaire police officer. *{Ex. 3; Ex. 4, p. 7, ll. 18-23; p. 9, ll. 18-21; p. 15, ll. 13-15; Ex. 6}.*  Officer Edwards was aware thieves had burglarized a dozen vehicles in Bellaire the night before and also that vandals had painted street gang graffiti on Bellaire shopping center buildings in the vicinity of the 5800 block of Bissonnet so he patrolled that area in his police vehicle. *{Ex. 2, p. 18, ll. 7-18; ll. 21-24; Ex. 3; Ex. 4, p. 15, ll. 20 - p. 16, ll. 12; p. 16, ll. 19-25; p. 17, ll. 14-16; p. 18, ll. 1-4; p. 18, ll. 16-p. 19, ll. 1, ll. 4-12; Ex. 6}.* The vehicle Officer Edwards was driving prominently displayed reflective tape, words identifying the vehicle as a police car and it was equipped with a spotlight, overhead emergency lights and a video recording system. *{Ex. 3; Ex. 6}.*

3.      As Officer Edwards drove out of the shopping center parking lot, he turned onto Evergreen Street and drove his vehicle in a direction that would allow him to remain in the City of Bellaire instead of turning the other direction which would have lead him out of Bellaire. *{Ex. 3; Ex. 4, p. 20, ll. 9-12, 17-23, p. 21, 21-24; Ex. 6}.*  While traveling eastbound along Evergreen, Officer Edwards saw a black Nissan Sports Utility Vehicle (SUV) traveling ahead of him on Evergreen Street and observed it make a turn onto Woodstock Street. *{Ex. 3; Ex. 4, p. 20, ll. 2-16, p. 21, ll. 21- p. 22, l. 4, p. 22, ll. 13-21}.*

4.      The manner in which the driver of the SUV executed the turn appeared abrupt to Officer Edwards and alerted his suspicion because he perceived the turn to suggest it may not have been planned by the driver until the vehicle was very near the intersection. *{Ex. 3; Ex. 4, p. 23, ll. 6-22; p. 75, ll. 13-18}.*  Such a turn could suggest the driver sought to avoid being followed by the police vehicle, that the driver was unfamiliar with the neighborhood, that the driver's ability to

operate his vehicle safely might be impaired, that the driver may have generally poor driving habits, that the driver may have been momentarily distracted or a number of other possibilities. Therefore, at approximately 1:51 a.m. Officer Edwards stopped his police vehicle at the intersection of Evergreen and Woodstock Street to continue to observe the vehicle's movements on Woodstock. *{Ex. 3; Ex. 4, p. 23, ll. 20 – p. 24, ll. 23; Ex. 6}.*  Officer Edwards was aware that Woodstock ends in a cul-de-sac that it is not open for through traffic and that the SUV would have to come back past him to exit Woodstock. *{Ex. 4, p. 22, ll. 18 – p. 23, ll. 4.}*

5.      Officer Edwards observed that the driver of the SUV parked on the west side of Woodstock and two males stepped out of the SUV. *{Ex. 3; Ex. 4, p. 25, ll. 18-25; p. 26, ll. 11-12}.*  Although Officer Edwards did not then know the identity of either of the two individuals, they were later identified as Robert "Robbie"[1] Ryan Tolan and Anthony Cooper. *{Ex. 15, p. 27, ll. 20-24}.*  As Robbie Tolan opened the door, he saw headlights reflecting on his door. *{Ex. 15, p. 27, ll. 20- 24; P's Complaint @ ¶ 25}.*  Robbie Tolan looked at Cooper and pointed out the police car but Cooper was distracted by his search through the passenger side of the vehicle for a misplaced wallet. *{Ex. 15, p. 28, l. 25 – p. 29, l. 3; p. 30, l. 25 – p. 31, l. 15;  Ex. 16, p. 40, ll. 1-9; P's Complaint @ ¶ 25}.*

6.      At the same time, Officer Edwards noted that Tolan and Cooper looked in the direction of the marked patrol car when each stepped out of the SUV. *{Ex. 3}.*  Officer Edwards also observed Robbie Tolan and Cooper remove several items from inside the SUV. *{Ex. 3; Ex. 4, p. 30, ll. 12-p. 31, ll. 10}.*  As he continued to observe the activity associated with the SUV and its occupants at approximately 1:52 a.m., Officer Edwards drove his patrol car slowly past the SUV and noted the license plate number of the SUV as he drove by. *{Ex. 4, p. 26, ll. 5 – 20 Ex. 6}.*

---

[1]      This individual's given name is Robert but he often goes by the nickname of Robbie Tolan. Accordingly, Defendants identify him as Robbie Tolan herein.

7.      Officer Edwards typed the Texas license plate number 696BGK into the police computer in his vehicle to run a routine check on the SUV.  *{Ex. 3}.*  Although he was not at all aware of it at the time, Officer Edwards erred when he entered the license plate number into the Mobile Data Terminal (MDT) police computer.  *{Ex. 4, p. 28, ll. 16-20, p. 70, ll. 4-13}.*  The license plate number on the SUV was actually 695BGK, but Officer Edwards erred by either misidentifying the 5 as a 6, or by striking the 6 key instead of the 5 key on the keypad of his computer, as he drove by the SUV.  *{Ex. 2, p. 97, ll. 7-20; Exs. 10-12}.*

8.      After driving slowly past the SUV, the police computer in Officer Edwards' vehicle sounded an audible alert tone signaling that the license plate number he had typed into the computer matched that of a vehicle that was reported stolen.  *{Ex. 4, p. 27, ll. 13-24; Exs. 10-12}.*  The police computer also audibly and visually announced inside Officer Edwards' vehicle that the vehicle he was checking was a reportedly stolen Nissan vehicle.  *{Ex. 4, p. 64, ll. 1-16; Exs. 10-12}.*  Additionally, because the MDT automatically alerted the police dispatcher as well, the Bellaire Police Department dispatcher also informed Officer Edwards that the license plate number he had run through his police computer was reportedly displayed on a stolen vehicle.  *{Ex. 4, p. 28, ll. 8-17}.*  Officer Edwards then informed the police dispatcher of the location of the vehicle and that two males occupied the vehicle.  *{Ex. 4, p. 28, ll. 2-5; p. 29, l. 4-10}.*

9.      Officer Edwards recognized that the occupants of the SUV were aware the police car was nearby so Officer Edwards decided to attempt to maintain the status quo while awaiting backup by driving through the cul-de-sac turn and stopping his police vehicle on the side of the road facing, but a distance away from, the SUV.  *{P's Complaint @ ¶ 26; Ex. 4, p. 28, ll. 21-25; 29, ll. 23- p. 30, l. 3}.*  Officer Edwards believed he was investigating a reported felony crime and that he was outnumbered by the occupants of the SUV.  *{Ex. 29, Ex. 3}.*

10.    Officer Edwards had provided the Bellaire police dispatcher with the information necessary to send back-up officers of the Bellaire police department and he had also requested back-up from the Houston police department. *{Ex. 4, p. 29, ll. 4 – p. 30, ll 3}*. Officer Edwards' approach in this regard is consistent with police training and within a range of acceptable tactics in such a circumstance when an officer is waiting for backup to arrive. *{Ex. 29}*.

11.    As he awaited back-up, Officer Edwards observed Robbie Tolan and Cooper walk away from the SUV and toward a house nearby. *{Ex. 3; Ex. 4, p. 31, ll. 5-14}*. Robbie Tolan and Cooper carried several items including paper bags as they approached the house. *{Ex. 4, p. 31, ll. 6-10; P's Complaint @ ¶ 31}*. Officer Edwards concluded that he must then adjust his tactics to account for the changed circumstances created by Robbie Tolan and Cooper leaving the reportedly stolen Nissan and approaching a dwelling which Officer Edwards believed the suspects were preparing to enter. *{Ex. 4, p. 31, ll. 11-20; Ex. 3}*.

12.    Thus, Officer Edwards drove his police patrol car forward and stopped it near to, and in front of, the Nissan SUV while shining a spotlight from the police car to illuminate Robbie Tolan and Cooper in the poorly lit yard and driveway in front of the house. *{Ex. 4, p. 31, ll. 17-20}*. Officer Edwards parked the patrol car, exited it, unholstered his police handgun and called out to Robbie Tolan and Cooper, *"Police, come here."* *{Ex. 4, p. 31, ll. 21-22; p. 32, ll. 11-14, 22-24}*. Officer Edwards was wearing a regulation Bellaire police department uniform that identified him as a police officer and he held his handgun in one hand and a flashlight in the other. *{Ex. 3}*. Officer Edwards sought to temporarily detain Robbie Tolan and Cooper near the SUV so that he could make an effective field investigation. *{Ex. 3}*. This is a common tactic used by police officers when investigating a suspected felony crime such as a reported stolen vehicle. *{Ex. 4, p. 31, ll. 11-14; Ex. 29}*.

13.     Neither Robbie Tolan nor Cooper complied with Officer Edwards' verbal request.  *{Ex. 4, p. 32, ll. 11-18; p. 33, ll. 17-21; Ex. 15, p. 40, l. 22 – p. 41, l. 8; Ex. 16, p. 51 ll. 4-7}.*  Instead, both looked at Officer Edwards, turned and continued walking toward the house away from Officer Edwards.  *{Ex. 4, p. 32, ll. 19-21, p. 33, ll. 17-22}.*  Since Robbie Tolan and Cooper did not comply with Officer Edwards' initial requests to "come here," and since both men were still associated with a reported felony, Officer Edwards modified his attempt to gain control by using verbal tactics and repeatedly commanded Robbie Tolan and Cooper to stop and lay down.  *{Ex. 4, p. 34, ll. 1-6, p. 36, ll. 7-12; Ex. 29}.*  Neither Robbie Tolan nor Cooper complied with Officer Edwards' verbal commands to stop and get on the ground.  *{Ex. 4, p. 34, ll. 11-12, p. 36, ll. 7-12; Ex. 15, p. 40, ll. 22 – p. 41, ll. 8}.*  Instead, both walked in different directions and verbally challenged Officer Edwards' authority to detain them.  *{Ex. 4, p. 34, ll. 13-23, p. 35, ll. 1- p. 36, ll. 2}.*  Both Robbie Tolan and Cooper asked why they were being told to get on the ground and Officer Edwards plainly and repeatedly informed them that he was investigating a report of a stolen car.  *{P's Complaint @ ¶ 37}; Ex. 3; Ex. 4, p. 35, ll. 1-3, 7-11, p. 41, ll. 9-24}.*  Despite being informed of the purpose of Officer Edwards' instruction, both Robbie Tolan and Cooper still refused to comply with Officer Edwards' commands.  *{Ex. 4, p. 35, l. 17-p. 36, ll. 2, p. 36, ll. 7-12; p. 38, ll. 18-22}.*  Robbie Tolan carried a bag behind a Sago type palm tree near the door of the house and stepped out of Officer Edwards' view.  *{Ex. 4, p. 37, ll. 3-6}.*  During this time, two individuals stepped outside the house through the door near where Robbie Tolan was standing.  *{Ex. 4, p. 38, l. 23-25}.*  Officer Edwards did not know the identity of either of these two individuals at the time but they were later identified as Bobby[2] and Marian Tolan, Robbie Tolan's parents.  *{Ex. 4, p. 39, ll. 1-6}.*

---

[2]     This individual's given name is Robert but he often goes by the nickname of Bobby Tolan, which is the name he used to file suit.  Therefore, Defendants identify him as Bobby Tolan herein.

14.     Bobby Tolan promptly yelled at Robbie Tolan and Cooper to "shut the fuck up" and "get on the ground." *{Ex. 4, p. 39, ll. 12-20; Ex. 15, p. 42, ll. 14-18; Ex. 16, p. 55, ll. 14-19; Ex. 17,p. 65, ll. 61-63; p. 72. ll. 5-8; Ex. 18, p. 48, ll. 15-19}.*  Robbie Tolan thereafter complied with Bobby Tolen's command and positioned himself in a prone position on the porch of the residence and Cooper kneeled down to the ground in the yard, nearer Officer Edwards.  *{Ex. 4, p. 39, ll. 25 – p. 40, ll. 16; Ex. 15, p. 64, ll. 7-13; Ex. 16, p. 57, ll. 9-12}.*  Cooper, however, continued to move about on the ground in an unpredictable manner.  *{Ex. 4, p. 41, ll. 8-10, 20-24; p. 46, l. 5-10}.*  Robbie Tolan laid on his stomach with his head in the direction of the door of the residence and his feet toward the driveway.  *{Ex. 4, p. 42, ll. 7-14, p. 71, ll. 12-16}.*

15.     Officer Edwards informed Bobby Tolan that the vehicle the young men had been driving was reported stolen.  *{Ex. 4, p. 39, ll. 9-16}.*  Bobby Tolan then instructed Cooper and Robbie Tolan explicitly to "shut the fuck up and listen to the police*." {Ex. 4, p. 39, ll. 9-20; Ex. 18, p. 48, ll. 15-19; Ex. 15, p. 42, ll. 1-16}.*  While Officer Edwards was speaking with Bobby Tolan, Marian walked throughout the yard disregarding Officer Edwards' requests for everyone to remain where they were.  *{Ex. 4, p. 46, ll. 18 - p. 47, ll. 9}.*  When Officer Edwards found he had four individuals to manage, and he still did not know if any had stolen the vehicle, he asked the police dispatcher to have the responding back-up officers hurry to assist.  *{Ex. 2, p. 28, ll. 14-21; p. 34, ll. 20-22, p. 40, ll. 13-16; p. 41; ll. 14-25; Ex 4, p. 41, ll. 11-15}.*

16.     Bellaire Police Sergeant Jeffery Cotton was at the Bellaire Police Department when he learned from police radio transmissions that Officer Edwards had encountered a vehicle that was reported stolen.  {*Ex. 1*; *Ex. 2, p. 28, ll. 2-5, p. 37, ll. 1-4; Ex. 31}.*  Sergeant Cotton also heard from police radio transmissions that Officer Edwards had encountered two individuals who had occupied the reportedly stolen vehicle.  *{Ex. 1; Ex. 2, p. 28, ll. 14-24; p. 34, ll. 20-22.}*

17.     Sergeant Cotton responded at approximately 1:53 a.m. to the area of 800 Woodstock where Officer Edwards reported he was located.  *{Ex. 1; Ex. 2, p. 35, l. 23 – p. 36, l. 2; Ex. 5}.* Sergeant Cotton directed Bellaire Police Corporal Chris Delk to respond to Braeburn Street, south of Woodstock Street, in case a foot pursuit occurred in connection with the stolen vehicle investigation.  *{Ex. 1; Ex. 2, p. 34, ll. 20-p. 36, ll. 12; Ex. 5; Ex. 31}.*  As he neared Officer Edwards' location, Sergeant Cotton also heard Officer Edwards asking for back-up officers to hurry to get to his location.  *{Ex. 1; Ex. 2, p. 36, ll. 24 – p. 37, ll. 21; p. 41, ll. 14-20}.*

18.     When Sergeant Cotton arrived at 800 Woodstock, at approximately 1:55 a.m., he turned on the overhead white "takedown" lights on his patrol vehicle to provide more illumination, quickly parked and exited his patrol car, and then ran into the front yard of 8** Woodstock Street where Officer Edwards, Cooper and the three Tolans were located.  *{Ex. 1; Ex. 2, p. 43, ll. 6-18; p. 43, l. 22 - p. 45, ll. 6; Ex. 5}.*   Upon his approach, Sergeant Cotton observed that Officer Edwards was pointing his handgun generally toward two male subjects who were low to the ground, Cooper and Robbie Tolan.  *{Ex. 1; Ex. 2, p. 44, ll. 2-4; p. 45, ll. 5-6, 12 – p. 46, ll. 1}.* Sergeant Cotton unholstered his police handgun, moved next to Officer Edwards and asked him for a brief description of the situation.  *{Ex. 1; Ex. 2, p. 46, ll. 5-7; Ex. 4, p. 42, ll. 15-21}.* Officer Edwards quickly informed Sergeant Cotton that the two individuals on the ground, Robbie Tolan and Cooper, had been inside the vehicle that was reported stolen.  *{Ex. 1; Ex. 2, p. 42, ll. 15-21, p. 46, ll. 8-19; Ex. 4, p. 42, ll. 15-21}.* Informed by Officer Edwards' reports, Sergeant Cotton made his own personal observations of the circumstances occurring in the yard. *{Ex. 1}.*  Sergeant Cotton observed that Bobby Tolan appeared to be remaining generally in one area near Officer Edwards.  *{Ex. 1; Ex. 2, p. 46 – 47, l. 3}.*

19.     Sergeant Cotton observed, however, that Marian Tolan continually walked throughout the yard loudly protesting the officers' presence and her actions in doing so interfered with the officers' efforts to maintain a reasonable degree of security at the scene necessary to undertake an investigation.  *{Ex. 1; Ex. 2, p. 47, ll. 4-19; Ex. 4, p. 46, ll. 21 – p. 47, ll. 2}.*  Sergeant Cotton's assessment of the circumstances led him to conclude that establishing some degree of control over Marian Tolan was necessary to maintain security at the scene so he asked her to move away from the two individuals on the ground.  However, Marian flatly and loudly refused to comply with Sergeant Cotton's request, shouting "excuse me?"  *{Ex. 1; Ex., 2, p. 47, ll. 4-19., p. 51, ll. 6-10, p. 52, l. 22 – p. 52, l. 2;  p. 54, l. 14 – p. 55, ll. 1-17}.*  Sergeant Cotton determined that since verbal direction was proving ineffective in moving Marian Tolan out of the way, he would exert a minimal degree of physical restraint on her movements in order to guide her out of harm's way.  *{Ex. 1; Ex. 2, p. 51, ll. 6-p. 51, ll. 2; p. 54, ll. 14-p. 55, ll. 12}.*  Sergeant Cotton, therefore, holstered his police handgun and used his hand to guide Marian Tolan toward the garage door of the residence away from the other people in the yard.  *{Ex. 1; Ex. 2, p. 57, ll. 1-7 or 18}.*  When Sergeant Cotton began to pull Marian Tolan toward the garage, she resisted the escort physically and also verbally protested the escort.  *{Ex. 1; Ex. 2, p. 57, l. 16 – p. 59, ll. 18}.*

20.     At this point, Robbie Tolan, who was in a poorly lit area on the porch of the house yelled out "Get your fucking hands off my mom," pushed himself up very quickly from the prone position he had been in, and angrily spun his entire body toward Sergeant Cotton in a quick and admittedly aggressive motion.  *{Ex. 1; Ex. 2, p. 60, ll. 7-24, p. 62, ll. 9-12, p. 62, ll. 22- p. 65,  l. 5, p. 80, ll. 19-12; Ex. 4, p. 70, ll. 24 - p. 71, ll. 3; Ex. 15, p. 105, ll. 21-24; Ex. 15, p. 86, ll. 3-5; p. 100, ll. 9 – p. 101, ll. 2; p. 101, ll. 3-8; Ex. 17, p. 174, ll. 19 – p. 175, ll. 4}.*

9

21.     Officer Edwards also saw Robbie in, what he described as, a "charging position" as if he was going to charge Sergeant Cotton.  *{Ex. 4, p. 53, ll. 11-25; p. 54, ll. 12-19}*.  Based upon police training and the totality of the circumstances presented, including Robbie Tolan's quick aggressive motion, Sergeant Cotton perceived Robbie Tolan's actions as consistent with producing a weapon in his hand from his waistband area and being an immediate threat to Sergeant Cotton's life.  *{Ex 1; Ex. 2, p. 65, ll. 6 - p. 66, ll. 2, p. 67, ll. 3-19, p. 68, ll. 4 - p. 69, l. 5; p. 78, ll. 18-p. 79, ll. 18; p. 81, ll. 15-24; Ex. 23, p. 9, ll. 20-p. 10, ll. 8, p. 10, ll. 18 - p. 16, ll. 13; Ex. 29; Ex. 15, p. 84, ll. 17-20; p. 85, ll. 10-13, ll. 20-24; p. 85, l. 25-p. 86, l. 8; p. 98, l. 24-p. 99, l. 4; p. 100, l. 9 - p. 102, l. 10; p. 105, l. 9 - p. 107, l. 2; p. 138, ll. 7-10; p. 146, l. 11-18}*.

22.     Sergeant Cotton responded to the threat of serious injury he then perceived by pushing Marian Tolan away and quickly stepping backward away from Robbie Tolan, while simultaneously unholstering the same handgun he had previously replaced in its holster when Robbie Tolan was not exhibiting an imminent threat and firing three shots in the direction of Robbie Tolan to repel the perceived threat Robbie Tolan posed at that moment.  *{Ex. 1; Ex. 2, p. 62, ll. 13-18; p. 92, ll. 18-19}*.  It was then approximately 1:55:36 a.m., less than 44 seconds after Sergeant Cotton had arrived on the scene.  {*Ex. 7*}.  Marian Tolan fell against the garage door and Robbie Tolan fell back down to the ground after one of the three shots Sergeant Cotton fired struck Robbie Tolan in the chest.  *{Ex. 1; Ex. 2, p. 89, ll. 19 – p. 90, ll. 6, p. 92, ll. 14-19}*.

23.     Sergeant Cotton kept his handgun pointed in Robbie Tolan's direction, approached him, and searched Robbie Tolan for weapons.  *{Ex. 1; Ex. 2, p. 89, ll. 19 – p. 90, ll. 6}*.  Sergeant Cotton then asked Robbie Tolan what he had been reaching for but Tolan did not respond to the question.  *{Ex. 1; Ex. 2, p. 90, ll. 9-13; Ex. 7}*.  After determining Robbie Tolan had sustained a gunshot wound to his chest, Sergeant Cotton immediately summoned an ambulance which

promptly responded, provided care to Robbie Tolan on the scene and transported Robbie Tolan to a local hospital for medical care. *{Ex. 1; Ex. 2, p. 92, ll. 9-10; p. 92, ll. 18-25}.* There is no indication the medical care provided to, or not provided to, Robbie Tolan worsened his injury in any way. *{Ex. 29}.*

24.     Within moments after hearing "shots fired" over the radio, Corporal Delk immediately responded to the scene and, at approximately 1:56:24 a.m., Sergeant Cotton and Officer Edwards relinquished control of the scene and investigation of both to Corporal Delk and other officers who responded but who were not involved in the events that occurred before the shooting. *{Ex. 7; Ex. 31}.* Corporal Delk placed handcuffs on Cooper and placed him in a police car at the scene at approximately 1:58 a.m. *{Exs. 5-7; Ex. 31.}* Corporal Delk also placed Marian Tolan and Bobby Tolan in separate police vehicles at approximately 1:58 a.m. during the exigent circumstances present in the immediate aftermath of the shooting. *{Ex. 3; Ex. 7; Ex. 31}.* At approximately 1:58 a.m., Corporal Delk summoned investigative and at approximately 2:00 a.m., administrative personnel and he maintained charge of the scene from the time of his arrival until assigned investors arrived to assume control. *{Ex. 7; Ex. 31}.*

25.     The ambulance arrived at approximately 2:01 a.m. and Robbie Tolan was placed inside the ambulance at approximately 2:03:30 a.m. *{Exs. 5-7}.* The ambulance departed to transport Robbie Tolan to Ben Taub hospital at approximately 2:07:29 a.m. *{Exs. 5-7}.* While Corporal Delk was awaiting the arrival of investigative and administrative personnel to assume control of the investigation, at 2:16:29 a.m., Marian Tolan asked if she could get out of the police car to check on her son's condition at the hospital. *{Ex. 31; Ex. 7}.* Corporal Delk made cell phone calls to Detective Bohannon, at approximately 2:20:26 a.m., and Lieutenant Leal at approximately 2:22:29 a.m. to obtain authority to permit Marian and Bobby Tolan out of police

cars before the assigned investigators arrived so that the Tolans could go to the hospital to check on Robbie's condition.  *{Ex. 31; Ex. 7}.*  Investigator Bohannon and Lt. Leal both immediately directed Corporal Delk to allow Bobby and Marian Tolan out of the police cars, and by 2:23:17, approximately twenty-five minutes after they had been separated for officer safety and investigative integrity, Bobby and Marian Tolan were released from the police vehicles.  *{Ex. 31; Ex. 7}.* This was approximately 16 minutes after the ambulance transporting Robbie Tolan let for the hospital. *{Ex. 7}.*

26.     Corporal Delk offered to provide Bobby and Marian Tolan a ride to Ben Taub hospital in a police car but, after Marian Tolan's sister arrived at approximately 2:24 a.m., she offered to provide them a ride to the hospital.  *{Ex. 7}.*  Instead of immediately going to the hospital to check on Robbie Tolan, Bobby and Marian Tolan insisted on remaining on the scene for at least seven minutes longer,  voicing various complaints to officers still on the scene.  *{Ex. 7}.*  After he arrived later, Detective Bohannon interviewed Cooper inside a police car from approximately 2:50 to 2:59, when Cooper was released from inside the police car.  *{Ex. 7}.*

## APPLICABLE MOTION STANDARDS

27.     Summary judgment is appropriate where a non-movant, viewing the facts in the light most favorable to him, has no cognizable claim or is subject to a defense.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348 (1986); *Stults  v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir. 1996).  Thus, a district court shall grant summary judgment when a movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law regarding any identified claim on which summary judgment is sought.  FED.R.CIV.P. 56(a). "At the summary judgment stage, facts must be viewed in the light most favorable to the non-moving party only if there is a genuine dispute as to those facts." *Scott*

*v. Harris*, __ U.S. __, 127 S. Ct. 1776, 1779 (2007).  Factual *controversies* are resolved in a non-movant's favor, "but only when there is an actual controversy, that is, when both Parties have submitted evidence of contradictory facts."  *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1048 (5th Cir. 1996) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)); *accord S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 494 (5th Cir. 1996).  There must be a conflict in substantial evidence to create a jury question.  *Boeing Co. v. Shipman*, 411 F.2d 365, 375 (5th Cir. 1969), *overruled on other grounds by Gautreaux v. Scurlock Marine Inc.*, 107 F.3d 331, 339 (5th Cir. 1997).  Unchallenged facts supporting summary judgment, such as those in this record, must be credited.  *Eversley v. Mbank*, 843 F.2d 172, 173-174 (5th Cir. 1988).  A court cannot ignore uncontroverted proof on material issues simply because there are differing versions of immaterial facts.  *Gibson v. Rich*, 44 F.3d 276, 277-78 n.7 (5th Cir. 1995); *Fraire v. City of Arlington*, 957 F.2d 1268, 1273 (5th Cir. 1992). A reviewing court must give credence to evidence supporting summary judgment provided by unimpeached, disinterested witnesses. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151, 120 S. Ct. 2097, 2110 (2000).

28.     The court need consider only the cited materials in the record.  FED.R.CIV.P. 56(c).  A party opposing summary judgment by asserting that a fact is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.  FED.R.CIV.P. 56(c).  An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that

the affiant or declarant is competent to testify on the matters stated.   FED.R.CIV.P. 56(c).

Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly

contradicted by the record, so that no reasonable jury could believe it, a court should not adopt

that version of the facts for purposes of ruling on a motion for summary judgment."   *Scott,* 127

S. Ct. at 380.

29.      Thus, when confronted with a properly supported summary judgment motion, a

"nonmoving party must direct the court's attention to evidence in the record which demonstrates

that it can satisfy a fair-minded jury that it is entitled to verdict in its favor."   *International

Shortstop, Inc. v. Rally's, Inc*., 939 F.2d 1257, 1263 (5th Cir. 1991).   If a party fails to properly

address a movant's assertion of fact as required by Rule 56(c), the court may consider the fact

undisputed for purposes of the motion and grant summary judgment if the motion and supporting

materials — including  the facts considered undisputed--show that the movant is entitled to it.

FED.R.CIV.P. 56(e).   Substantive law will identify those facts that are material and only disputes

over facts that might affect the outcome of the suit under governing law will properly preclude

the entry of summary judgment.   *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48, 106 S.

Ct. 2505, 2512 (1986).   The summary judgment "standard provides that the mere existence of

*some* alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

30.      A non-movant fails to satisfy this burden by identifying only some metaphysical doubt as

to the material facts or conclusory allegations supported by only unsubstantiated assertions.

*Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994).   "The mere existence of a scintilla

of evidence in support of the plaintiff's position will be insufficient; there must be evidence on

which the jury could reasonably find for the plaintiff."   *Anderson*, 477 U.S. at 252, 106 S. Ct. at

512; *accord Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1286 (5th Cir. 1990).

31.     Notably, "[t]he burden is on a plaintiff to overcome a defendant's defense of qualified immunity." *Burns-Toole v. Byrne*, 11 F.3d 1270, 1274 (5th Cir. 1994) (emphasis added). "The Fifth Circuit does not require that an official demonstrate that he did not violate clearly established federal rights; [] precedent places that burden upon plaintiffs." *See Salas v. Carpenter*, 980 F.2d 299, 304-06 (5th Cir. 1992). "The moving party is not required to put forth evidence to meet its summary judgment burden for a claim of immunity. It is sufficient that the Movant in good faith pleads that it is entitled to absolute or qualified immunity." *Beck v. Texas State Board of Dental Exam'rs*, 204 F.3d 629, 633 (5th Cir. 2000). As such, when law enforcement officers like Sergeant Cotton and Officer Edwards assert qualified immunity the burden shifts to the Plaintiffs to muster evidence sufficient to rebut the officers' immunity defense. *Whatley v. Philo*, 817 F.2d 19, 20 (5th Cir. 1987).

32.     This fact, notwithstanding the undisputed evidence, including Plaintiffs' own admissions, clearly establishes both officers' entitlement to immunity under both prongs of the immunity analysis. To overcome the presumption of a law enforcement officer's qualified immunity, it is imperative that the officer's actions be viewed from the perspective of a reasonable law enforcement officer on the scene and not in hindsight because settled law acknowledges the practical reality that "a police officer views the facts through the lens of his police experience and expertise." *Ornelas v. United States*, 517 U.S. 690, 699-700, 116 S. Ct. 1657, 1663 (1996). Controlling precedent, mandates that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 109 S. Ct. 1865; *see also Muehler v. Mena*, 544 U.S. 93, 108, 125 S. Ct. 1465, 1476 (2005). This mandate applies even in the summary

judgment context when the court is also required to consider evidence in the light most favorable to the person alleging a use of excessive force.  *See Linbrugger v. Abercia*, 363 F.3d 537, 542-43 (5th Cir. 2004) and *Fraire*, 957 F.2d at 1270.  *See also Ballard v. Burton*, 444 F.3d 391, 402-03 (5th Cir. 2006) and *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).  Thus, while a court considering a summary judgment record is required to consider the evidence in the light most favorable to an individual claiming excessive force was used against him, the Court must still adhere to the fundamental principle underlying immunity; that determination of the reasonableness of a police officer's use of force must be undertaken from the *perspective of a reasonable police officer* on the scene.  *Graham*, 490 U.S. at 396, 109 S. Ct. 1865.  This includes the requirement that the Court may not consider irrelevant, immaterial facts learned only after the challenged conduct, such as the fact that the car was not stolen or that Robbie Tolan ultimately turned out to be unarmed.  *See Sherrod v. Berry,* 856 F.2d 802, 807 (7th Cir. 1988).

33.    Specifically, a vital precept that must be adhered to when determining whether a summary judgment record rebuts a law enforcement officer's qualified immunity is that the Supreme Court has specifically mandated that only those facts known to the police officer are what count in judging the reasonableness of his action; not subjective facts known only to a plaintiff and certainly not information that is subject to a variety of interpretations by lay individuals with no relevant experience or expertise.  *See U.S. v. Banks*, 540 U.S. 31, 39, 124 S. Ct. 521, 527 (2003).  It is also impermissible for a reviewing court to interpose its own subjective beliefs and judgments regarding any favored method of police responses, procedures or tactics into an analysis that controlling precedent mandates must be conducted from the objective perspective of a reasonable police officer trained to perform law enforcement duties.  *See Linbrugger*, 363 F.3d at 542-43 and *Stroik v. Ponseti*, 35 F.3d 155, 158 (5th Cir. 1994).

34.     The Court must grant summary judgment in favor of Officer Edwards and Sergeant Cotton here because the summary judgment record establishes that both officers are protected from liability by not just one, but both, points of the immunity analysis.

### ARGUMENTS AND AUTHORITIES

## I.     Officer Edwards and Sergeant Cotton are Entitled to Qualified Immunity

35.     The summary judgment record establishes that Sergeant Cotton and Officer Edwards are insulated from liability by their entitlement to the protections provided by the qualified immunity defense. "Public officials acting within the scope of their official duties are shielded from civil liability by the qualified immunity doctrine." *Kipps v. Caillier*, 197 F.3d 765, 768 (5th Cir.), *cert. denied*, 531 U.S. 816 (2000).  Governmental officials performing discretionary functions generally are shielded from liability for civil damages in so far as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18, 102 S. Ct. 2727, 2738 (1982).  Qualified immunity is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."  *Swint v. Chambers County Commission*, 514 U.S. 35, 42, 115 S. Ct. 1203, 1208 (1995); *accord McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002).  Qualified immunity analysis requires a two-step process which involves a determination of whether the plaintiff has presented evidence of a cognizable violation of a constitutional right, as well as a determination of whether the plaintiff has presented evidence that the conduct alleged was objectively unreasonable in light of clearly established law at the time that the challenged conduct occurred.  *Saucier*, 533 U.S. at 199, 121 S. Ct. at 2155.  The record here shows that the Plaintiffs have failed to meet their burden to establish a claim under either prong of the required test.

### A.      There was No Unconstitutional Conduct

36.     The claims against Sergeant Cotton and Officer Edwards fail because the summary judgment record establishes that the officers did not engage in unconstitutional conduct and that the Plaintiffs cannot present evidence of a cognizable violation of any Plaintiff's constitutional rights.  Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred."  *Baker v. McCollan*, 443 U.S. 137, 145, 99 S. Ct. 2689, 2695 n.3 (1979).  Before a plaintiff can successfully support a cause of action under § 1983, he must first identify constitutionally protected conduct he contends a defendant has infringed, but the Plaintiffs simply cannot do so here.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 842, 118 S. Ct. 1708, 1714 n.5 (1998).

### 1.      There was No Violation of 14th Amendment Rights

37.     The summary judgment record establishes that, notwithstanding their pleading allegations, the Plaintiffs cannot present evidence of a cognizable violation of any Plaintiff's constitutional rights protected by the 14th Amendment. The Due Process Clause of the 14th Amendment does not generally confer any affirmative right to governmental aid to an individual. *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 196, 109 S. Ct. 998, 1003 (1989).  Due Process protects against an "exercise of power without any reasonable justification in the service of a legitimate governmental objective" and "government power arbitrarily and oppressively exercised."  *County of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S. Ct. 1708, 1716 (1998).  "[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'"  *Id.*  (*Quoting Collins v. Harker Heights*, 503 U.S. 115, 129, 112 S. Ct. 1061, 1071 (1992)).  As such, to support a claim of an alleged violation of Due Process, a plaintiff must adduce evidence showing a defendant's action shocks the conscience and was so

brutal and offensive as not to comport with traditional ideas of fair play and decency - which Plaintiffs fail to do in this case. *See Rochin v. California*, 342 U.S. 165, 172, 72 S. Ct. 205, 209-10 (1952); *Brown,* 188 F.3d 579, 591.

a. **Claims of Alleged Use of Excessive Force During an Investigative Detention or Arrest are Not Cognizable Under the 14th Amendment**

38.     The allegation that a law enforcement officer allegedly used excessive force during the course of an investigative detention or the incidents of arrest are simply not cognizable under the 14th Amendment.   Indeed, the Supreme Court has repeatedly and expressly rejected the 14th Amendment as a basis for a use of force claim in such circumstances.   The Court, instead, has consistently held that, where a provision of the Constitution "provides an explicit textual source of Constitutional protection, a court must assess a plaintiff's claim under that explicit provision and not the more generalized notion of substantive due process. *See Conn v. Gabbert*, 526 U.S. 286, 293, 119 S. Ct. 1292, 1296 (1999) (*quoting Graham v. Conner*, 490 U.S. at 395, 109 S. Ct. at 1865 (1989)).   It is, therefore, an undeniably established fundamental legal principle that allegations a law enforcement officer has used excessive force in the course of an arrest, investigatory stop, or other seizure of a free citizen *must* be analyzed under the 4th Amendment and its reasonableness standard, rather than under a 14th Amendment substantive due process approach. *See Graham*, 490 U.S. at 395, 109 S. Ct. at 1871.   Accordingly, Plaintiffs claims advanced under the 14th Amendment for alleged use of excessive force are not legally cognizable and judgment must be entered in favor of Sergeant Cotton and Officer Edwards on those claims even if the Court believes a constitutional use of excessive force may have occurred. *See id.*

**b.** **Claims of Alleged Unconstitutional Seizure During an Investigative Detention or Arrest are Not Cognizable Under the 14th Amendment**

39.     Likewise, an allegation that a police officer allegedly committed an unconstitutional stop, detention or seizure during the course of an investigative detention or the incidents of arrest are also not cognizable under the 14th Amendment.  As a general matter, the [Supreme] Court has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decision-making in this unchartered area are scarce and open-ended.  *See Collins v. Harker Heights*, 503 U.S. 115, 125, 112 S. Ct. 1061, 1068 (1992).   The protections of substantive due process have, for the most part, been accorded to matters relating to marriage, family, procreation, and the right of bodily integrity.  *See Albright v. Oliver*, 510 U.S. 266, 272, 114 S. Ct. 807, 812 (1994).  The Framers [of the Constitution] considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it.  *Id.* at 274.  Accordingly, in *Albright*, the Supreme Court made clear that a claim of a substantive due process violation affords no relief for an allegation of unlawful detention.  *Albright,* 510 U.S. at 275, 114 S. Ct. at 814.  As such, Plaintiffs' claims of alleged unconstitutional seizure during the course of an investigative detention or arrest are not cognizable under the 14th Amendment and judgment must summarily be entered in favor of Sergeant Cotton and Officer Edwards on those claims, even if the Court believes there is evidence of an unconstitutional detention.  *See id*.

**c.     There was No Denial of Equal Protection**

40.     The summary judgment record also establishes that neither Sergeant Cotton nor Officer Edwards denied a Plaintiff equal protection of the laws and it further establishes that the Plaintiffs cannot present evidence of a cognizable violation of their equal protection rights.  The Equal Protection clause of the 14th Amendment requires only that similarly situated persons be

treated alike.  *Rolf v. City of San Antonio*, 77 F.3d 823, 828 (5th Cir. 1996).  As such, an equal protection allegation may only be sustained "if the challenged government action classifies or distinguishes between two or more relevant groups."  *Outb v. Strauss*, 11 F.3d 488, 492 (5th Cir.), *cert. denied*, 511 U.S. 1127 (1994).  "As a prerequisite to such a claim, the plaintiff must prove that similarly situated individuals were treated differently."  *Bryan v. City of Madison*, 213 F.3d 267, 276 (5th Cir. 2000).  It is well established that a plaintiff's unsubstantiated alleged personal belief that race played a factor in an arrest cannot support a claim of denial of equal protection of the laws.  *See Edwards v. Woods*, 51 F.3d 577, 580 (5th Cir. 1995).  A plaintiff must do more than allege a *personal belief* he is the subject of discrimination.  *See Johnson v. Rodriguez*, 110 F.3d 299, 311 (5th Cir. 1997).  Instead, in order to support a claim, a plaintiff must allege and ultimately prove *facts* showing improper motivation.  *See Allen v. Thomas*, 388 F.3d 147, 149 (5th Cir. 2004); *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999).

41.     Additionally, to support a claim of denial of equal protection, "a plaintiff must prove that the government official's acts were motivated by improper considerations, such as race, religion, or the desire to prevent the exercise of a constitutional right."  *Id*. at 277.  Therefore, to support a claim, a civil rights equal protection claimant must prove a defendant's action had a discriminatory effect and was motivated by a discriminatory purpose.  *See United States v. Armstrong*, 517 U.S. 456, 465, 116 S. Ct. 1480, 1487 (1996); s*ee also Chavez v. Illinois State Police*, 251 F.3d 612, 635-36 (7th Cir. 2001).  Also, an absolute requirement for showing a cognizable equal protection claim is a showing that a similarly situated person outside the plaintiff's class was not similarly affected.  *Gardenshire v. Schubert*, 205 F.3d 303, 319 (6th Cir. 2000).  However, it is fundamental that a plaintiff cannot convert a due process claim into an equal protection claim via an allegation state a official exercised discretion to act in one incident

but not in another.  *McKee v. City of Rockwall*, 877 F.2d 409, 413 (5th Cir. 1989).

42.     The summary judgment record in fact expressly disproves the Plaintiffs' claim of denial of equal protection.  It is undisputed that Officer Edwards did not even know any Plaintiff's race until after Robbie Tolan and Cooper refused to submit to temporary detention and until after Marian Tolan and Bobby Tolan stepped outside their house.  {*Ex. 4, p. 66, ll. 7-16; p. 79, ll. 5-11; p. 19, ll. 4-12*}.  Likewise, Sergeant Cotton did not know of any Plaintiff's race until after he exited his police vehicle at the Tolan residence.  {*Ex. 2, p. 34, ll. 13-19*}.  The Plaintiffs' essentially admit that they cannot identify any admissible evidence even suggesting that Officer Edwards or Sergeant Cotton knew of any Plaintiff's race before their police actions were undertaken, or that either officer was motivated to act due to any Plaintiff's race.  {*Ex. 15, p. 13, ll. 15-16; p. 14, l. 24 - p. 15, l. 3; p. 15, ll. 6-11; p. 17, ll. 14-21; p. 17, l. 22 - p. 18, l. 6; p. 18, ll. 7-25; Ex. 16, p. 130, ll. 12-22; p. 130, l. 25 - p. 131, l. 2; p. 132, ll. 6-11; Ex. 18, p. 91, ll. 10-15; p. 92, ll. 3-19; Ex. 17, p. 22, ll. 8-14; p. 22, l. 18 - p. 23, l. 9; p. 25, ll. 1-16; p. 178, ll. 19-24; p. 178, l. 25 - p. 179, l. 5*}.  Thus, there is no evidence whatsoever that could support a claim of denial of equal protection against Sergeant Cotton or Officer Edwards under any aspect of the required legal standard. There is no evidence showing that Sergeant Cotton or Officer Edwards treated the Plaintiffs differently than other similarly situated persons.  *See Rolf*, 77 F.3d at 828. As even the Plaintiffs admit, beyond their own identification of their race, there is absolutely no evidence showing that Sergeant Cotton or Officer Edwards actions were motivated by improper considerations, such as race, religion, or the desire to prevent any Plaintiff's exercise of a constitutional right.  *See Bryan*, 213 F.3d at 277.  Moreover, there is no evidence showing that Sergeant Cotton or Officer Edwards actions were not rationally related to a legitimate state objective or that either have treated similar situated individuals of another race differently under

22

identically similar circumstances.  *See Id.*  Accordingly, Plaintiffs equally frivolous claims of alleged denial of equal protection brought against Sergeant Cotton and Officer Edwards are not cognizable and judgment must summarily be entered in favor of Sergeant Cotton and Officer Edwards on those claims.  *See id.*

## 2.    There was No Violation of 4th Amendment Rights

43.    The summary judgment record, including Plaintiffs' own testimonial admissions, establishes that they cannot present evidence of a cognizable violation of any Plaintiff's constitutional rights protected by the 4th Amendment.  The record establishes, to the contrary, that neither Officer Edwards nor Sergeant Cotton violated any Plaintiff's 4th Amendment protections. "Fourth Amendment claims are appropriate [only] when the complaint contests the method or basis of the arrest and seizure of the person." *Jones v. City of Jackson*, 203 F.3d 875, 880 (5th Cir. 2000).  "The Fourth Amendment prohibits unreasonable seizures, not unreasonable or ill-advised conduct in general.  Consequently, [the courts] scrutinize only the seizure itself, not the events leading to the seizure, for reasonableness under the Fourth Amendment." *Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir. 1993); *see also Terry v. Ohio*, 392 U.S. 1, 9, 88 S. Ct. 1868, 1873 (1968).

## a.    There was No Unconstitutional Detention

44.    The summary judgment record disproves any claim of alleged unconstitutional detention against Sergeant Cotton or Officer Edwards.  It is so well established as to be beyond reasonable argument that a police officer may lawfully stop and briefly detain an individual to perform an investigation based upon reasonable suspicion of *possible* criminal activity.  *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000).  The Constitution requires only a minimum level of objective justification, considering the totality of the circumstances, for an investigating

officer's actions to authorize an investigative stop and detention.  *United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994); *see also United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 n.5 (5th Cir. 1999).  Justification for an investigative detention does not depend upon whether the investigating officer's suspicion that an offense may have been committed ultimately proves to be confirmed or even whether the officer was more likely or not correct in his suspicion.  *Texas v. Brown*, 460 U.S. 730, 742, 103 S. Ct. 1535 (1983); *see also Piazza v. Mayne*, 217 F.3d 239, 246 (5th Cir. 2000) and *Jewett v. Anders,* 521.F.3d 818, 823-27 (7th Cir. 2008).

45.    Also, justification to detain a suspect for *any* suspected offense is a *complete defense* to an unlawful arrest claim under § 1983 provided any reasonable police officer could have believed reasonable suspicion could have existed.  *See Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990).  Moreover, the law is clear that, while such an investigative detention is occurring, a law enforcement officer may lawfully "**take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop**."  *United States v. Hensley*, 469 U.S. 221, 235, 105 S. Ct. 675, 684 (1985) (emphasis added); *U.S. v Campbell*, 178 F.3d 345, 349-50 (5th Cir. 1999); *U.S. v. Sanders*, 994 F.2d 200, 210 (5th Cir. 1993).

46.    Also, § 38.15 of the Texas Penal Code provides the Texas criminal law that addresses interference with a law enforcement officer's public duties, and under that statute, a person commits an offense when, with criminal negligence she interrupts, disrupts, impedes, or otherwise interferes with a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law.  The Fifth Circuit has recognized that "[i]ndeed, citizens have no right to intervene in lawful police business."  *Mouille v. City of Live Oak*, 977 F.2d 924, 928 (5th Cir. 1993).  "The constitution does not empower private citizens to

imperviously interfere with police business." *Id*. at 929.

47.     Each Plaintiff's claim of alleged unconstitutional detention fails here because this case involves appropriate application of the doctrine embodied in *Terry v. Ohio*, 392 U.S. 1, 9, 88 S. Ct. 1868, 1873 (1968).

<div align="center">

**(1)     Reasonable Suspicion Existed to Briefly Detain the
Plaintiffs to Investigate the Stolen Vehicle Report**

</div>

48.     It is beyond reasonable argument that reasonable suspicion existed to temporarily detain the individuals associated with the reportedly stolen vehicle.  Officer Edwards was patrolling after midnight in an area where a substantial amount of crime involving thefts from motor vehicles had occurred the night before.  Officer Edwards observed a black Nissan SUV traveling ahead of him and the manner in which the driver of the SUV executed a turn raised an articulable suspicion in Officer Edwards' mind that the driver may have not planned to turn onto a dead end street until the last moment.  Officer Edwards observed that the driver parked the SUV and two males stepped outside and saw the police car but continued to fidget inside the SUV for some time before walking away from it. Officer Edwards entered the license plate number he believed was displayed on the SUV into the police computer and the police communications network signaled that the license plate number Officer Edwards entered was displayed on a Nissan vehicle when it was stolen.  Officer Edwards observed the two occupants of the reportedly stolen vehicle remove bags from the SUV and walk away from it into the darkness.  Officer Edwards drove his marked police patrol car forward, stopped it near the Nissan SUV and shined a spotlight from the police car to illuminate the former occupants of the SUV.  Officer Edwards exited from his police car wearing his police uniform and, while holding a flashlight and police handgun, called out to the former occupants of the vehicle "police, come here," but the former occupants of the vehicle did not comply with Officer Edwards' request.  They, instead, looked at

Officer Edwards, turned and continued walking toward a house.  *{Summary of facts}*.

49.    When the former occupants of the reportedly stolen SUV refused to comply with Officer Edwards' *request*, he issued a *command* for them to stop and lay down but they refused to comply with the officer's reasonable command as well and continued to walk away while issuing verbal challenges to the officer's authority to detain them.   The two individuals who had occupied the suspected stolen vehicle *never* complied with Officer Edwards' requests designed to maintain the status quo so that a thorough investigation could be performed.  The two individuals did, somewhat and only for a brief time, generally comply with directions from two person who later emerged from inside a house.  *{Summary of facts}*.

50.    Law enforcement training dictates that investigating possible stolen vehicle notifications is within a law enforcement officer's scope of authority.  Law enforcement academies instruct officers to be observant for suspicious activity and to follow up on said activity to determine whether reasonable suspicion exists to stop and detain the persons suspected of involvement in the activity.  Police officers are trained to recognize that they may legally detain persons based upon reasonable suspicion for the purpose of investigating whether probable cause exists to believe a person committed a particular crime.  An officer is also trained that he may take reasonable steps to protect his safety when conducting a field investigation based on reasonable suspicion.  {*Ex. 29*}.

51.    Law enforcement officers are trained to conduct license plate checks on vehicles that are involved in suspicious activity.  Officer Edwards ran a registration check on the Nissan SUV and was notified the vehicle may have been stolen.  The information received by Officer Edwards on the Nissan SUV possibly being stolen could lead any well-trained law enforcement officer to believe that reasonable suspicion existed to stop and detain the occupants of the vehicle to

investigate further to confirm or disprove, the report. {*Ex. 29*}.

52.     Law enforcement officers are trained to understand that it is within their law enforcement authority to stop and detain persons when reasonable suspicion exists pursuant to training received on the Texas Commission on Law Enforcement Officer Standards and Education (TCLEOSE) training topics of Arrest, Search, and Seizure.  Police officers are trained under state guidelines provided through TCLEOSE that a report, such as a computer identification of a suspected stolen vehicle would constitute reasonable suspicion to warrant a stop and detention of the occupants to investigate the report.  Law enforcement officers are also trained to diligently perform their duties.  Officer Edwards, therefore, consistent with standard training could not allow a possible stolen vehicle notice to go unaddressed.  Officer Edwards guided his actions pursuant to accepted, State sanctioned, law enforcement training and continued to investigate the stolen vehicle report.  In doing so, Officer Edwards adhered to the accepted law enforcement training principles of unholstering his handgun in addressing the occupants of the suspected stolen vehicle and giving clear commands.  Officer Edwards informed the occupants of the vehicle of the reason for police intervention.  These undisputed facts within the summary judgment record undeniably suffice under *Terry* to justify Officer Edwards, and later Sergeant Cotton's, efforts to detain Cooper and Robbie Tolan to investigate whether the SUV was stolen and whether the former occupants of the SUV and/or the former occupants of the house had any involvement in an apparent theft of the SUV.  *See Terry*, 392 U.S. at 9, 88 S. Ct. at 1873.  Because there was a real report of a stolen vehicle, the detention was valid regardless of whether Officer Edwards erred in entering the correct license plate number into the police computer because he could reasonably have relied on the license plate report information he received even though it was later determined to be incorrect. *Compare United States v. De Leon*, 930 F.2d 396,

398-400 (5th Cir. 1991) (en banc).[3]

<div align="center">

**(2)    Reasonable Suspicion Existed to Briefly Detain the
Plaintiffs After the Shooting Occurred**

</div>

53.    Reasonable suspicion also existed to briefly detain the Plaintiffs in the immediate
aftermath of the shooting. "The permissible scope of a Terry stop has expanded [] to include the
use of handcuffs and temporary detention in squad cars."  *U.S. vs. Stewart,* 388 F.3d 1079, 1084
(7th Cir. 2004).  Seconds after the shooting occurred, Sergeant Cotton summoned Corporal Delk
to the scene and, at approximately 1:56:24 a.m., upon his arrival, Corporal Delk handcuffed
Cooper – still a potential car theft suspect – and placed him in a police car at the scene at
approximately 1:58 a.m. Corporal Delk also place Marian Tolan and Bobby Tolan in separate
police vehicles at approximately 1:58 a.m. during the exigent circumstances present in the
immediate aftermath of the shooting and to protect the integrity of the investigation related to
both the reported stolen vehicle and Sergeant Cotton's use of force in response to Robbie Tolan's
actions.  *{Summary of facts}.*

54.    The police officers who responded to the scene after the shooting performed their duties
of obtaining medical care for Robbie Tolan and of protecting the integrity of the scene and
individualized witness statements so that a thorough investigation could be performed after
Tolan received emergency medical care.  In performing their duties, the officers necessarily were
required to see that Bobby Tolan and Cooper did not hamper, and Marian Tolan did not continue
to hamper, the provision of emergency medical care, efforts to preserve the available evidence at
the scene or interfere with the officers, or medical staff in the performance of their duties in the
immediate aftermath of the shooting.  Additionally, Cooper's role in the suspected automobile
theft was still equivocal and Marian and Bobby Tolan's role in the events was likewise unsettled.

---

[3]    Indeed, the unusual actions of the vehicle, at the time and place they occurred, reasonably
justified an investigating stop.  However, the license plate "HIT" clearly mandated further investigation.

It was apparent they were interfering with events occurring at the scene and that they had, at least, witnessed portions of the events surrounding the stolen vehicle investigation, if not played a more prominent role, and Sergeant Cotton's act of reported self defense.   *{Summary of facts}.*

55.      In light of these undisputed facts, reasonable suspicion existed to briefly detain the Plaintiffs in the immediate aftermath of the shooting.   *Compare Mouille*, 977 F.2d at 928; s*ee also Illinois v. Lidster*, 540 U.S. 419, 426-27, 124 S. Ct. 885 (2004); *Walker v. City of Orem*, 451 F.3d 1139, 1148 (10th Cir. 2006) (discussing unreasonableness of detaining mere witnesses).

### (3)    Officer Edwards and Sergeant Cotton Did Not Detain the Plaintiffs After the Shooting Occurred

56.      Moreover, regardless of whether justification existed for Corporal Delk to briefly detain the Plaintiffs in police vehicles after the shooting, neither Officer Edwards nor Sergeant Cotton was responsible for detaining a Plaintiff after the shooting occurred. As discussed *supra*, Corporal Delk assumed full control over the scene and investigation when he arrived seconds after the shooting occurred.   Therefore, as the Plaintiffs admit, Marian and Bobby Tolan's twenty-five minute detention and Cooper's one hour detention in a police vehicle after the shooting occurred were not detentions Officer Edwards or Sergeant Cotton made.   Therefore, these officers are entitled to judgment in their favor on Plaintiffs' alleged unconstitutional detention claims, even if the Court believes the post-shooting detentions may have been unconstitutional.   *Compare Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005); *Champagne v. Jefferson Parish Sheriff's Office*, 188 F.3d 312, 314 (5th Cir. 1999); *Cronn v. Buffington*, 150 F.3d 538, 544-45 (5th Cir. 1998); and *Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir. 1992).

### (4)    An Allegation of Use of Excessive Force Does Not Create a Separate Unconstitutional Detention Claim

57.    The Defendants will address *supra*, each Plaintiff's claim of alleged use of excessive force but an allegation that an officer used excessive force in the course of a seizure does not create a separate unconstitutional detention claim distinct from the excessive force claim.  *See Flores v. City of Palacios*, 381 F.3d 391, 403 (5th Cir. 2004).  Accordingly, no Plaintiff may support an alleged *unlawful detention* claim merely by alleging that an officer used *excessive force* during a detention.  *See id.*

### b.    There was No Unconstitutional Use of Force

58.    The record also disproves any claim of alleged unconstitutional use of force by Sergeant Cotton or Officer Edwards against any Plaintiff. Consistent with Supreme Court authority, the Fifth Circuit Court of Appeals has established a three part test for consideration of a claim of excessive force during detention under § 1983.  In order to prevail on an excessive force claim, a plaintiff must show (1) some injury; (2) which resulted directly and only from a use of force that was clearly excessive to the need; and (3) the excessiveness of which was objectively unreasonable.  *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009).

### (1)    Bobby Tolan was Not Subjected to Excessive Force

59.    The summary judgment record establishes that Bobby Tolan was not subjected to any use of excessive force by Sergeant Cotton or Officer Edwards. Bobby Tolan testified explicitly that neither Officer Edwards, nor Sergeant Cotton, used *any* force against him at all.  *[Ex. 18, p. 54, l. 24 - p. 55, l. 25; p. 56, ll. 4-12; p. 60, ll. 3-9; Ex. 17, p. 163, ll. 12-16]*.  Accordingly, Sergeant Cotton and Officer Edwards are entitled to judgment in their favor on Bobby Tolan's claim of alleged use of excessive force.  *See Ontiveros*, 564 F.3d at 382.

### (2)  Cooper was Not Subjected to Excessive Force

60.   The summary judgment record likewise establishes that Anthony Cooper was not subjected to any use of excessive force by Sergeant Cotton or Officer Edwards.  Indeed, Cooper testified similarly that neither Officer Edwards, nor Sergeant Cotton, used any force against him. Cooper claims only that Officer Edwards may have been the officer who applied handcuffs to Cooper's wrists, but admits that use of the hand restraints did not cause him any injury.  *{Ex. 16, p. 90, l. 11 - p. 91, l. 24; Ex. 17, p. 151, ll. 13-13}.*  It is well-settled law in this Circuit that the use of handcuffs in this manner cannot support a claim of alleged use of excessive force.  *See Tarver v. City of Edna*, 410 F.3d 745, 751-52 (5th Cir. 2005); *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007); *Glenn v. City of Tyler,* 242 F.3d 307, 314 (5th Cir. 2001); and *Dunn v. Denk*, 79 F.3d 401, 403 (5th Cir. 1996); *see also Crumley v. City of St. Paul*, 324 F.3d 1003, 1007-08 (8th Cir. 2003) (collecting cases); *Neague v. Cynkar*, 258 F.3d 504, 508 (6th Cir. 2001); *Hannula v. City of Lakewood*, 907 F.2d 129, 132 n.3 (10th Cir. 1990).  It is clear that "an officer may handcuff a suspect when 'reasonably necessary to maintain the status quo and protect [officer] safety during an investigative stop.'"  *Young v. Prince George's County*, 355 F.3d 751, 755 (4th Cir. 2004) (*quoting United States v. Taylor*, 857 F.2d 210, 213 (4th Cir. 1988)).  Accordingly, Sergeant Cotton and Officer Edwards are entitled to judgment in their favor on Cooper's claim of alleged use of excessive force as well.  *See Tarver*, 410 F.3d at 751-52.

### (3)  Marian Tolan was Not Subjected to Excessive Force

61.   The record also establishes that Marian Tolan was not subjected to use of excessive force. Marian Tolan makes no allegation that Officer Edwards used any force against her.[4]  *{Ex. 17, p. 18, l. 25 - p. 19, l. 7; p. 19, l. 21 - p. 20, l. 11}.*  Therefore, Officer Edwards is entitled to

---

[4]       Each individual officer's claim to immunity must be evaluated separately, *Meadours v. Ermel*, 483 F.3d 417, 422 (5th Cir. 2007); *Longoria v. Texas*, 473 F.3d 586, 593 (5th Cir. 2006).

judgment in his favor on Marian Tolan's force claim.  *See Ontiveros*, 564 F.3d at 382.

62.     Marian Tolan does allege that Sergeant Cotton's actions of what she describes as shoving her toward the garage door by taking hold of her arm and then later pushing her against the garage door constitute uses of excessive force.  *{Ex. 17, p. 110, l. 21 - p. 111, l. 19; p. 117, l. 13 - p. 118, l. 25; p. 125, ll. 3-11; p. 128, ll. 20-22; p. 134, ll. 9-20}.*  However, a police officer cannot be subjected to liability merely because he uses force while carrying out his duties and an officer cannot be held responsible for unfortunate results of use of *necessary force.  Hill v. Carroll County*, 587 F.3d 230, 237 (5th Cir. 2009).  "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to affect it."  *Graham*, 490 U.S. at 396, 109 S. Ct. at 1872.  Law Enforcement officers are often required to use force to accomplish their duties and "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment."  *Id.*  (*Quoting Johnson v. Glick*, 481 F.2d 1028, 1033, *cert. denied*, 414 U.S. 1033, 94 S. Ct. 462 (1973)).  In *Graham*, the Supreme Court held that, in order to sustain a cause of action for use of excessive force, the evidence must establish a use of force was "objectively unreasonable."  *Graham,* 490 U.S. at 397; 109 S. Ct. at 1872. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation," *id.*, and this altercation is a demonstration of that very principle.  *See also Saucier,* 533 U.S. at 202, 121 S. Ct. at 2156.

63.     The record before the Court establishes that, after conferring with Officer Edwards, Sergeant Cotton's attention was immediately drawn to Marian Tolan and that her behavior

heightened the officers' tension because she was part of a scene that was out of control and that must be controlled before the investigation could be conducted successfully. *{Ex. 2, p. 50, l. 21-p. 51, l. 15}*. Marian Tolan was hindering Sergeant Cotton's ability to search and handcuff Robbie Tolan. *{Ex. 2, p. 51, ll. 16-18}*.

64.     Sergeant Cotton attempted to gain Marian Tolan's cooperation with the investigation by asking her several times to step toward the garage door but she admits she flatly refused to comply with that reasonable request and she continued to protest the officers' presence while blocking Sergeant Cotton's efforts to safely securing the scene. *{Ex. 2, p. 51, l. 22-p. 52, l. 2}*. Thus, the record establishes that Marian Tolan interjected herself into the police investigation *{Ex. 17, p. 110, l. 25 - p. 111, l. 19}* and that she refused to comply with Sergeant Cotton's requests to move out of the way without the use of some minimal force being applied. *{Ex. 2, p. 61, l. 8 - p. 62, l. 21; Ex. 17, p. 117, l. 22 - p. 118, l. 25; p. 124, l. 21 - p. 125, l. 11; p. 128, ll. 20-22; Ex. 15, p. 80, ll. 3-24; p. 84, ll. 1-25, p. 85, ll. 1-9}*.

65.     The record further establishes that Sergeant Cotton followed accepted law enforcement officer training when deciding to move Marian Tolan out of the way and attempt to keep her from continuing to interfere. Sergeant Cotton also followed standard law enforcement training by attempting to de-escalate Marian Tolan's agitated state by asking her to calm down and informing her that things were going to be worked out as he attempted to physically direct her out of the way. The verbal de-escalation techniques were not effective in controlling Ms. Tolan however. *{Ex. 29}*.

66.     Law enforcement training expert Lieutenant Albert Rodriguez testified that law enforcement trainers instruct police officers on the importance of stabilizing law enforcement scenes involving felony suspects and multiple persons that are interfering with an arrest. Officers

are trained to recognize they must first stop the suspects and other persons' movements, if the scene is to be stabilized.  Allowing individuals and/or the suspects to roam and/or interfere with the situation increases the degree of danger to all involved.  *{Ex. 29}.*

67.     Notably, Marian Tolan freely admits that she walked from the sidewalk to the Chevrolet Suburban, back to Cooper, and back toward an officer while the officers were attempting to stabilize the situation.  Marian Tolan further admits that she heard an officer state, *"get against the wall,"* and that her response to the direction was the exclamation "are you kidding me?"  Marian Tolan admits she did not comply with Sergeant Cotton's reasonable request.  Officers stopping and/or controlling suspects and persons' movements in dangerous and uncertain scenes allows for the ability to safely confirm the unknown persons' and suspects' identity and/or their possible involvement in the situation.  *See Jewett,* 521 F.3d at 827.  Law enforcement officers must take reasonable steps in controlling the movements of suspects and persons that might be interfering before an officer proceeds to the identification, handcuffing, and/or verification of the information and suspects.  *{Ex. 29}.*

68.     Marian Tolan admits that she inserted herself into a law enforcement scene that was dangerous and uncertain and that she interfered with the officers' efforts to safely investigate a reported crime.  The confusion at the scene in the first minutes could have been stabilized if Marian Tolan had simply chosen to follow Sergeant Cotton's instructions, as Bobby Tolan did, instead of acting to further inflame the situation and increase this risk to all involved.  This was an event in which the Plaintiffs possessed, and controlled access to, the information necessary to resolve the investigation promptly and peaceably but their response to simply being approached by officers led the Plaintiffs to take actions which made it much more difficult for Officer Edwards and Sergeant to obtain the necessary information, which significantly compressed the

34

time frames within which the officers were required to interpret and analyze information; make decisions and take action; and increase the perception of risk to all involved.   Regardless of Marian Tolans' motives, her actions interfered with a prompt safe resolution of the investigation.

69.     "There can be a constitutional violation only if injuries resulted from the officer's use of excessive force. Injuries which result from, for example, an officer's justified use of force to overcome resistance to arrest do not implicate constitutionally protected interests."   *Johnson v. Morel*, 876 F.2d 477, 479-80 (5th Cir. 1989) (en banc).   Fifth Circuit precedent is clear that, if any of the elements of a claim under this test fail, so too does a plaintiff's claim.   *Id.*   Therefore, any reasonable law enforcement officer could have believed that Marian Tolan was subject to the reasonable restraint Sergeant Cotton used here, even if the Court views it as a shove, as Marian Tolan describes it.   *{Ex. 29}*.   Accordingly, the force Sergeant Cotton used against Marian Tolan was neither excessive to the need, nor objectively unreasonable.   *See Collier v. Montgomery*, 569 F.3d 214, 219 (5th Cir. 2009).   Therefore, Sergeant Cotton is entitled to judgment on Marian Tolan's claim of alleged use of excessive force.   *See id.*

### (4)     Robbie Tolan was Not Subjected to Excessive Force

70.     The record establishes as well that Robbie Tolan was not subjected to use of excessive force.   First, Robbie Tolan makes no allegation that Officer Edwards used *any* force against him. His only allegation against Officer Edwards is that he negligently keyed an incorrect license

71.     plate number into the police computer.[5]   *{Ex. 15, p. 59, l. 18 - p. 60, l. 21; p. 61, l. 11 - p.*

---

[5]     Negligence cannot provide a basis for liability under § 1983.   *Daniels v. Williams,* 474 U.S. 327, 106 S. Ct. 662 (1986); *Davidson v. Cannon,* 474 U.S. 344, 106 S. Ct. 668 (1986); *McCoy v. City of Monticello*, 342 F.3d 842, 847 (8th Cir. 2003).

   [T]he police on an occasion calling for fast action have obligations that tend to tug against each other.   Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs.   They are supposed to act decisively and show restraint at the same moment, and their decisions have to be made

*62, l. 10}.*

72.     As Circuit Judge Weiner wrote on behalf of the *Fraire* panel, "[t]he constitutional right to be free from unreasonable seizure has never been equated by the Court with the right to be free from a negligently executed stop or arrest." *See Fraire*, 957 F.2d at 1276.   Therefore, Officer Edwards is entitled to judgment in his favor on Robbie Tolan's claim of alleged use of excessive force.  *Compare Ontiveros*, 564 F.3d at 382.

73.     Robbie Tolan contends that Sergeant Cotton used excessive force when he fired the shot that struck Tolan.  *{Ex. 15, p. 140, ll. 17-2}.*  Sergeant Cotton testified that he believed his life was in danger because he perceived Robbie Tolan's actions as drawing a weapon from his waistband area.  *{Ex. 2, p. 67, ll. 3-9; p. 68, ll. 4-17}.*  It is undisputed that Sergeant Cotton and Robbie Tolan are the only two individuals who can provide factual information regarding the observations Sergeant Cotton made which led him to fire, {*Ex. 17, p. 66, ll. 18-25; p. 92, ll. 8-13; p. 92, l. 25 - p. 93, l. 5; p. 110, ll. 22-24; p. 117, ll. 18-21; p. 117, l. 25 - p. 118, l. 8; p. 174, ll. 19-25; p. 185, l. 24 - p. 186, l. 7; Ex. 18, p. 60, ll. 3-9; p. 65, ll. 4-13; p. 73, ll. 12-18; p. 78, ll. 9-14; p. 85, ll. 14-17*}, and even Robbie Tolan's testimony substantiates the validity of Sergeant Cotton's perceptions under the circumstances.  While it is true that, in some ways, Robbie Tolan and Sergeant Cotton view the undisputed factual information differently, from their individual subjective perspectives, but their differing opinions regarding the meaning or significance of the undisputed facts do not control the analysis the Court must undertake to resolve this motion for summary judgment.  *See Anderson v. Creighton,* 483 U.S. 635, 641 (1987); *Lockett v. New*

---

"in haste, under pressure, and frequently without the luxury of a second chance."

*Lewis*, 523 U.S. at 842, 118 S. Ct. at 1714 n. 5.  Notably, as it applies to the instant case, "[w]hen unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates 'the large concerns of the governors and the governed."  *Lewis*, 523 U.S. at 853, 118 S. Ct. at 1720; *see also Checki v. Webb*, 785 F.2d 534, 538 (5th Cir. 1986); *Herrera v. Millsap*, 862 F.2d 1157, 1160 (5th Cir. 1989).

*Orleans City*, 607 F.3d 992 (5th Cir. 2010); *Pierce v. Smith,* 117 F.3d 866, 871 n.5 (5th Cir. 1997).  Certainly "a constitutional violation does not occur every time someone *feels* that they have been wronged or treated unfairly."  *Shinn ex rel. Shinn v. College Station Independent School District,* 96 F.3d 783, 786 (5th Cir.) *cert. denied*, 520 U.S. 1211 (1997) (emphasis added).

74.     The question the Court must answer is whether *any officer*, not just Sergeant Cotton, could have evaluated the totality of the circumstances Sergeant Cotton encountered and reasonably reach the decision that firing was permitted under the law.  Put another way, summary judgment is required unless Plaintiffs have identified record evidence proving to the Court that not one reasonable police officer could have perceived a threat of serious injury based upon Robbie Tolan's admittedly expressive, aggressive actions.  *Cf., Ontiveros*, *supra*.  This is a standard Lieutenant Rodriguez ably has discussed repeatedly in his testimony.  *{Ex. 29; Ex. 28, p. 73, ll. 17-20; p. 121, ll. 8-10; p. 27, l. 13 - p. 28, l. 3; p. 30, l. 18 - p. 31, l. 1; p. 40, ll. 10-13; p. 56, l. 24 - p. 57, l. 15; p. 65, ll. 4-14; p. **72, ll. 11-18; p. 72, l. 21 - p. 73, l. 13;** p. 80, ll. 10-18; p. 81, ll. 12-22; p. 85, ll. 11-20; p. 98, ll. 15-21}.*  Because, consistent with the Constitution, this is how officers are trained.

75.     Consistent with the method the Supreme Court has provided for evaluating police uses of force, Lieutenant Rodriguez evaluated the appropriateness of this police conduct by the standard of how law enforcement officers are trained.  Prominently, he performed an *objective* analysis by evaluating how *any* well-trained officer – not just Sergeant Cotton and Officer Edwards – could reasonably be expected to respond when faced with the same or similar circumstances that Sergeant Cotton and Officer Edwards encountered in this incident based upon law enforcement training.  This analysis includes the evaluation of the totality of the circumstances, as could reasonably be perceived by a well-trained law enforcement officer, at the time that Sergeant

Cotton and Officer Edwards exercised their duties and authorities as law enforcement officers. Lieutenant Rodriguez's evaluation was conducted from the standpoint of what the record evidence show that a reasonable officer could reasonably have known and reasonably perceived at the time of the incident in question and not from a 20/20 hindsight standpoint. *{Ex. 29}*.

76.     Thus, Lieutenant Rodriguez's method of analysis here mirrors that the Supreme Court has identified as required for evaluating cases such as this and is like that the Court must now employ in its evaluation of the summary judgment record. Controlling jurisprudence acknowledges the practical reality that "a police officer views the facts through the lens of his police experience and expertise." *Ornelas v. United States*, 517 U.S. 690, 699-700, 116 S. Ct. 1657, 1663 (1996).   Thus, controlling precedent mandates that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 109 S. Ct. 1865. The reasonableness of Sergeant Cotton's actions, therefore, must be evaluated from the objective perspective of a *reasonable police officer on the scene* – not the subjective beliefs about police procedure of the Plaintiffs or their attorney. *See Linbrugger v. Abercia*, 363 F.3d 537, 542-43 (5th Cir. 2004); *Stroik v. Ponseti*, 35 F.3d 155, 158 (5th Cir. 1994).   Claimed disputes which are simply varying *interpretations* of events from differing, and generally irrelevant, points of view cannot raise material disputes because the *only* relevant perspective in correctly performing the required analysis is that of **an objectively reasonable** *police officer on the scene. See Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989),[6] *Mangieri v. Clifton,* 29 F.3d 1012,

---

[6]     Supreme Court mandate requires the Court to disregard merely speculative, possible, connotations *about* otherwise undisputed events which are not disputes of *fact* regarding the events themselves because resolution of subjective, divergent, impressions or interpretations about otherwise undisputed events is not necessary to resolve the relevant legal issue of whether the Officers' actions were lawful in light of the objective information known to them, from the point of view of a reasonable police officer on the scene. *See United States v. Banks*, 540 U.S. 31, 39, 124 S. Ct. 521, 527 (2003).

1017 (5th Cir. 1994). Application of this standard to Sergeant Cotton's testimony shows that his reported perception of the events and split second, reflexive, reaction to that perception was reasonable under the totality of the tense, uncertain, and rapidly evolving circumstances all witnesses agree he encountered. *{Ex. 2, p. 60, ll. 7-15; p. 61, l. 25 - p. 66, l. 2; p. 67, l. 9 - p. 69, l. 25; p. 71, ll. 3-12; p. 71, ll. 14-23; p. 78, ll. 18 - p. 79, l. 4; p. 79, l. 7-p. 80, l. 6; p. 80, ll. 11-21; p. 81, ll. 4-24; p. 82, ll. 19-23; p. 84, ll. 14-23; p. 88, ll. 11-23}.*

77.     Moreover, application of this standard which is required under *Graham* likewise shows there is nothing within Robbie Tolan's testimony which indicates that Sergeant Cotton's reported perception of the undisputed factual information was unreasonable, or that Sergeant Cotton's response to the undisputed factual information was unreasonable. Similarly, there is nothing within Robbie Tolan's testimony which indicates that no other competent law enforcement officer could not have reasonably have concluded his life was in danger and that firing in self defense was appropriate in response to the uncontested factual account provided by Robbie Tolan. *{Ex. 15, p. 85, l. 3 - p. 86, l. 8; p. 86, l. 20 - p. 88, l. 3; p. 88, l. 9 - p. 89, l. 15; p. 98, l. 20 - p. 99, l. 14; p. 99, l. 21 - p. 100, ll. 1-8; p. 100, l. 9 - p. 102, l. 10; p. 104, l. 19 - p. 105, l. 3; p. 105, l. 9 - p. 107, l. 22; p. 108, ll. 19-24; p. 109, ll. 22-25; p. 110, l. 22 - p. 111, l. 6; p. 111, l. 7-p. 112, l. 13; p. 112, l. 19 - p. 114, l. 15; p. 114, l. 19 - p. 115, l. 4; p. 115, ll. 10-21; p. 120, ll. 3-13; p. 120, l. 19 - p. 121, l. 1; p. 134, ll. 20-24; p. 137, ll. 8-11; p. 137, ll. 14-22; p. 138, ll. 1-10; p. 139, ll. 6-16; p. 142, l. 13 - p. 143, l. 9; p. 146, l. 19 - p. 147, l. 10; p. 147, ll. 14-16; p. 152, l. 9 - p. 153, l. 7}.* This testimony reveals that *a reasonable officer on the scene* could reasonably have evaluated the circumstances to authorize him to fire to defend himself, and that is the applicable standard for evaluating Sergeant Cotton's actions in this case. *See id*.

78.     Lieutenant Rodriguez's evaluation explains that law enforcement officers receive comprehensive training and education in the use of deadly force and civil rights issues related thereto in their TCLEOSE instruction, as well as the tactical need to be prepared to defend themselves in situations just like this.  Officers are trained that the use of deadly force is not a violation of civil rights when said force is within the parameters provided by the relevant provisions of the Texas Penal Code.  Lieutenant Rodriguez also studies, and uses when providing instruction to officers, court decisions pertaining to law enforcement action, including decisions of the Supreme Court and Fifth Circuit Court of Appeals.  Moreover, these legal opinions are informed by, and consistent with, research into officer action/reaction time, as discussed by Lieutenant Rodriguez and Dr. Lewinski.  *{Ex. 29}.*

79.     Lieutenant Rodriguez found that the circumstances Sergeant Cotton encountered, and which a well-trained police officer is taught to consider, included at least the following factors:

1)      Officer Edwards had requested assistance with two felony suspects;

2)      Officer Edwards requested that Sergeant Cotton to hurry to his location;

3)      Sergeant Cotton observed two more persons on the scene than reported;

4)      Sergeant Cotton did not know the Tolans, or their intentions;

5)      Sergeant Cotton did not know if any of the persons were armed;

6)      Marian Tolan was walking around in an agitated state, not complying with Officer Edwards' instructions, and interfering with the officers' duties;

7)      The scene was confusing, distracting, and not stabilized;

8)      Sergeant Cotton and Officer Edwards were outnumbered;

9)      Robbie Tolan yelled "Get your fucking hands off my mother;"

10)     Robbie Tolan had been in a prone position but shortly after yelling to Sergeant Cotton to get his "fucking hands" off his mother, Tolan raised and faced Sergeant Cotton;

11)     Robbie Tolan simultaneously moved his hand past his waistband area;

12) Sergeant Cotton recognized that if waited to confirm whether Robbie Tolan accessed a firearm from his person that it would be too late for Cotton to react in time to prevent from being seriously harmed or killed based on the principles of action being faster than reaction.

80. It is notable that almost immediately after firing and recognizing that Robbie Tolan was no longer a threat, Sergeant Cotton approached Robbie Tolan and asked what Robbie Tolan had been reaching for after searching Robbie Tolan looking for the expected weapon. {*Ex. 29*}.

81. Lieutenant Rodriguez testified he would instruct any law enforcement officer under the aforementioned circumstances, that a reasonable law enforcement officer could and should have a reasonable belief that Robbie Tolan presented an imminent threat of serious bodily injury or death to Sergeant Cotton. Therefore, Sergeant Cotton's actions were consistent with actions of a reasonable and well-trained law enforcement officer and Sergeant Cotton followed accepted training and understandably discharged his firearm to protect his life against Robbie Tolan's potentially life threatening actions. *{Ex. 29}.*

82. Contemporary law enforcement training does not train police officers to wait until they can positively confirm that a suspect has a weapon before the use of deadly force is justified. If that was the case, many more law enforcement officers would be killed due to the fact that scientific analysis demonstrates, and officers are trained, that a suspect's actions are always are faster than the officer's capability to react. Law enforcement training specifically addresses the fact that a suspect can access a firearm from the waistband area and shoot before an officer can react to shoot in defense if the officer waits until he positively confirms the existence of a weapon. Officers are trained to understand that, even if the officer is able to shoot at the *same time the suspect fires*, it is of no likely advantage to the officer. Shooting at the same time the suspect does means the officers could also get killed or seriously injured. *{Ex. 29}.* The courts

have recognized this fact.  *See Ontiveros, infra.*

83.     Sergeant Cotton did not have time to issue commands, nor does it appear that additional commands would likely have been effective at that moment, and/or at the point in time that Tolan decided to rise, turn toward Sergeant Cotton, and reached past his waistband area, particularly if, as Sergeant Cotton perceived, Robbie Tolan retrieving and intention to use a weapon.  Had Sergeant Cotton taken time to issue commands to Tolan at that particular point in time such inappropriate response would likely have cost him his life if Tolan was presenting a weapon.   Law enforcement training and research indicates that issuing commands while attempting to react to a deadly force situation increases an officer's reaction time and thereby denies him to an even greater degree the precious little time to react in defense.  *{Ex. 29}.*

84.     Law enforcement officers are trained to understand that an officer must have a reasonable belief that the suspect is reaching for a weapon before using force to repel the threat but they are required, and therefore not trained, that they must have a confirmed, one hundred percent accurate, confirmation that the suspect is reaching for a weapon before responding to the perceived threat.  Accordingly, law enforcement trainers educate officers on the fact that they simply do not have time to wait until they actually see a weapon before they take action in such circumstances.  Officers are trained that, if they wait to confirm the existence of a weapon, their likelihood of surviving the encounter decreases dramatically.  Therefore, officers are trained not to wait to this point but, rather, to respond to actions consistent with retrieving or drawing a weapon; actions which even Robbie Tolan admits he undertook.  *{Ex. 29}.*

85.     Sergeant Cotton discharged his firearm based upon the totality of circumstances that existed at the time, in accordance with law enforcement training stemming from the United States Supreme Court's Decision in *Graham v Connor*.  As Graham and its progeny instructs,

that Tolan was later found to be unarmed is not pertinent to the analysis of Sergeant Cotton's actions in accordance with his law enforcement officer training[7] because that information could not have been known by Sergeant Cotton until after the time had passed for him to act in self-defense from an actual or perceived attack. *{Ex. 29}.*

86.     Lt. Rodriguez concluded that, consistent with accepted law enforcement training, Sergeant Cotton had no other reasonable alternative but to resort to his handgun unless he chose the alternative of waiting to see whether Tolan was going to attempt to shoot him.  And, for Sergeant Cotton to simply wait to see if he would be killed was not a reasonable alternative. In evaluating Sergeant Cotton's actions in light of how officers are trained, any well-trained and reasonable law enforcement officer could have believed that Tolan presented an imminent threat of serious bodily injury or death. Sergeant Cotton's actions were, therefore, in compliance with accepted law enforcement training and practices.  *{Ex. 29}.*

87.     Doctor William Lewinski's expert evaluation establishes that police officers are taught about the practical relationship of action and reaction elements during a police event like a shooting. A great deal of officer training involves instruction designed to offset or reduce the potential danger to an officer and others during a situation where an officer must react immediately to a serious risk of danger posed by threatening actions of an individual.  Dr. Lewinski's research, like that of others, has validated the information typically provided to officers regarding the need to recognize the dramatic disadvantages that perception, decision making and reaction time pose for an officer when he is required to respond to a suspect's action that unfolds rapidly and can reasonably be perceived as potentially being life threatening, even if it ultimately turns out not to be.  Dr. Lewinski's research establishes that law enforcement officers must be trained to respond preemptively to a

---

[7]     Courts have actually determined such information to be "irrelevant" to evaluating the constitutionality of an officer's decision to shoot. *See Sherrod,* 856 F.2d at 807.

reasonably perceived threat because that is the *only effective way* an officer has to protect himself from imminent harm.  Dr. Lewinski has augmented the instruction officers typically receive by providing advanced training classes, seminars, articles, research bulletins, etc., which inform officers of the findings of his research and its practical implications, during potentially violent and rapidly unfolding encounters.  *{Ex. 27}.*

88.     While simply placing a hand in a waistband area is not necessarily considered a threat, within certain contexts that position or a movement toward that position can be a very threatening action. Context for a law enforcement officer is shaped by the training and experience of an officer, and by the information acquired by the officer as he approaches the incident and acquires information about the incident as it is unfolding. This information is typically then compared, consciously or unconsciously, with known facts such as information provided by training or factually accurate or perceived elements pertaining to the incident, and is used to help the officers reach a contextual understanding of the dynamics of an encounter.  *{Ex. 27}.*

89.     For instance, in this incident, as it evolved, Sergeant Cotton began to acquire information about the occupants of the suspected stolen vehicle, starting with the suspicion of their activity and including their response to his requests and then to his commands. He noted the difficulty the officers had in controlling the people at the scene and this reasonably led him to be concerned for his personal safety. Subsequently, when Robbie Tolan rose up and spun toward Sergeant Cotton with Tolan's hand passing his waistband area while Sergeant Cotton was attempting to control Marian Tolan, Robbie Tolan's abrupt, unexpected, and aggressive movement, taken in context, became an immediately threatening situation for Sergeant Cotton. Sergeant Cotton's concern was very reasonable as Dr. Lewinski's research shows that **a person with the intent to resist an officer by shooting that officer can pull a weapon from the position Robbie Tolan was in and fire a gun toward an**

**officer in one quarter of a second - on average; way too fast for an officer to do anything more than react consistent with standard police training and his own self-preservation instinct.** Therefore, an individual who is defiantly non-compliant and whose hands are in, going to, or reasonably appear to be going to his waistband area, certainly creates a very real threat to the officer.  As in baseball, the average batter in a professional game has approximately ½ a second of travel time of the ball from the pitcher's mound to home plate to react to the ball.  In the situation Sergeant Cotton faced, he had only half that time, or possibly less, to recognize and then react to Robbie Tolan's aggressive actions which compressed the relevant time frame for responsive reaction.  *{Ex. 27}.*

90.    In Dr. Lewinski's research of actual officer involved shootings, he has acquired videos of officers being shot so quickly that the only response they provided, if they reacted at all before being shot, was a flinch movement. Therefore, from a law enforcement training and research perspective, an appropriate law enforcement response to an imminent, potentially deadly, threat necessarily requires some degree of reasonable anticipation to compensate for the lag time the officer faces due to the reactionary gap**.  Therefore, a primary purpose of law enforcement training is to condition an appropriate response to a deadly threat so that it may be accomplished reflexively by the officer upon his detection of an imminent risk of serious injury.**  This means that when an officer detects a threat, consciously or unconsciously, in this type of situation, the only possible way for the officer to survive is if the officer's assessment of the threat and response thereto is trained to a very high degree of automaticity.  This is due to the fact that even deliberate thought takes time.  If the officer were to engage in any type of detailed assessment or prolonged thinking about the situation or his response, the initiation of the responding action would be delayed, by at least ½ to ¾ of a second at a minimum. Therefore, the assessment and reaction must be nearly automatically programmed.  Thus the propriety of an officer's reaction cannot be reliably evaluated by resorting to

information not readily apparent or available to a reasonable officer at the scene of an incident under the circumstance present at the moment of the perceived threat. The average officer using a short stroke, light poundage, handgun, like the Kimber .45 caliber handgun Sergeant Cotton used, can rapidly pull the trigger at the rate of ¼ of a second per shot. Therefore, Dr. Lewinski's research shows that the shooting time Sergeant Cotton had was approximately ½ a second, with the first bullet being fired at zero time and the third bullet being fired only ½ a second later.  Research shows that, during the brief moments that an officer is engaged in rapidly responding to save his life during this type of apparent, imminent threat, the officer is usually so intently focused on his response to the perceived threat that once he has made the decision to shoot and start toward that responsive action, it practically precludes his ability to critically analyze the response rapidly during the incident itself.  It also impairs the officer's ability to note that the conditions of the threat might have changed somewhat between the time he initiated his response and the actual completion of that response. Simply put, the exigencies of the situation and the need to accomplish a potentially life saving response occupies all of the officer's attention and cognitive resources.  The officer is, quite literally scared for his life and the self-preservation instinct and training provide an automatic response.  *{Ex. 27}.*

91.     Accordingly, guided by his education, training and experience, including the scientific, peer-reviewed and published research he has conducted regarding the scientific principles underlying action/reaction principles and law enforcement officer training on this issue, Dr. Lewinski's expert evaluation establishes that a reasonably well trained, law enforcement officer would likely perceive a threat and should have responded as Sergeant Cotton did in this instance. *{Ex. 27}.*

92.     Similarly, application of controlling judicial authority establishes that Robbie Tolan was not subjected to any use of excessive force. "Prominently, [n]o right is guaranteed by federal law

that one will be free from circumstances where he will be endangered by the misinterpretation of his acts." *Young v. City of Killeen*, 775 F.2d 1349, 1353 (5th Cir. 1985); *see also Fraire v. City of Arlington*, 957 F.2d 1268, 1275-76 (5th Cir. 1992).   As Texas Ranger Jeff Cook starkly explained a similar exigency confronting a law enforcement officer in *Ontiveros*, 564 F.3d at 384, n. 2:

> Q. If Lieutenant Logan perceived Mr. Ontiveros's actions as Mr. Ontiveros putting his hand inside the boot do you think it would have been necessary for Lieutenant Logan to wait until Mr. Ontiveros exhibited a weapon before taking defensive action?
> A. Absolutely not.
>
> Q. And why not?
> A. Because he will then be behind the curve on reacting. Action is always-action always beats reaction.
>
> Q. If Mr. Ontiveros had a handgun in this boot, would there be any threat to Lieutenant Logan by Mr. Ontiveros just leaving his hand in the boot?
> A. Absolutely.
>
> Q. And why so?
> A. Because you can shoot through a boot. If Mr. Ontiveros had a weapon, a gun in the boot, he could simply fire through the boot at Officer Logan.
>
> Q. And do you think that it's likely that Lieutenant Logan would have had enough time to take appropriate steps to protect himself if he waited until Mr. Ontiveros removed a handgun from the boot if he had had one in there?
> A. No. Once again, action beats reaction. If someone pulls a gun-I don't know if you want me to go into that or not but-
>
> Q. Explain that for us.
> A. Action is going to beat reaction every time. For example, if I have-if I have a gun and my brain-I have made the decision to shoot, then that message is going to travel down to my muscles and I'm going to shoot. For you to react to that-I have already started a process. You have to recognize it, then your brain has to tell your muscles to react, and then you're reacting to my actions. So action is going to beat reaction simply because of the cognitive element involved.
>
> Q. Have you observed a training exercise where one training officer stands across a room from an officer, for example, and the training officer has his hand down next to his body with a gun in it and then the other officer is supposed to react? Have you seen that kind of training exercise?

A. I actually participated in that training about three weeks ago.

Q. Can you explain that in detail, how that training section works?
A. Well, we had simunition guns. I don't know if I need to explain, but it's guns that look and feel real but they don't shoot real bullets. And literally, I stood there and pointed a gun at the instructor and the instructor had the gun actually pointed to the ground and just told me to shoot whenever he acted. And I could not shoot him before he shot me. At best, I could tie him. He could bring the gun up, pull the trigger before I could pull the trigger. I never beat him, and at best I could tie him.

Q. Is a tie good enough in this work?
A. No, a tie, you die, you know.

93.    **A tie, you die** is precisely the principle Lieutenant Rodriguez and Dr. Lewinski have explained in their testimony regarding the reasonableness of Sergeant Cotton's response to the potential threat he faced when he encountered the totality of the circumstances present in this. Supreme Court precedent demands that the "standard of reasonableness at the moment applies" in considering a claim of excessive use of force.  *Graham*, 490 U.S. at 396, 109 S. Ct. at 1872. Therefore, as the *Graham* Court discussed, appropriate application of the reasonableness standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*  Of particular consequence for the required analysis here, "[a]n officers use of deadly force is presumptively reasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others."  *Ontiveros,* 564 F.3d at 382; *accord Manis v. Lawson*, 585 F.3d 839, 844 (5th Cir. 2009). The Supreme Court held in *Tennessee v. Garner*, 471 U.S. 1, 11-12, 105 S. Ct. 1694, 1701 (1985), that:

Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon…deadly force may be used if necessary to

prevent escape, and if, where feasible, some warning has been given.

94.     "The reasonableness of an officer's use of deadly force is therefore determined by the existence of a credible, serious threat to the physical safety of the officer or those in the vicinity." *Hathaway v. Bazany*, 507 F.3d 312, 320 (5th Cir. 2007).  Noting the importance of proximity and temporal factors, the *Hathaway* Court concluded that:

> the entirety of the officer's actions were predicated on responding to a serious threat quickly and decisively. That his decision is now subject to second-guessing-even legitimate second-guessing-does not make his actions objectively unreasonable given the particular circumstances of the shooting.

*Id. at 322.*

95.     In *Reese v. Anderson*, 926 F.2d 494, 500-01 (5th Cir. 1991), Waco police officer Steve Anderson shot an unarmed suspect, who was surrounded by police officers, following a vehicular pursuit.  The *Reese* Court discussed the relevant objective facts *known to the officers*, including the suspect's action of reaching below Officer Anderson's line of sight, *even though it turned out the suspect was not reaching for a weapon.*  Considering the facts, in the light most favorable to the suspect, the *Reese* Court determined Officer Anderson could have reasonably, albeit ultimately mistakenly believed the suspect was reaching for a gun.  Properly, the *Reese* Court did not – as the Plaintiffs may ask this Court to do to avoid summary judgment – delve into possible reasons *why* the suspect refused to obey the law enforcement officers' commands or speculate as to what the suspect was possibly thinking, feeling, or trying to accomplish by his furtive and threatening acts.  Because the suspect's subjective thoughts or unknown intentions cannot, obviously, inform an officer's consideration of whether, or how much, force is needed, the *Reese* Court properly analyzed the objective circumstances, as this Court must and the District Court should have, from the viewpoint of a reasonable police officer performing public duties.  In so doing, the *Reese* Court discussed "[t]he sad truth is that [the suspect's] actions alone

could cause a reasonable officer to fear imminent and serious physical harm." *Id*.  The same conclusion is supported by the allegations made in the instant case.  The implication is clear; regardless of whether Robbie's actions were in actuality threatening or not, an officer is entitled to act upon his reasonable perception a threat exists.

96.     In *Mace v. City of Palestine*, 333 F.3d 621, 622-23 (5th Cir. 2003), police officers encountered an intoxicated suspect who was brandishing a sword.  The officers attempted to negotiate with the suspect without success and ultimately shot him when he raised his sword while within 8-10 feet of the officers.  Circuit Judge Jolly, on behalf of the *Mace* Court explained that the officer faced an intoxicated, violent and uncooperative armed individual within a few feet of police officers.  This Court determined "[i]t is not objectively unreasonable for an officer in that situation to believe that there was a serious danger to himself and the other officers present. *Id*. at 625.

97.     Also, consistent with the holdings of the Fifth Circuit on this issue, is the decision in *Blanford v. Sacramento County*, 406 F.3d 1110, 1115-16 (9th Cir. 2005),  Section 1983 claims against law enforcement officers were dismissed after they shot a saber wielding mentally disturbed man who seemingly refused to obey the officers' commands to disarm.  After the shooting, the officers determined the disturbed man may not have heard the warnings because he wore music headphones which were not apparent to the officers, the man was on medication which may have affected his behavior and judgment and there was no actual threat to others because the man lived at the location of the shooting and no one else was home at the time. *Blanford*, 406 F.3d at 1116.  The *Blanford* Court specifically analyzed the officers' perceptions of the events – without resorting to hindsight or speculation – and concluded, that from the perspective of a reasonable officer on the scene, the officer's perceptions were reasonable, *even*

50

*though incorrect* in light of the apparent threat the suspect posed.  *Id.*

98.     Likewise, in *Bell v. Irwin*, 321 F.3d 637, 639-40 (7th Cir. 2003), a plaintiff argued an officer's use of force was unreasonable because a colorable argument could be made both *for and against* the view the police officer acted appropriately.  However, the *Bell* Court rejected the plaintiff's request to essentially equate the question of reasonableness of a use of force under the constitution to a simple negligence standard.  *Id.*  The *Bell* Court discussed that, "[u]nder the Constitution, the right question is how things appeared to objectively reasonable officers at the time of the events, *not* how they appear in the courtroom to a cross-section of the civilian community."  *Id.*  As the *Bell* Court explained, when enough material facts to justify the challenged conduct are undisputed, there is nothing left for a fact finder "to do *except* second guess the officers, which *Graham* held must be prevented."  *Id.*  A creative individual "engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished."  *Id.*

99.     "The fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, itself, render the [challenged police action] unreasonable." *Cady v. Dombrowski*, 413 U.S. 433, 447, 93 S. Ct. 2523, 2531 (1973). "The reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative less intrusive means." *Illinois v. Lafayette*, 462 U.S. 640, 647, 103 S. Ct. 2605, 2610 (1983).  A police officer is not constitutionally required to perform his duties in the best manner possible; he is only required, under the Constitution, to act reasonably.  *See United States v. Sharpe*, 470 U.S. 675, 686-87, 105 S. Ct. 1568, 1575-76 (1985).  Therefore, even if Sergeant Cotton misinterpreted the Plaintiffs' intended actions, Sergeant Cotton's conduct is simply not cognizable under § 1983 because he could reasonably have believed his actions were necessary

under the totality of the factual circumstances evidenced by the record.  *See Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151 (2001) and *Brousseau v. Haugen*, 543 U.S. 194, 125 S. Ct. 596 (2004).

100.    Accordingly, Sergeant Cotton[8] is entitled to summary judgment in his favor.

### B.    Officer Edwards and Sergeant Cotton's Conduct was Objectively Reasonable

101.    Even if this Court finds there is sufficient evidence to overcome immunity on the first prong of the *Saucier* test, summary judgment is still required because the evidence disproves the elements necessary to sustain the Plaintiffs' burden on the second step in the analysis.  The summary judgment record likewise proves Officer Edwards and Sergeant Cotton's conduct was objectively reasonable in light of clearly established law at the time that the challenged conduct occurred.[9] For purposes of immunity, it "is not enough" that a factual dispute remains as to whether a Plaintiff was deprived of a constitutionally protected right; Officer Edwards and Sergeant Cotton are nonetheless entitled to qualified immunity because the evidence establishes that their respective actions were objectively reasonable under the circumstances each encountered or they were not on notice their respective actions were prohibited by clearly established law.[10]  *See Brousseau*, 543 U.S. at 199, 125 S. Ct. at 599.  It is error to merely give lip service to the immunity standard and then rely upon the general tests of *Graham* and *Garner*

---

[8]        There are certainly no allegations that Officer Edwards was personally involved in any use of excessive force against Robbie Tolan.

[9]        While the record affirmatively establishes the reasonableness of the officers' conduct, the burden is not theirs to prove. Instead, the Plaintiffs must negate the immunity defense by identifying evidence within the summary judgment record that shows Officer Edwards and Sergeant Cotton's conduct was objectively unreasonable in light of clearly established law at the time that the challenged conduct occurred.  *See Collier*, 569 F.3d at 217.

[10]       Notably, claims against Officer Hyman, the officer who fired the fatal shot in *Tennessee v. Garner*, were dismissed based upon his qualified immunity despite the decision that his action was ultimately held unconstitutional.  *See Garner*, 471 U.S. at 5, 105 S. Ct. at 1698; *Garner v. Memphis Police Department*, 8 F.3d 358, 365 (6th Cir. 1993).  This is the important difference between the constitutional test and the test of immunity which *Saucier* reminds must be respected in deciding an immunity case, *even where a constitutional violation may have occurred*.

in finding fair notice of a clearly established right. *Id.* "Here, case law does not provide the necessary precedent, either specifically or through broad principles, to clearly establish the right" sufficient to void the application of immunity. *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1292 (11th Cir. 2009).

102.    The qualified immunity analysis is actually a *two-step* process which entails both a determination of whether the plaintiff has shown the violation of a constitutional right, as well as also a determination of whether the conduct alleged was objectively reasonable in light of clearly established law at the time that the challenged conduct occurred. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034 (1987); *Saucier v. Katz*, 533 U.S. 194, 199, 121 S. Ct. 2151, 2155 (2001); *Glenn v. City of Tyler*, 242 F.3d 307, 312 (5th Cir. 2001).   Therefore, if a trial court determines a plaintiff's allegations, if proved, would have violated a constitutionally protected right, another step in a proper qualified immunity analysis is a determination of whether the right allegedly violated, considering the specific circumstances of the case, was clearly established in a particularized sense at the time a defendant was alleged to have violated it. *Saucier*, 533 U.S. at 201-02, 121 S. Ct. at 2155-56.

103.    Moreover, "[t]he second prong [of a qualified immunity analysis] 'is better understood as two separate inquiries: whether the allegedly violated constitutional rights were *clearly established at the time of the incident*; and, if so, whether the conduct of the defendants was *objectively unreasonable* in the light of that then clearly established law.'" *Felton v. Polles,* 315 F.3d 470, 477 (5th Cir. 2002) (*quoting Hare v. City of Corinth*, 135 F.3d 320, 326 (5th Cir. 1998)).   The second step of the analysis "focuses not only on the state of the law at the time of the complained of conduct, but also on the particulars of the challenged conduct and/or factual setting in which it took place." *Pierce v Smith*, 117 F.3d 866, 882 n. 5 (5th Cir. 1997).   As such,

to defeat an assertion of qualified immunity, a plaintiff must demonstrate that an officer violated clearly established federal rights.  *Salas*, 980 F.2d at 306; *Whatley*, 817 F.2d at 20.

> ### 1.   Officer Edwards and Sergeant Cotton Did Not Deprive any Plaintiff of a Clearly Established Right

104.   The summary judgment record establishes that neither Officer Edwards, nor Sergeant Cotton, deprived a Plaintiff of a clearly established right of which a reasonable police officer would have known.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 817-18, 102 S. Ct. 2727, 2738 (1982).  Whether a right was clearly established is an inquiry which "must be undertaken in light of the case's *specific context*, not as a broad general proposition."  *Saucier*, 533 U.S. at 201-02, 121 S. Ct. at 2156 (emphasis added).  If the law did not put the officer on notice *his conduct would be clearly unlawful*, dismissal based on qualified immunity is appropriate.  *Saucier*, 533 U.S. at 202, 121 S. Ct. at 2156; *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000).

> ### a.   Plaintiffs Cannot Identify a Clearly Established Right they Claim Either Officer Violated

105.   The Officers served Plaintiffs with interrogatories in an effort to discover the basis the Plaintiffs contend suggests Officer Edwards or Sergeant Cotton deprived a Plaintiff of a clearly established right but the Plaintiffs could not, or refused to, identify any clearly established right they claim either officer violated.  *{Exs. 21-24}*.  The Officers asked the following specific questions regarding this issue as to the claims asserted against Officer Edwards:

> State specifically each accepted law enforcement standard that any Plaintiff contends applies in a particularized sense to the specific circumstances of this case which could reasonably have put Officer John Edwards on notice that his conduct would be clearly outside an acceptable range of legitimate law enforcement activity.

> State each accepted law enforcement standard that applies in a particularized sense to the specific circumstances of this case which could reasonably have put Officer John Edwards on notice that his conduct would be clearly outside an acceptable range of legitimate law enforcement activity.

Identify all generally accepted law enforcement officer standards that Plaintiffs contend apply in a particularized sense to the specific circumstances of this case which could reasonably have put Officer John Edwards on notice that his conduct in this matter would be clearly unlawful and, for each such standard, identify the basis or source for Plaintiff's identification.

State all generally accepted law enforcement officer standards that apply in a particularized sense to the specific circumstances of this case which could reasonably have put Officer John Edwards on notice that his conduct in this matter would be clearly unlawful.

Identify any and all clear body of law Plaintiffs contend exists that could reasonably have put Officer John Edwards on notice that the conduct of which Plaintiffs have complained in this matter would be clearly unlawful.

State any body of law that could reasonably have put Officer John Edwards on notice that his conduct in this matter would be clearly unlawful. For each stated body of law, identify the source of the law, as well the basis for Plaintiffs' contention the identified body of law could reasonably have put Officer Edwards on notice that his conduct would be clearly unlawful.[11]

106.    Plaintiffs, however, did not even attempt a substantive response. The Officers similarly asked the following specific questions regarding this issue as to the claims asserted against Sergeant Cotton:

State each accepted law enforcement standard that applied in a particularized sense to the specific circumstances of this case which could reasonably have put Sergeant Jeffrey Cotton on notice that his conduct would be clearly outside an acceptable range of legitimate law enforcement activity.

State all generally accepted law enforcement officer standards that apply in a particularized sense to the specific circumstances of this case which could reasonably have put Sergeant Jeffrey Cotton's on notice that his conduct in this matter would be clearly unlawful.

107.    Plaintiffs did not even attempt to provide a substantive response to these questions. Accordingly, not only does the summary judgment record lack *any evidence* even suggesting Officer Edwards or Sergeant Cotton deprived a Plaintiff of a clearly established right, the

---

[11]        The Plaintiffs do provide a vague, non-substantive, response to only this question.  *[Ex. 23]*. Their response, however, is simply that the Fourth Amendment provides the required notice which is obviously deficient under *Brousseau v. Haugen*, 543 U.S. 194, 125 S. Ct. 596 (2004).

Plaintiffs are additionally precluded from taking the position that any does by their failure to participate in discovery by disclosing any basis for such a contention.  *See* FED.R.CIV.P. 33, 37.

### b.   Officer Edwards and Sergeant Cotton Followed Applicable Training Standards

108.   As discussed fully *supra*, the summary judgment record establishes that Officer Edwards and Sergeant Cotton followed applicable law enforcement officer training standards. Moreover, both Lieutenant Rodriguez and Dr. Lewinski have testified expressly that no standards exist which suggest either officer violated clearly established applicable training standards.  *{Exs. 27, 29}.*  Lieutenant Rodriguez testified explicitly that there is no accepted law enforcement officer standard that applies to the circumstances of this case which could have reasonably put Sergeant Cotton and/or Officer Edwards on notice that their conduct in this matter would be improper. Likewise, there is no training standard which even suggests that a competent law enforcement officer could not reasonably believe that Sergeant Cotton and/or Officer Edwards' actions were within an acceptable range of legitimate law enforcement procedures.  *{Ex. 29}.*

109.   Dr. Lewinski similarly testified that there is no accepted standard for law enforcement conduct during deadly force encounters such as Sergeant Cotton confronted in this incident which could have reasonably informed him, or any reasonable officer, that Sergeant Tolan's response to Robbie Tolan's action would be determined improper after any valid evaluation. To the contrary, this is exactly how officers are trained to respond to this type of situation. Dr. Lewinski testified that a contemporary law enforcement safety training instructs that Sergeant Cotton's actions were within an acceptable range of appropriate law enforcement responses to Robbie Tolan's conduct.  *{Ex. 27}.*

### c.     Officer Edwards and Sergeant Cotton Followed Applicable Legal Standards

110.    The summary judgment record also establishes not only that Officer Edwards and Sergeant Cotton followed applicable training standards but also that they followed applicable legal standards.  "If the law at the time of a constitutional violation does not give the officer 'fair notice' that his conduct is unlawful, the officer is immune from suit."  *Manis*, 585 F.3d at 845-46 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 599 (2004)).   "Clearly established for qualified immunity purposes means that the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Wilson v. Layne*, 526 U.S. 603, 615, 119 S. Ct. 1692, 1799 (1999); *Sanchez v. Swyden*, 139 F.3d 464, 466 (5th Cir. 1998).   If the law did not put the officer on notice *his specific conduct would be clearly unlawful*, dismissal based on qualified immunity is appropriate*, even if the conduct was in fact unconstitutional.  See Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3039 (1987); *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000).

111.    "Before 2005, Supreme Court precedent and cases in this circuit authorized deadly force when an officer had 'probable cause to believe that the suspect posed[d] a threat of serious physical harm.'"  *Manis* (*quoting Tennessee v. Garner*, 471 U.S. 1, 11-12, 105 S. Ct. 1694, 1701 (1985)).  The holdings of the Fifth Circuit throughout the last 25 years have instructed officers that it is clearly established that a law enforcement officer may, consistent with the Constitution, defend himself by shooting an individual provided that any officer, knowing only what that Officer knows at the moment, could reasonably have believed his life was in imminent danger, regardless of whether that officer's belief, in fact, ultimately correct.  *See Young*, 775 F.2d at 1352-53; *Reese*, 926 F.2d at 500-01; *Fraire*, 957 F.2d at 1275-76; *Ontiveros*, 564 F.3d at 384; *Hathaway*, 507 F.3d at 312; *Manis*, 585 F.3d at 844.  The Fifth Circuit has expressly recognized

that "[a]n officer's use of deadly force is presumptively reasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others." *Ontiveros*, 564 F.3d at 582. This is the applicable body of clearly established law and there is no evidence in the record even suggesting that Officer Edwards or Sergeant Cotton acted outside this standard.

112.    Understandably, therefore, from a law enforcement officer training perspective, Lieutenant Rodriguez testified that he has studied the applicable body of law and is not aware of any clear body of law that reasonably could have informed Sergeant Cotton and/or Officer Edwards that their conduct would be deemed improper. Instead, pursuant to law enforcement training, Sergeant Cotton's actions were objectively reasonable and in compliance with contemporary training standards that embody legal standards. *{Ex. 29}*.

### d.      Plaintiffs' Actions Were Unlawful

113.    Notably moreover, the record plainly establishes that the Plaintiffs actions were clearly unlawful. To overcome a police officer's assertion of qualified immunity, a plaintiff "must show *the legality of [his] conduct* was clearly established." *Sorrenson v. Ferrie*, 134 F.3d 325, 328 (5th Cir. 1998). As discussed in detail *supra*, the record establishes that the Plaintiffs were engaged in potentially unlawful conduct, including resisting the officers' lawful efforts to maintain the status quo and conduct an investigation when the incidents which form the basis of the suit occurred. Most significantly, however, the Plaintiffs actions were the driving force that accelerated the speed in which the pertinent events occurred. The Plaintiffs refusal to permit Officer Edwards and Sergeant Cotton to conduct a field investigation, unhampered by the complications and additional variables caused by the Plaintiffs' acts of resistance, greatly compressed the rate of which the officers were required to respond to the officers' efforts to determine whether the SUV was stolen. Therefore, the Plaintiffs cannot overcome Officer

Edwards or Sergeant Cotton's qualified immunity because the Plaintiffs' conduct was not clearly lawful. Accordingly, for all these reasons, the summary judgment record plainly establishes that Officer Edwards and Sergeant Cotton could not have been on notice that any of their actions, in reacting to the Plaintiffs' actions, in this case would violate clearly established law. *See Brosseau*, 543 U.S. at 198, 125 S. Ct. at 599.

### 2.    An Officer Could Reasonably Have Believed that Officer Edwards' and Sergeant Cotton's Conduct Was Lawful

114.    The summary judgment record also establishes that a competent officer could reasonably have believed that Officer Edwards and Sergeant Cotton's conduct was lawful. Plaintiffs simply cannot adduce evidence showing that no reasonable officer could have believed that Officer Edwards' and Sergeant Cotton's conduct was lawful in light of the information they possessed and clearly established law and, indeed, even Plaintiffs' own admissions establish the very opposite. *Compare Mendenhall*, 213 F.3d at 231; *Babb*, 33 F.3d at 477.  If officers of reasonable competence could disagree as to whether the alleged conduct violated a plaintiff's rights, immunity remains intact. *See Malley v Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096 (1986). Stated differently, a police officer is entitled to qualified immunity when even an *arguable* basis for his actions exists. *See Haggerty*, 391 F.3d at 656; *Vance v. Nunnery*, 137 F.3d 270, 274 (5th Cir. 1998).  Thus, even if an officer's conduct is determined, with the cool benefit of hindsight to be imprudent, he is still entitled to the protections of qualified immunity because he could reasonably have believed his actions proper under the circumstances he faced at the time.  *See Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997).

115.    The Officers have provided the Court with testimony from a former commander of the Texas Department of Public Safety state law enforcement training academy and from *the* preeminent psychological researcher in law enforcement officer shootings and both of these

59

experts agree that a reasonable officer could have believed Sergeant Cotton and Officer Edwards' conduct was appropriate. The Plaintiffs, on the other hand, rely only upon the sheer, insupportable mere denials of this evidence and unsupported argument.  Obviously, this is not sufficient to overcome the presumption of the officers' immunity, as is the Plaintiffs' burden.

116.    As Lieutenant Rodriguez testified, when viewed through the eyes of a well train law enforcement officer on the scene not benefitted by information only available through hindsight facts, the facts indicate that Officer Edwards and Sergeant Cotton did not violate Tolan's rights. Officers are trained to react as did Officer Edwards and Sergeant Cotton. Officer Edwards and Sergeant Cotton's actions were within the parameters of proper law enforcement training. {*Ex. 29*}.  This record undeniably establishes that Officer Edwards and Sergeant Cotton are entitled to summary judgment in their favor based upon their proven entitlement to qualified immunity. *See Saucier*, 533 U.S. at 201-02, 121 S. Ct. at 2155-56; *Snyder*, 142 F.3d at 800-01.

## II.    Plaintiffs' Claims Against Officer Edwards and Sergeant Cotton in their *Official Capacity*, are Duplicative and Should be Dismissed

117.    Lastly, since all Plaintiffs sue the City of Bellaire as well,[12] claims against the individuals in their official capacity should be dismissed.  The Plaintiffs' claims against Officer Edwards and Sergeant Cotton in their respective official capacities are duplicative of the claims asserted by the Plaintiffs against the City of Bellaire and should be dismissed.  A lawsuit against a governmental official in his official capacity is not a lawsuit against the individual but, rather is a suit against the official's office and is no different than a suit against the governmental unit which employs the official.  *Will v. Michigan Department of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312 (1989); *Anderson v. Pasadena Independent School District*, 184 F.3d 439, 443 (5th Cir. 1999).

---

[12]    Consistent with the Court's Scheduling Order, only the issue of the Officers' entitlement to immunity is presented by this motion.  The City will move for summary judgment, if necessary, at a later time.

Supreme Court, as well as, Fifth Circuit precedent clearly establishes that "[o]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent…"  *Monell v. New York City Department of Social Services*, 436 U.S. 658, 690, 98 S. Ct. 2018, 2035 n. 55 (1978); *accord Turner v. Houma Municipal Fire and Police Civil Service Board*, 229 F.3d 478, 483 (5th Cir. 2000).  Therefore, a lawsuit against a governmental official in his official capacity must be treated as a suit against the government itself.  *See Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 361 (1991); *see also Flores v. Cameron County*, 92 F.3d 258, 261 (5th Cir. 1996); *Bennet v. Pippin*, 74 F.3d 578, 584 (5th Cir. 1996).

118.    In this case, the Plaintiffs sue the City and also assert claims against Officer Edwards and Sergeant Cotton, the City's officials in their official capacity.  Accordingly, Plaintiffs' claims against Officer Edwards and Sergeant Cotton, in their *official capacity*, are duplicative of the claims against the City and should be dismissed.  *See Kentucky v. Graham*, 473 U.S. 159, 167, 105 S. Ct. 3099, 3106 (1985); *Young*, 775 F.2d at 1351.

## CONCLUSION AND PRAYER

119.    The claims the Plaintiffs' have asserted against Officer Edwards and Sergeant Cotton are simply not legally cognizable.  The Plaintiffs ask the Court to evaluate the reasonableness of law enforcement conduct undertaken by Officer Edwards and Sergeant Cotton from the point of view of a lay individual who was shot, and his parents, even though the Supreme Court has expressly held that this constitutional analysis must be performed very differently.  A lawsuit against a law enforcement officer brought under the Constitution invokes much broader societal, and consequent legal, interests than can be adequately considered in the narrow, personal view the Plaintiffs aver.  Society's interests must accommodate for the often times competing personal interests of individuals and greater societal concerns.  Obviously an individual has a personal

interest in generally being let alone but that individual interest, at times, must be compromised somewhat by the community's interest for protection from those individuals who would trample the individual rights of others.  Thus, the Constitution and federal laws were drafted, and later interpreted, to allow for reasonable operation of law enforcement activities.

120.    A prosecutable suit brought under § 1983 is meant to remedy harm to an individual plaintiff, and society as well to some degree, for the constitutional *misconduct* of a government official, not merely a negligent action of an official while he is performing duties associated with public service.  This is so because the duties society asks its officials, and most particularly its police officers, to perform must often be made during tense, uncertain and rapidly evolving circumstances.  Thus, public officials must have ample room for merely mistaken judgments in the pursuit of society's interests so that the government's agents will not be deterred in performing duties on behalf of the community at large.  The law acknowledges as much in recognizing qualified immunity.

121.    Consequently, a suit challenging the actions of a police officer must necessarily involve an evaluation of the accused officer's conduct through a legal standard which acknowledges the actions a reasonable law enforcement officer must take in the performance of his difficult public duties. The Plaintiffs' lawsuit fails because they only concern themselves with the individual harm they have personally sustained. The Plaintiffs seemingly do not even recognize, and certainly do not acknowledge and weigh, the personal interests of Officer Edwards and Sergeant Cotton in being apprised of reasonable limitations on their authority, or the broader societal interests at stake in this case.  The summary judgment record establishes that neither Officer Edwards, nor Sergeant, committed governmental misconduct. The record, instead, proves that they both acted reasonably and in accordance with constitutional limits. Officer Edwards did err

in either correctly perceiving the license plate number on the SUV, or in correctly typing the number he accurately perceived into his police computer as he drove past the SUV. Regardless of whether Officer Edwards erred in observation of the correct license plate number or erred in performing the task of typing, neither error reaches constitutional dimensions.

122.    Certainly, the mistaken suspicion that the SUV may have been stolen did not cause Robbie Tolan to be shot. Sergeant Cotton did not make the decision to shoot Robbie Tolan to merely apprehend a suspected auto thief. There is no evidence that, had Robbie Tolan actually stolen the SUV, Sergeant Cotton would have shot Tolan for the purpose of apprehending him for that crime. To the contrary, still suspecting Robbie Tolan may be a felony auto theft suspect, Sergeant Cotton placed his police handgun back into its holster when he escorted Marian Tolan toward the garage as Sergeant Cotton was positioning himself to approach Robbie Tolan to search him. It was not until *after* Marian Tolan physically and verbally resisted Sergeant Cotton's escort and *after* Robbie Tolan likewise took both verbal and physical aggressive actions toward Sergeant Cotton that he reasonably perceived his safety was in imminent danger.  Sergeant Cotton drew his police handgun from its holster and fired in self defense in response to the threat to his personal, physical safety that he reasonably believed existed at the moment he fired, not because he believed Robbie Tolan had stolen a vehicle.  Therefore, Officer Edwards' error in entering the correct license plate number is not what caused Sergeant Cotton to shoot Robbie Tolan.

123.    Other than entering the incorrect license plate number into the police computer, Officer Edwards made no other errors. While he certainly would have preferred to have conducted his investigation regarding the stolen vehicle report differently, he was not permitted to do so because of the Plaintiffs' actions. Officer Edwards first tried *asking* Robbie Tolan and Anthony

Cooper to provide information that could dispel the suspicion that the vehicle was stolen but they refused to comply with the reasonable request. Then Officer Edwards tried *commanding* Robbie Tolan and Cooper to get into a position which would permit Officer Edwards to perform an investigation that ultimately would have revealed that the SUV was not stolen, but Robbie Tolan and Cooper likewise refused to comply with that reasonable command.

124.    Officer Edwards did not act unreasonably when Bobby and Marian Tolan interjected themselves into the investigation. Officer Edwards similarly asked them cooperate with his efforts to conduct an investigation but Bobby and Marian Tolan obviously believed that their mere unverified claims that the vehicle was not stolen, even though the police computer had identified it as stolen, should have been accepted immediately and stop the investigation.  Officer Edwards heard the Plaintiffs' claims that the SUV was not stolen but he was still required to verify those claims and he could not safely do so until after the scene was more secure.  The Plaintiffs clearly did not recognize this fact of police procedure and were intolerant of, and apparently further angered by, its requirements. In light of the responses of all the Plaintiffs, it is understandable that Officer Edwards would seek assistance from other police officers, which he did. Officer Edwards provided Sergeant Cotton with the information available at the time of Cotton's arrival and, thereafter, Officer Edwards essentially occupied himself with Bobby Tolan and Cooper. Officer Edwards relinquished control of the investigation and scene to Corporal Delk within seconds after Robbie Tolan was shot and Officer Edwards did not use force against any Plaintiff.  The record therefore undeniably shows that Officer Edwards should never have been sued, but since he was, he is now entitled to summary judgment in is favor.

125.    Sergeant Cotton is likewise entitled to summary judgment in his favor. The record developed during the course of discovery confirms, as the state criminal court determined, that

Sergeant Cotton's conduct was justified in light of the totality of the circumstances he encountered.  Even though Sergeant Cotton did not commit any error in his decisions or actions, the Plaintiffs nonetheless seek to subject him to the unnecessary burdens of litigation and impose liability upon him for engaging in appropriate law enforcement conduct but the Constitution simply does not permit this type of unwarranted imposition on society's public servants.  The evidence unequivocally proves that Sergeant Cotton acted not only reasonably, but further that he acted appropriately in addressing the obstacle Marian Tolan presented to the investigation and in facing the apparent threat Robbie Tolan's actions presented at the moment of the shooting. Sergeant Cotton also would have preferred to conduct his investigation differently, but again, he was not permitted to do so because of the Plaintiffs' actions.

126.    Obviously *knowing now* that the SUV was not stolen and that no Plaintiff was armed, Sergeant Cotton wishes he had not used any force against any Plaintiff. However, Sergeant Cotton could not have known this information while he was on the scene at the time of the events. This is precisely why information like this, which is only available through the 20/20 vision of hindsight, is not probative of the constitutionality of Sergeant Cotton's conduct.  From the perspective of a reasonable police officer on the scene (like Sergeant Cotton here), and considering the totality of the circumstances that would have been apparent to any reasonable officer on the scene at the time (which have been discussed fully *supra*), it was consistent with police officer training, police procedure and controlling judicial decisions for Sergeant Cotton to escort Marian Tolan a few feet by grasping and pulling her arm firmly and placing her against the garage door. Sergeant Cotton was informed that Robbie Tolan and Cooper had used a vehicle that was reported stolen so Officer Edwards attempted to confirm the stolen vehicle report by investigating the circumstances further.  Officer Edwards could not conduct the necessary

investigation safely until the scene was determined to be safe. Sergeant Cotton attempted to make the scene safer by asking for Marian Tolan's cooperation with the investigation but she refused to comply with Sergeant Cotton's request so he escorted her in a direction that he reasonably believed would provide greater safety for the investigation to be conducted. Due to Marian Tolan's resistance to the escort, and the unanticipated words and sudden actions of Robbie Tolan, Sergeant Cotton pushed Marian Tolan out of the way and into the garage door. This minimal level of force applied by Sergeant Cotton against Marian Tolan was not excessive to the need, nor was it objectively unreasonable, in light of the circumstances at the scene.

127.   Also, from the perspective of a reasonable police officer on the scene (like Sergeant Cotton here), and considering the totality of the circumstances that would have been apparent to any reasonable officer on the scene at the moment Sergeant Cotton fired (which have been discussed fully *supra*), it was consistent with police officer training, police procedure and controlling judicial decisions for Sergeant Cotton to shoot Robbie Tolan. It is not correct to conclude that Sergeant Cotton's police tactical decision and action was wrong simply because Robbie Tolan did not ultimately confront Sergeant Cotton with a weapon. If that is the standard by which Sergeant Cotton's response must be judged (tactically or legally), he could not know whether he had acted "wrongly," or justifiably, by firing in self defense until *after* it was too late to defend himself from an attack.[13] Such an impractical standard could not apprise any officer of reasonable bounds for his conduct and would not serve the public interest. This is why officers are trained to respond to reasonably perceived threats, not only those which later prove to have been in fact deadly to the officer, and also why the judicial decisions pertaining to evaluation of police officer conduct support the manner in which officers are trained. The record before the

---

[13]      As Texas Ranger Cook testified, a tie is not good enough because "a tie, you die." *Ontiveros*, 564 F.3d at 384, n. 2.

Court plainly establishes that Sergeant Cotton reasonably responded to the need to control the scene during the investigation of possible felony criminal conduct and used only reasonable levels of force in response to reasonably perceived, apparent threats. Therefore, under the applicable standard for analysis, Sergeant Cotton acted appropriately.

128.    Prominently, the Plaintiffs have wholly failed to identify any evidence which they even contend could have guided either Officer Edwards or Sergeant Cotton on how to respond differently to the Plaintiffs' conduct during this occurrence.  The Plaintiffs have failed to even offer any alternative accepted law enforcement training or procedural standard, or any body of law, that could reasonably be applied to the circumstances of this case which could reasonably have placed Officer Edwards or Sergeant Cotton on notice that their conduct would be unlawful, or even outside an acceptable range of legitimate law enforcement activity.  The Plaintiffs have certainly not produced any evidence showing that Officer Edwards or Sergeant Cotton was *constitutionally required* to act differently than he did.

129.    While it is understandable how some lay persons, particularly those with personal interests at stake, may initially question the actions Officer Edwards and Sergeant took in this case; uninformed lay persons simply do not have the necessary training or experience to objectively evaluate the propriety of a law enforcement officer's conduct. Nor are lay persons typically called upon to balance the types of competing interests necessary to evaluate law enforcement duties in contemporary society. Therefore, it is necessary for any fact finder, or legal arbiter, who is called upon to evaluate a plaintiff's claim against a law enforcement officer to understand *how* law enforcement officers are trained, and the practical reasons *why* they are trained as they are. When evaluating the evidence within the summary judgment record, from the perspective of a reasonable law enforcement officer and considering that the training provided to

67

officers informs that perspective, the record proves that Officer Edwards and Sergeant Cotton acted reasonably and thus are entitled to summary judgment in their favor. Their actions were guided by, and performed according to, contemporary police officer training. Thus, they could not have been on notice that their conduct would later be found unconstitutional. The record establishes that they performed their duties reasonably so they ask the Court to dismiss the claims brought against them and grant judgment in their favor, as a matter of law.

130.    FOR THE FOREGOING REASONS, Officer Edwards and Sergeant Cotton respectfully move this Court to grant its motion for summary judgment, dismiss Plaintiffs' claims and allegations with prejudice, and afford these Defendants all other relief to which they are justly entitled in law and equity.

<div style="margin-left:40%">

Respectfully Submitted,

CHAMBERLAIN, HRDLICKA, WHITE,
   WILLIAMS & MARTIN
By:   /s/ Norman Ray Giles
   WILLIAM S. HELFAND
   SBOT: 09388250
   NORMAN RAY GILES
   SBOT: 24014084
   1200 Smith Street, Suite 1400
   Houston, Texas 77002
   (713) 654-9630
   (713) 658-2553 (Fax)
   ATTORNEYS FOR DEFENDANTS

</div>

## CERTIFICATE OF SERVICE

    I certify that a true and correct copy of the foregoing has been forwarded to the following counsel of record in accordance with the District's ECF service rules on this 1st day of January, 2011, as follows:

Geoffrey Berg
BERG & ANDROPHY
3704 Travis Street
Houston, Texas 77002

<div style="margin-left:55%">/s/ Norman Ray Giles</div>