IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT R. TOLAN, MARIAN TOLAN, | § | |
| BOBBY TOLAN, AND | § | |
| ANTHONY COOPER, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:09-1324 |
| | § | |
| JEFFREY WAYNE COTTON; | § | |
| JOHN C. EDWARDS; | § | |
| RANDALL C. MACK, CHIEF OF | § | |
| POLICE; BYRON HOLLOWAY, | § | |
| ASSISTANT CHIEF OF POLICE; | § | |
| CYNTHIA SIEGEL, MAYOR; | § | |
| BERNARD SATTERWHITE, CITY | § | |
| MANAGER; THE CITY OF BELLAIRE; | § | |
| AND THE BELLAIRE POLICE | § | |
| DEPARTMENT, | § | |
| | § | |
| **Defendants.** | § | JURY TRIAL DEMANDED |

REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS',
EDWARDS AND COTTON, MOTION FOR SUMMARY JUDGMENT

Defendants, Officer John Edwards and Sgt. Jeffrey Cotton, file this reply to the Plaintiffs'

opposition to the Defendants' motion for summary judgment.   These Defendants would

respectfully show the Court as follows:

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ....................................................................................... ii

APPLICABLE MOTION STANDARDS ..................................................................... 1

ARGUMENTS AND AUTHORITIES.......................................................................... 3

I.      There Was No Violation of the 4th Amendment ................................................. 3

        A.      Sgt. Cotton Did Not Use Excessive Force Against Robbie Tolan .......................... 4

        B.      Sgt. Cotton Did Not Use Excessive Force Against Marian Tolan ....................... 19

        C.      There is No Support for a 4th Amendment Claim Against Officer Edwards ........ 20

II.     There Was No Violation of the 14th Amendment ............................................ 21

III.    Officer Edwards and Sgt. Cotton are Protected by Immunity Even if a Dispute Exists Regarding a Claimed Constitutional Violation................................................. 25

        A.      There was No Violation of a Clearly Established Right...................................... 27

        B.      An Officer Could Reasonably Have Believed that Officer Edwards' and Sgt. Cotton's Conduct Was Objectively Reasonable................................................... 30

CONCLUSION................................................................................................... 31

CERTIFICATE OF SERVICE ....................................................................... 32

# TABLE OF AUTHORITIES

## Federal Cases

*Anderson v. Liberty Lobby,*
    477 U.S. 242, 106 S.Ct. 2505 (1986) .......................................................................... 3, 21, 24

*Arendale v. City of Memphis,*
    519 F.3d 587 (6th Cir. 2008) ..................................................................................... 22, 23, 24

*Beck v. Texas State Board of Dental Exam'rs,*
    204 F.3d 629 (5th Cir. 2000) ................................................................................................... 1

*Boeing Co. v. Shipman,*
    411 F.2d 365 (5th Cir. 1969) ............................................................................................ 1, 24

*Brosseau v. Haugen,*
    543 U.S. 194, 125 S.Ct. 596 (2004) ........................................................................ 4, 25-27, 29

*Brumfield v. Hollins,*
    551 F.3d 322 (5th Cir. 2008) ................................................................................................... 1

*Bryan v. City of Madison,*
    213 F.3d 267 (5th Cir. 2000) ................................................................................................. 24

*Collier v. Montgomery,*
    569 F.3d 214 (5th Cir. 2009) ................................................................................................... 1

*Eversley v. Mbank,*
    843 F.2d 172 (5th Cir. 1988) ..................................................................................... 20, 27, 28

*Fraire v. City of Arlington,*
    957 F.2d 1268 (5th Cir. 1992) ................................................................................... 15, 16, 28

*Garner v. Memphis Police Department,*
    8 F.3d 358 (6th Cir. 1993) ....................................................................................................... 4

*Gautreaux v. Scurlock Marine Inc.,*
    107 F.3d 331 (5th Cir. 1997) ............................................................................................ 1, 24

*Graham v. Connor,*
    490 U.S. 386, 109 S. Ct. 1865 (1989) .................................................................................... 25

*Haggerty v. Texas Southern University,*
    391 F.3d 653 (5th Cir. 2004) ................................................................................................. 31

*Harlow v. Fitzgerald,*
    457 U.S. 800, 102 S. Ct. 2727 (1982) ................................................................ 27

*Hathaway v. Bazany,*
    507 F.3d 312 (5th Cir. 2007) ........................................................................... 28

*International Shortstop, Inc. v. Rally's, Inc.,*
    939 F.2d 1257 (5th Cir. 1991) ..................................................................... 3, 24

*Lewis v. City of West Palm Beach,*
    561 F.3d 1288 (11th Cir. 2009) ..................................................................... 29

*Little v. Liquid Air Corp.,*
    37 F.3d 1069 (5th Cir. 1994) ............................................................................ 2

*Mangieri v. Clifton,*
    29 F.3d 1012 (5th Cir.1994) ......................................................................... 20

*Manis v. Lawson,*
    585 F.3d 839 (5th Cir. 2009) ............................................................. 5, 6, 8, 28-30

*Mendenhall v. Riser,*
    213 F.3d 226 (5th Cir. 2000) ......................................................................... 27

*Ontiveros v. City of Rosenberg,*
    564 F.3d 379 (5th Cir. 2009) ............................... 2, 5, 6, 8, 15, 16, 19, 29, 30

*Pfannstiel v. City of Marion,*
    918 F.2d 1178 (5th Cir.1990) ....................................................................... 20

*Pierce v. Smith,*
    117 F.3d 866 (5th Cir. 1997) ................................................................... 25, 26

*Reese v. Anderson,*
    926 F.2d 494 (5th Cir. 1991) ..................................................................... 5, 28

*Rolf v. City of San Antonio,*
    77 F.3d 823 (5th Cir. 1996) ........................................................................... 24

*Saucier v. Katz,*
    533 U.S. 194, 121 S. Ct. 2151 (2001) ................................................ 4, 25, 26, 31

*Siegert v. Gilley,*
    500 U.S. 226, 111 S.Ct. 1789 (1991) ............................................................ 4, 25

*Tennessee v. Garner,*
    471 U.S. 1, 105 S.Ct. 1694 (1985) .......................................................................... 4

*TIG Insurance Co. v. Sedgwick James of Washington,*
    276 F.3d 754 (5th Cir. 2002) .............................................................................. 21

*Vance v. Nunnery,*
    137 F.3d 270 (5th Cir. 1998) .............................................................................. 31

*Washington v. Allstate Ins. Co.,*
    901 F.2d 1281 (5th Cir. 1990) ............................................................................ 24

*Whatley v. Philo,*
    817 F.2d 19 (5th Cir. 1987) .................................................................................. 1

*Young v. City of Killeen,*
    775 F.2d 1349 (5th Cir. 1985) ......................................................................... 5, 28

## Federal Rules

FED.R.CIV.P. 11(b)(3) ............................................................................................... 21

FED.R.CIV.P. 56 ..................................................................................... 1, 3, 21, 24

FED.R.CIV.P. 56(e) .......................................................................................... 20, 27, 28

FED.R.EVID. 106 ............................................................................................. 8, 16, 17

## APPLICABLE MOTION STANDARDS

1.      "Although nominally an affirmative defense, the plaintiff has the burden to negate the assertion of qualified immunity once properly raised." *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009). Therefore, it is well-settled that Sgt. Cotton and Officer Edwards are not required to identify summary judgment evidence showing their entitlement to qualified immunity, it is sufficient that they plead their entitlement to immunity *at which point the burden is on the Plaintiffs to disprove immunity*. *See Beck v. Texas State Board of Dental Exam'rs*, 204 F.3d 629, 633 (5th Cir. 2000). Thus, because Sgt. Cotton and Officer Edwards have invoked their qualified immunity {*Doc. nos. 21, 67*}, "the burden of negating the defense lies with [the Plaintiffs], even on summary judgment." *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008). Accordingly, the Plaintiffs' transparent redundant use of the term "affirmative defense" throughout their brief in opposition to the officers' motion for summary {*Doc. no. 70*}, therefore, does not relieve the Plaintiffs of **their obligation** to satisfy **their burden** which requires that **they negate immunity** by specifically identifying evidence which **rebuts** the officers' **presumed** entitlement to dismissal based upon **immunity**. *Whatley v. Philo*, 817 F.2d 19, 20 (5th Cir. 1987).

2.      Moreover, throughout their brief, the Plaintiffs also repeatedly rely upon what the "Plaintiffs allege." Reference to those bare assertions, particularly to the extent they are disproved by the evidence, is not an acceptable substitute for competent summary judgment evidence at this stage of the litigation. *See* FED.R.CIV.P. 56. Rather, to avoid summary judgment, there must be a conflict in substantial **evidence** to create a jury question, not merely an *allegation. Boeing Co. v. Shipman*, 411 F.2d 365, 375 (5th Cir. 1969), *overruled on other grounds by Gautreaux v. Scurlock Marine Inc.*, 107 F.3d 331, 339 (5th Cir. 1997).[1]

---

[1]      Oddly, the numerous foundationless assertions that "Plaintiffs allege" are not competent evidence also because the factual record establishes that the Plaintiffs do not, *in fact*, even make the assertions their counsel argues

3.      Because the Plaintiffs' have simply inserted the unsubstantiated phrase "Plaintiffs allege" throughout their brief wherever they cannot identify competent summary judgment evidence, or legal authority, to support a contention they bear the burden on, the Court can more accurately evaluate the summary judgment record by reading the phrase "Plaintiffs' allege" as "Plaintiffs cannot identify evidence or legal support supporting" the proposition argued. Therefore, the Plaintiffs *allegations,* supported only by continued unsubstantiated assertions and unsupported mere argument of counsel fail, to satisfy the Plaintiffs' burden to identify a **genuine dispute** in **material facts** necessary to avoid summary judgment and, accordingly, Plaintiffs' own briefing demonstrates the propriety of entry of summary judgment in favor of Sergeant Cotton and Officer Edwards. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

4.      Furthermore, even though resolution of the motion for summary judgment by the Court necessarily requires evaluation of the objective reasonableness[2] of the conduct of two police officers, the Plaintiffs' response wholly fails to analyze or even consider, let alone disprove as required, either officer's actions measured against the perspective of a reasonable law enforcement officer on the scene; an essential element of the immunity defense. Prominently, the Plaintiffs instead employ the 20/20 skewed vision of a plaintiff's hindsight expressly eschewed by the Supreme Court and Fifth Circuit as an obviously unacceptable approach to judging the reasonableness of a police officer's conduct or his related claim of immunity. *See Graham*, 490 U.S. at 396, 109 S. Ct. 1865. *Accord, Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009). This fundamental error renders the Plaintiffs' contentions flawed in both their burden to identify the *material* facts, and in determining whether any alleged factual dispute in the record

---

the Plaintiffs *allege*, as discussed in detail *infra*.

[2]      Significantly, two separate forms of *objective reasonableness* must be evaluated in resolving the claim of qualified immunity. *See Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382-83 (5th Cir. 2009).

is *genuine* for purposes of evaluating the objective reasonableness of Sgt. Cotton or Officer

Edwards' conduct. The substantive law dictates identification of the material facts. *Anderson v.*

*Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986).

> Only disputes over facts that might affect the outcome of the suit *under the governing law* will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* (emphasis added).

> Of course, the court need only concern itself with contradictions of salient facts: factual disputes over issues not germane to the claim are simply irrelevant because they are not outcome determinative. The court may grant a motion, immaterial factual disputes notwithstanding.

*International Shortstop, Inc. v. Rally's, Inc*., 939 F.2d 1257, 1264 (5th Cir. 1991).

5.      A dispute about a material fact is genuine, under FED.R.CIV.P. 56, only "if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S.

at 248, 106 S.Ct. at 2510. Contrary to the Plaintiffs' argument, appropriate application of the

controlling standards requires summary judgment in favor of Officer Edwards and Sgt. Cotton

because the record establishes that both officers are protected from liability based upon the fact

neither committed an unconstitutional act and, *additionally*, both are immune.

## ARGUMENTS AND AUTHORITIES

## I.      There Was No Violation of the 4th Amendment

6.      The summary judgment record establishes there was no violation of the Fourth

Amendment against any Plaintiff by either individual Defendant. In an effort to avoid summary

judgment, the Plaintiffs attempt a slight of hand by which they mix terms, such as "clearly

established," into their briefing which would only pertain to the second element of the qualified

immunity test while seeking to utilize the legal standard which is only applicable to the first

element of the test. However, this ploy is unavailing because "[a] necessary concomitant to the

determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793 (1991). As the Defendants' explained, and proved, at length through their motion, yet the Plaintiffs have simply ignored in their response by arguing a merger of the analyses of the underlying constitutional question and whether immunity nonetheless exists regardless of the possibility of unconstitutional conduct, the fallacy of Plaintiff's approach to this fundamental principle is clearly illustrated by the ultimate result in *Tennessee v. Garner*.  In *Garner*, the police officer who fired the fatal shot was found entitled to qualified immunity *despite the decision that his use of force was unconstitutional. See Tennessee v. Garner*, 471 U.S. 1, 5, 105 S.Ct. 1694, 1698 (1985); *Garner v. Memphis Police Department*, 8 F.3d 358, 365 (6th Cir. 1993). Accordingly, and despite Plaintiffs' efforts to ignore this essential distinction, there is a critical difference between the constitutional test and the test of immunity where a constitutional violation may have occurred. *See Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 598 (2004) and *Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 2156 (2001). As the Defendants discuss more fully *infra*, the Plaintiffs have failed in their briefing to even address the relevant immunity issues but, because the Plaintiffs argue alleged factual disputes exist regarding the underlying Fourth Amendment claim, the Defendants first discuss why the summary record establishes that Sgt. Cotton and Officer Edwards are entitled to judgment in their favor on that initial independent ground.

### A.    Sgt. Cotton Did Not Use Excessive Force Against Robbie Tolan

7.    Contrary to the Plaintiffs' insupportable argument, the summary judgment record shows that Sgt. Cotton did not use excessive force against Robbie Tolan. The Plaintiffs' *argument*,

without supporting evidence, otherwise is further wholly premised upon an incorrect legal standard. Claiming support from *Garner*, Plaintiffs argue that "[t]he use of deadly force is not justified unless a suspect poses a risk of serious harm at that point in time." {*Doc. no 70 at ¶ 45*}. However, this *ipse dixit* assumption is a far cry from the actual state of the law. The actual controlling legal standard is that "[a]n officer's use of deadly force is **presumptively reasonable** when the officer has **reason to believe** that the suspect poses a threat of serious harm to the officer or to others." *Ontiveros,* 564 F.3d at 382 (emphasis added); *accord Manis v. Lawson*, 585 F.3d 839, 844 (5th Cir. 2009). Regardless of whether a suspect is ultimately found to have actually posed a risk of serious harm at that point in time, or not, "[t]he sad truth is that [the suspect's] actions alone could cause a reasonable officer to fear imminent and serious physical harm" authorizing the use of deadly force. *Reese v. Anderson*, 926 F.2d 494, 500-01 (5th Cir. 1991). Accordingly, contrary to the Plaintiffs' contentions, "[n]o right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts." *Young v. City of Killeen*, 775 F.2d 1349, 1353 (5th Cir. 1985). In ignoring this legal reality, the Plaintiffs assert various arguments which they claim create disputes in the application of their desired, but incorrect, legal standard.

8.      The Plaintiffs write *in their briefing* that they contend Robbie Tolan got up on his knees, made no threatening movements toward his waistband and did not charge toward Sgt. Cotton. Plaintiffs assert that these allegedly disputed claimed "facts" preclude summary judgment, presumably under their legal standard. {*Doc. no. 70 at ¶ 45*}. This argument fails for several reasons however. Foremost, the pertinent question is whether an officer could reasonably have perceived the totality of the circumstances Sgt. Cotton encountered as a threat of serious harm, not necessarily whether any of the claimed discrete disputed facts existed or occurred.

9.      Moreover, the uncontroverted record undeniably shows that a reasonable officer could have so thought in accordance with police training and controlling legal authorities. *See Ontiveros,* 564 F.3d at 382; *Manis,* 585 F.3d at 844. Plaintiffs present no evidence – only argument – to the on contrary.

10.      Moreover, irrespective of these discrete alleged disputed facts, the record establishes that Robbie Tolan was in a poorly lit area on the porch of the house, he admittedly yelled out "[g]et your fucking hands off my mom" as he pushed himself up very quickly from the prone position he had been in, and angrily spun his entire body toward Sgt. Cotton in a quick, angry, and aggressive motion. *{Ex. 1; Ex. 2, p. 60, ll. 7-24, p. 62, ll. 9-12, p. 62, ll. 22- p. 65,  l. 5, p. 80, ll. 19-12; Ex. 4, p. 70, ll. 24 - p. 71, ll. 3; Ex. 15, p. 105, ll. 21-24; Ex. 15, p. 86, ll. 3-5; p. 100, ll. 9 – p. 101, ll. 2; p. 101, ll. 3-8; Ex. 17, p. 174, ll. 19 – p. 175, ll. 4}.* Officer Edwards observed that Robbie Tolan was in, what Edwards perceived as a "charging position" as if he was *about to charge toward* Sgt. Cotton.  *{Ex. 4, p. 53, ll. 11-25; p. 54, ll. 12-19}.* In light of standard police training and the totality of the circumstances presented to Sgt. Cotton at that moment, including Robbie Tolan's quick aggressive motions, without regard to the minute discrete allegedly disputed *characterizations* of the facts, the evidence is that Sgt. Cotton did perceive, and could, consistent with accepted training, reasonably perceive Robbie Tolan's actions as consistent with obtaining a weapon from his waistband area and being an immediate threat to Sgt. Cotton's life; so Sgt. Cotton understandably fired in self-defense. *{Ex 1; Ex. 2, , p. 62, ll. 13-18; p. 65, ll. 6 - p. 66, ll. 2, p. 67, ll. 3-19, p. 68, ll. 4 - p. 69, l. 5; p. 78, ll. 18-p. 79, ll. 18; p. 81, ll. 15-24; ; p. 92, ll. 18-19; Ex. 23, p. 9, ll. 20-p. 10, ll. 8, p. 10, ll. 18 - p. 16, ll. 13; Ex. 29; Ex. 15, p. 84, ll. 17-20; p. 85, ll. 10-13, ll. 20-24; p. 85, l. 25-p. 86, l. 8; p. 98, l. 24-p. 99, l. 4; p. 100, l. 9 - p. 102, l. 10; p. 105, l. 9 - p. 107, l. 2; p. 138, ll. 7-10; p. 146, l. 11-18}.*

11.    This factual record is **wholly uncontroverted** and it certainly does not establish that any of these "facts" allegedly in dispute must be proven for Sgt. Cotton's action to be reasonable in light of the undisputed evidentiary record or the *totality of the circumstances supra*. Sgt. Cotton plainly explained this throughout his deposition.

> Q.   What is it he did that made you fear for your life?
> A.   It wasn't any one thing.  It was the totality of everything that was happening that put me in fear, which included the way he was getting up and where his hand was and while he was getting up. So it's not one thing.  It's a lot of different things.
> {*Ex. 2, p. 68, l. 18-p. 69, l. 5*}.
>
> Q.   What we're trying to do is get an idea of what all of those elements were that brought you to that place where you were in fear for your life and that fear was reasonable.  Okay?
> A.   (Witness nods.)
> {*Ex. 2, p. 69, ll. 12-16*}.
>
> Q.   So was it Mrs. Tolan's noncompliance?  Did that put you in fear for your life?
> A.   Well, it -- once again, it's everything together.  I couldn't give a -- like a list that would say all of these different things, because there's all sort of factors that you're kind of analyzing and – and seeing and stuff as you go along.  So I really – I couldn't say that this list is an all inclusive list of what made me feel that way.
> {*Ex. 2, p. 69, ll. 17-25*}.
>
> Q.   Had Robbie continued laying on the ground with his arms outstretched and done nothing other than yelled at you, would you have shot him?
> A.   I don't believe I would have, no.
> Q.   But he didn't do that?
> A.   That's correct.
> Q.   He started to get up.  If he got up on one knee, would -- and that was all that he did --
> A.   I mean, I can't -- once again, there are so many different factors that go into whether or not I'm in fear of my life that I really couldn't -- I couldn't answer these kind of hypotheticals where -- well, what if, what if.  Well, there are other things that are involved.  It's not -- it's not a list that I can go down.  I don't think I could accurately answer whether or not I would use deadly force based on the description of a scene alone because there's so many other things involved.
> {*Ex. 2, p. 71, ll. 3-23*}.

12.    Sergeant Cotton's testimony demonstrates the basis of the Supreme Court's warning in *Graham v. Connor* against efforts to pick apart an encounter and threat that is rapidly evolving in

a manifest manner under circumstances which are tense and rapidly evolving. Specifically, and in keeping with Supreme Court and Circuit authority, even if Robbie Tolan did not "jump up," did not "reach for anything," and did not "charge Sgt. Cotton," as the Plaintiffs argue outside the context of the entire event and express through the literal terms, a reasonable officer could – and indeed did perceive - nonetheless have perceived the *totality of the circumstances* evidenced by the undisputed facts as a threat of serious harm to Sgt. Cotton or to others. Like the plaintiffs in *Ontiveros* and *Manis*, the Plaintiffs here "are attempting to use these undisputed facts to imply a speculative scenario that has no factual support" despite the undisputable fact that Robbie Tolan's own testimony clearly explains how Sgt. Cotton could reasonably have perceived Tolan's actions as creating a need to respond in self defense. *See Ontiveros,* 564 F.3d at 38*3*; *Manis*, 585 F.3d at 845.

13.     Additionally, while the Plaintiffs' briefing *argues* that the three items Plaintiffs identify are disputed, the actual factual *evidentiary record* actually establishes otherwise. Contrary to the argument of his counsel, Robbie Tolan admits that, after he was shot, "I kind of stood there like this and then I blinked and was on the ground."[3] {*Ex. 32, p. 96, ll. 5-22*}. Therefore, the *factual* record, and indeed Robbie Tolan's own testimony plainly establishes that Robbie Tolan admits he actually rose and stood, not that he remained down on his knees.

14.     There is no dispute, regardless, because Sgt. Cotton does not place any particular significance on the height Robbie Tolan reached from the ground, which is the point the Plaintiffs myopically focus upon. Sgt. Cotton testified that, when Robbie Tolan shouted "[g]et your fucking hands off her," Sgt. Cotton turned toward Robbie Tolan and observed that "he was getting up and turning around." {*Ex. 2, p. 61, l. 2-p. 62, l. 1*}.

---

[3]     The Defendants are supplementing the evidentiary record with Defendants' exhibit no. 32, in response to Plaintiff's exhibit no. 3, in accordance with the provisions of FED.R.EVID. 106.

15.     Sgt. Cotton provided a detailed description of his observations:

Q.   Describe the action of him getting up that you witnessed.
A.   When I looked, he was already partially up.  He wasn't still -- so I did not see all of his getting up. When I looked again after hearing him, he was already getting up, probably halfway up or so, and was turning to his right rotating with his face toward the window.
{*Ex. 2, p. 63, ll. 6-12*}.

Q.   Was he still in motion or had he completed this getting up process?
A.   Well, I mean, the whole thing was very -- wasn't a motion, so exactly -- you know, exactly at what moment I saw what, I really couldn't testify to reliably.
{*Ex. 2, p. 63, ll. 13-18*}.

Q.   Okay.  So he could've been done in the process of getting up, it was just all happening so fast?
A.   When I first looked, he was -- still had his back, for the most part, to me in the process of rotating.
Q.   Rotating to turn and look at you?
A.   That's correct.
{*Ex. 2, p. 63, ll. 19-25*}.

Q.   Do you know if he was up on one knee?
A.   At -- when he said it?
Q.   Yes.
A.   I don't know where he was when he said it.
Q.   Okay.  And as he was getting up, as you've described it, was he leaning in your direction?
A.   At some point in the altercation, he was leaning in my direction.  I don't -- I mean –
{*Ex. 2, p. 64, ll. -25*}.

Q.   What did you see in order for him to get up?
A.   He was up, and when I turned after hearing him yell, he was up in a crouch kind of in the process of getting up with his feet under him facing kind of away from me while -- as he was rotating to his right.
 Q.   Where were his arms?
 A.   His right arm -- his right hand was at his waistband.  I don't know where his left hand was.
Q.   When you say "at his waistband," like on his hip?  In his pocket?
A.   In the middle, middle of his waist.
Q.   Okay.  In the center of his body?
A.   Yes.
{*Ex. 2, p. 64, l. 25-p. 65, l. 13*}.

Q.  As he was -- as you perceived him getting up?
A.  Yes.
Q.  What was his response to your verbalization?
A.  There was no change in his response.
Q.  He continued reaching for his waistband?
A.  Well, it didn't really happen -- I mean, it's all very fluid, very fast.  My verbalization was in the midst of drawing my weapon, so it's not -- I can't really say exactly at what point he was at -- and at what point I said it.  I couldn't accurately relay that information.
Q.  Was the purpose of your verbalization to get him to stop what he was doing, or was it sort of an automatic, I can't believe this is happening, kind of thing?
A.  I would say it's more of an automatic response to what -- what was happening.
{*Ex. 2, p. 84, l. 19-p. 85, l. 13*}.

16.    Thus, even indulging Plaintiffs' suggestion that Robbie Tolan's testimony about how high he raised from the ground has undisputedly changed for purposes of his lawsuit, there is simply no material, genuine factual dispute within the summary judgment record regarding the height to which Robbie Tolan had raised when Sgt. Cotton fired. That question is simply not pertinent to resolution of the summary judgment motion, as the circuit court would undoubtedly explain, because Sgt. Cotton did not shoot in self-defense based upon a specific height. This "faux" disputed fact is, therefore, not "material" to the analysis of whether Sgt. Cotton complied with the Fourth Amendment.

17.    Similarly, there is no material, genuine factual dispute regarding the movements Robbie Tolan made with his right hand in the vicinity of his midsection. Robbie Tolan testified:

Q.      I know in your grand jury testimony, and in your previous testimony, that you've been asked to talk about kind of the mechanics of getting up that night. Right?
A.      Yes.
Q.      Just like we're doing here, we're talking about pulling your hands back, push up with both hands, and at the same time that you're turning, right?
A.      Yes, sir.
Q.      But, would it be right for me to say, Mr. Tolan, that at the time that you were getting up that morning would it be right for me to say you really weren't thinking about how you were doing it, you were just doing it, right?
A.      Sure.

Q.      In other words, people have asked you, how were you doing it, and you
have tried to kind of recreate it in your mind and describe it, right?

A.      Yes, sir.

Q.      But in terms of each thing that you were doing at the moment you were
doing it, would it be right for me to say it's not something you were thinking
about at the moment that you were doing it?

A.      Sure.

Q.      So when you give us a recreation of it, it is your *best guess* of how you
were doing it, right?

A.      Sure.

{*Ex. 15, p. 101, l. 9-p. 102, l. 9*} (emphasis added).

18.      Robbie Tolan provided the following further testimony regarding his admitted

*guesstimate* of how he was moving at the time of the shooting:

Q.      In order for you to get up, I take it you pushed up with both your hands; is
that correct?

A.      Yes, sir.

Q.      When you're laying on the ground, were your arms out in front of you?

A.      Yes, sir.

Q.      So to get up you have got to pull your arms back towards kind of your
chest area and push up, right?

A.      Yes.

Q.      Would it be right for me to say you used kind of like a push up maneuver
to get yourself up?

A.      Yes, sir.

Q.      Drew your hands back from where they were about mid body and then
pushed up, right?

A.      Sure.

Q.      And as you're pushing up, you're also turning, is it to your left or to your
right?

A.      My left.

Q.      You're turning, you're pushing up with your hands, and turning towards
your left?

A.      Yes, sir.

{*Ex. 15, p. 100, l. 10-p. 101, l. 8*}.

Q.      Now, so as you're getting up and I think you told me you're turning to your
left as you're getting up?

A.      Yes, sir.

Q.      As you're getting up and turning to your left -- by the way, did you get up
quickly or slowly?

A.      Pretty quickly, I suppose.

Q.      As you're getting up, did you scream or raise your voice and say, "Get your fucking hands off my mom"?
A.      Yes, sir.
{*Ex. 15, p. 105, l. 9-24*}.

Q.      You were angry by then, right?
A.      Yes, sir.
Q.      So, if somebody said they saw an angry look on your face, you would say, well, that would probably be right, right?
A.      Sure.
Q.      And you would agree with me, wouldn't you, that saying something like "get your fucking hands off my mom" is an aggressive statement? You would agree with that, wouldn't you?
A.      Sure.
Q.      If somebody said they saw you and you looked aggressive, you would say, well, I wouldn't disagree with that?
A.      Sure. I guess. I don't know how you would look aggressive, but I guess look angry maybe.
Q.      Angry. Fair enough. And in turning, were you able to see Sgt. Cotton's face as you are turning towards him?
A.      Yes, sir.
Q.      Could you see an expression on his face as you jumped up, screamed at him, and began turning toward him?
A.      Could I see an expression on his face?
Q.      Yes.
A.      Yeah. I don't remember what it was exactly.
Q.      Could you describe that expression today?
A.      No. I don't recall what it was.
Q.      Did you see Sgt. Cotton actually unholster his weapon?
A.      Yes, sir.
Q.      Would it be right for me to say that you did not see Sgt. Cotton unholster his weapon until you were beginning to get up and turning toward him?
A.      Yes, sir.
Q.      In other words, from what you observed, Sgt. Cotton's weapon was holstered up until the time that you hollered to him and began getting up and turning toward him?
A.      Sure.
Q.      And then he unholsters his weapon, right?
A.      Yes, sir.
Q.      Points it at you, and at the same time, practically immediately, is shooting, right?
A.      Yes, sir.
{*Ex. 15, p. 105, l. 25-p. 107, l. 22*}.

Q.      Is there anything that leads you to believe that if you had complied with the instructions to be down on the ground, up until the time that the officers could search you and make sure that you didn't have any kind of a weapon, is there anything that makes you believe that you would have been shot anyway?

A.      No, sir.

Q.      Now, you understand that -- I take it they -- I think you heard Sgt. Cotton says that he shot you because he was afraid that you might be reaching for a weapon? You understand that?

A.      Do I understand that I have -- that he said that?

Q.      Yes, sir.

A.      Yes, sir.

Q.      Has Sgt. Cotton ever said anything that you heard that indicates to you that he didn't believe that at the time that he shot?

A.      No, sir.

{*Ex. 15, p. 113, l. 11-23*}.

Q.      Is there anything you can think of that you saw Sgt. Cotton do or anything you heard him say, that you would say is inconsistent with him saying I thought Mr. Tolan was going for a weapon when he got up off the ground?

A.      No, sir.

Q.      And, in fact, the first thing that Sgt. Cotton did after he fired his weapon was to come over to you and check you for weapons, right?

A.      Sure.

Q.      And when he didn't find a weapon, he specifically said to you, what were you reaching for, right?

A.      True.

{*Ex. 15, p. 114, ll. 2-15*}.

Q.      Up until the time that Sgt. Cotton actually checked you for weapons, is there anything that you would point to to say this should have told the police officer I didn't have a weapon?

A.      No, sir.

{*Ex. 15, p. 115, ll. 10-14*}.

19.      Sgt. Cotton similarly testified in deposition regarding his observations of Robbie Tolan's movements at the moment of the shooting. In addition to his testimony cited *supra*, Sgt. Cotton testified as follows:

Q.      What was he wearing that – as you recall?

A.      A dark jacket, a hoodie, I believe, with a zipper on it  -- and pants.

Q.      Hanging over his pants?

A.      Yes.  Yeah, it was not tucked in.

Q.      And in your experience, is it common or uncommon for people to carry weapons in their midsection in their waistband?

A.      I have found that to be the case often, yes.

{*Ex. 2, p. 65, l. 16-p. 66, l. 2*}.

Q.      Describe exactly what you saw.

A.      It appeared that he was drawing a weapon from his waistband.

Q.      So you thought he was drawing a weapon?

A.      Yes, I did.

Q.      Was his hand outside of his clothing or inside of his clothing?

A.      Oh, I don't know that I could see his hand specifically.  I could see where his hand was, but, you know, his clothing was probably covering the hand.  It was dark.  **I could see his total movement, which is what made me believe that it wasn't necessarily just where his hand was, for instance.**

Q.      But you know he was -- he had his hand in the vicinity of his waistband?

A.      That's correct.

Q.      Was he running toward you?

A.      No, I don't think he was running. He was turning around.

Q.      He was turning around to face you?

A.      Yes.

{*Ex. 2, p. 67, ll. 3-24*}. (emphasis added).

Q.      Tell me if this is an accurate representation of your testimony at your criminal trial.

A.      Okay.

Q.      "I felt like at this point he's drawing a weapon, and I'm behind the curve. I'm nowhere close to drawing my weapon when he is already starting to get up and his hand looked like it was coming from his waist."

A.      Yes. I would say that -- that's an accurate representation of my testimony.

Q.      And this all happened very fast?

A.      Yes.

Q.      His hand looked like it was coming from his waist?

A.      Yes, in response to the full statement that you read earlier.  I mean -- it seems like you're parsing it a little bit, but --

Q.      Fair enough.

{*Ex. 2, p. 79, l. 19-p. 80, l. 18*}.

Q.      I think you testified at your criminal trial that he was digging in his waistband.  Does that sound familiar?

A.      I don't recall.  If you'll -- if I can look at it.

Q.      I'll show you this page, and it's highlighted right here.

A.      Yeah.  It says "like he was digging in his waistband." That's a description trying to give a description of what he was doing -- "like" meaning that his hand was in that area. I don't mean that to mean, though, that he was reaching down inside of his pants necessarily.  That's not -- that wouldn't be accurately what I saw.

14

Q.      Describe exactly what you saw.
A.      It appeared that he was drawing a weapon from his waistband.
Q.      So you thought he was -- he was drawing a weapon?
A.      Yes, I did.
{*Ex. 2, p. 66, l. 7-p. 67, l. 8*}.

Q.      Sgt. Cotton, can you demonstrate, please, for the jury how Robbie dug and
--like he was digging in his waistband is your testimony.
A.      I don't think I could accurately demonstrate exactly how he did it.
Q.      You can't show where his hand was or --
A.      It was in the -- in the middle of his body around like you -- like you
characterized, around the belt buckle area.
{*Ex. 2, p. 88, ll. 11-23*}.

20.     This record evidence,[4] therefore, establishes that there is no genuine, material, dispute

within the evidentiary record regarding the movements a reasonable police officer on the scene

could have perceived at the moment Sgt. Cotton fired. Law enforcement officers are trained to

understand that an officer may have a reasonable belief that the suspect is attempting to obtain or

use a weapon which thus justifies using force to repel the threat and that an officer is not

required, and therefore not trained, to demand a confirmation that the suspect is definitely

reaching for a weapon before being authorized by training standards to respond in defense to a

reasonably perceived threat. {*Exs. 26-29*}. The law enforcement training adage "A tie, you die,

you know" applies aptly here.  *Ontiveros*, 564 F.3d at 384 n. 2.

21.     The Plaintiffs cannot avoid summary judgment by fabricating fictional disputes about

minute differences in detail, particularly when none actually exist in fact. "The mere allegation

of a factual dispute between the parties will not defeat an otherwise properly supported motion

for summary judgment." *Fraire v. City of Arlington*, 957 F.2d 1268, 1273 (5th Cir. 1992).

Likewise, **the mere existence of relatively minor discrepancies in the recollection of the**

---

[4]      The relevant testimony of Lieutenant Rodriguez and Dr. Lewinski, which was discussed previously in the
Defendants' opening brief further shows that no material, genuine dispute exists regarding this issue. {*Exs. 26-29*}.
Notably, Plaintiffs do not dispute these expert analyses with any competent summary judgment evidence at all.

**participants in a dynamic event like that which occurred in this case does not create**

**disputes which overcome summary judgment**. *Id*. at 1279.

> We have learned to expect that, given the tension and heat of the pursuit and the element of surprise in such a stressful situation, the versions of the facts related by the protagonists and the witnesses will almost always differ somewhat in the myriad details of the action.

*Fraire*, 957 F.2d at 1279. As in *Fraire*, "such differences are insufficient to place facts at issue. *Id*. "The minor factual discrepancies are far too petty to constitute genuine issues of material fact." *Id*. "[H]indsight and speculation create no genuine, material fact issue as to how a reasonable officer could have interpreted [Robbie Tolan's] actions." *See Ontiveros*, 564 F.3d at 384.

22.     The actual evidence in the record before the court also reveals the folly in the Plaintiffs' disingenuous argument that Sgt. Cotton agrees[5] that genuine issues of material fact exist within the record. The record, instead, proves that the Plaintiffs' counsel misrepresented the actual factual record to Sgt. Cotton during his deposition, just as he does now to this Court, and asked Sgt. Cotton to *assume* counsel's misrepresentations of the record evidence were accurate and then premised questions upon claimed "facts" which have never existed. The following exchange shows this ruse plainly:

> Q.     You know certainly that all of the Tolans, Robbie included, deny that he placed his hand at his waistband.  You know that.[6]
> A.     I don't think that he testified that he did not put his hand at his waist.  I don't remember that testimony, no.

---

[5]     "Moreover, because the issue is one of *objective* reasonableness in respect to whether the challenged action violated the constitutional provision sued on, the defendant's subjective motivation and subjective belief as to the lawfulness of his conduct or what facts justified it are irrelevant." *Pierce v. Smith*, 117 F.3d 866, 871 n. 5 (5th Cir. 1997); *see also Anderson*, at 483 U.S. at 641, 107 S.Ct. at 3040.

[6]     The Defendants are supplementing the evidentiary record with Defendants' exhibit no. 33, in response to Plaintiff's exhibit no. 1, in accordance with the provisions of FED.R.EVID. 106.

**Q.**     (By Mr. Berg) **Well, will you take my representation that the Tolans all deny that he put his   hand anywhere near his waist** --

A.     Well, and I'm not --

MR. GILES:  Objection; form.

A.     -- that's -- if that's their testimony, that's their testimony.  I don't remember -- remember that, but it's their testimony, not mine.  So it's --

Q.     (By Mr. Berg) Right.

A.     -- if the record shows that, then sure.

**Q.**     Okay.  And **I believe the record does show that.**

A.     Okay.

**Q.**     **So their testimony is he didn't have his hand near his waistband, wasn't doing anything that appeared or could have been interpreted as reaching for a weapon. That's what they say.**

A.     Okay.

Q.     You disagree?

A.     Yes.

**Q.**     **They deny that he made it to his feet, right?**

A.     Yes.

Q.     Their testimony is he was on a knee, correct?

A.     Some of their testimony, yes.

Q.     You believe there's some conflict in their testimony?

A.     Yes.

Q.     Okay.  Fair enough. So it's fair to say that what you have is just a general disagreement about the facts?

A.     Well, I mean, I have my statement of what happened, and that's all I can really speak to.  I'm not -- you know, **I can't testify as to their statement**.

Q.     Well, their statement is different than your statement.  You understand that?

A.     I don't think I can answer entirely – I suppose there are some things in their statement that are different.

{*Plaintiffs' exhibit no. 1, p. 72, l. 1-p. 73, l. 23 which are subject to specific objections*}.

Q.     (By Mr. Berg) Right.

A.     And I would have to go back and read – you know, I don't think I can answer that here.

{*Defendants' exhibit 33, p. 73, l. 24-p. 74, l. 1*}.

**Q.**     **And you've read the pleadings in this case?** [7]

A.     Yes.  Although a while back, yes.

**Q.**     **But you're familiar with the allegations?**

A.     Yes.

---

[7]     Subject to their objections to Plaintiff's exhibit no. 1, *p. 72, l. 6-p. 73, l. 23*, the Defendants are supplementing the evidentiary record with Defendants' exhibit no. 34, in response to Plaintiff's exhibit no. 1, in accordance with the provisions of FED.R.EVID. 106.

**Q.      And you don't dispute, do you, that the Tolans have a very different version of events than you do?**

A.      I would say that there are some things that are different than my statement, but I -- but in the same way, each of them have different statements that don't --
{*Defendants' exhibit 34, p. 74, l. 10-22*}.

Q.      And your statement certainly doesn't line up with their statements?

A.      I wouldn't say that --

Q.      (By Mr. Berg) No?

A.      -- entirely.

Q.      Okay.

A.      I mean, there -- there are a lot of things from my statement and theirs that are the same, and there are probably a few things that are different, but before I could actually -- I'd have to read them both before I could say what those were.
{*Defendants' exhibit 34, p. 75, ll. 6-18*}.

Q.      If they were asked whether he reached for his waistband, do you recall whether Robbie's response was, No, I never reached for my waistband?

A.      I don't recall him making that response.

**Q.      Okay.  But it's possible he did, correct?**

**MR. GILES:  Objection; speculation.**

**A.      Sure, it's possible.**

**Q.      Yeah.  And if that's the case, if it is the case that you've got a different version of events on those particular points, then we just have a genuine dispute about the facts, right?**

**MR. GILES:  Objection; mischaracterizes this record.**

A.      I don't know that I can really answer whether or not the -- my understanding of the facts pertaining to this don't -- there aren't that many differences. But I guess I could agree there are a couple of differences in the statements.
{*Defendants' exhibit 34, p. 77, l. 14-p. 78, l. 12*}.

Q.      Would you say him jumping up and reaching at his waistband were probably the two most important things that you perceived that put you in fear for your life?

A.      I would say they were important, yes.

Q.      I think you testified that it's been your experience that people sometimes carry weapons in their waistband.

A.      Well, yes.  I mean, I just said that.

Q.      Right. And that if someone reaches toward their waistband, is that a potentially dangerous action for someone to take?

A.      Depending on the context, it certainly can be, yes.

Q.      Right.  I mean, if you're, I don't know, tucking in your shirt and you're just walking down the street, that's not necessarily dangerous, right?

A.      Not necessarily.

Q.      Okay.  But if it's late at night and you've got someone at gunpoint, as you testified Officer Edwards did with Anthony Cooper and Robbie Tolan, and you previously had, it is not advisable to furtively gesture in the direction of your waistband, correct?
A.      Yes.
Q.      That's a signal that -- to you, that this person's reaching for a weapon?
A.      Yes.  Certainly can be, yes.
{*Ex. 2, p. 81, l. 15-p. 82, l. 18*}.

23.      Contrary to the Plaintiffs' briefing argument, the record shows that Sgt. Cotton recognized and attempted to correct many of the numerous factual misrepresentations the Plaintiff's counsel made during deposition questioning. Sgt. Cotton expressly disagreed with counsel's misrepresentations of the factual record but on occasion necessarily answered questions posed to him based upon the inaccurate assumptions the Plaintiffs' counsel told him to make for purposes of answering the question asked of him. Significantly, however, Sgt. Cotton has never testified that he agrees that any genuine issues of material fact existed in the actual facts of this case. While such efforts at trickery in a deposition should never be condoned as supporting a parties' unwarranted opposition to summary judgment, in this instance, the summary judgment record clearly refutes the Plaintiffs' argument that Sgt. Cotton admits that genuine issues of material fact exist as to whether he committed a Fourth Amendment violation by using excessive force against Robbie Tolan. *See Ontiveros,* 564 F.3d at 382.

### B.      Sgt. Cotton Did Not Use Excessive Force Against Marian Tolan

24.      The summary judgment record likewise establishes that Sgt. Cotton did not use excessive force against Marian Tolan. The Plaintiffs' essentially argue the irrelevant, speculative proposition that Sgt. Cotton may have been subjectively motivated to push Marian Tolan into the garage door because she was protesting the officers' action and not because her physical position was hampering the investigation. This argument is futile, however. First, whether Marian was interfering with the investigation by also placing her body in the way, or merely interfering by

19

continuing to verbally protest and resist the escort Sgt. Cotton reasonably believed appropriate to permit the officers to safely conduct the investigation, a reasonable officer could have responded by placing Marian Tolan against the garage door, regardless of the moment that it occurred.

25.     More importantly, however, the only relevant issue for purposes of a Fourth Amendment analysis is whether a hypothetical, reasonable officer could have pushed Marian Tolan into the garage door under the circumstances shown by the record, not whether Sgt. Cotton did so due to some improper purpose.[8] See *Mangieri v. Clifton,* 29 F.3d 1012, 1017 (5th Cir.1994); *Pfannstiel v. City of Marion,* 918 F.2d 1178, 1187 (5th Cir.1990). Accordingly, the Plaintiffs have not identified any genuine dispute of material fact that could preclude summary judgment in Sgt. Cotton's favor on Marian Tolan's claim of alleged use of excessive force under the Fourth Amendment.

### C.     There is No Support for a 4th Amendment Claim Against Officer Edwards

26.     Officer Edwards is entitled to summary judgment in his favor on Plaintiffs' claims brought under the Fourth Amendment for the reasons discussed fully in the Defendants' motion for summary judgment. The Plaintiffs fail to identify any factual, or legal, support for a claim against Officer Edwards under the Fourth Amendment.[9] Unchallenged facts supporting summary judgment, such as those in this record, must be credited and the court may consider such facts undisputed for purposes of the motion and grant summary judgment when, as here, the motion and supporting materials show that the Defendant is entitled to it. FED.R.CIV.P. 56(e); *Eversley v. Mbank*, 843 F.2d 172, 173-174 (5th Cir. 1988).

---

[8]     This point was otherwise fully covered in the Defendants' opening briefing.

[9]     Likewise, the facts pertaining to all the other claims that the Plaintiffs have asserted but failed to respond to in their response should be considered undisputed for purposes of the Defendants' motion for summary judgment.

## II.      There Was No Violation of the 14th Amendment

27.      The summary judgment record also conclusively establishes that neither Sgt. Cotton nor Officer Edwards denied a Plaintiff equal protection of the law.[10] "Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argument do not adequately substitute for specific facts showing a genuine issue for trial." *TIG Insurance Co. v. Sedgwick James of Washington*, 276 F.3d 754, 759 (5th Cir. 2002). Thus, the Plaintiffs' unsustainable argument stands only upon Robbie Tolan's conjecture that Officer Edwards *should have been able to* discern Robbie Tolan's race from a distance in the darkness when lights of a police car shined upon Tolan for a moment.[11]

28.      All of the actual, admissible, evidence disproves this speculative assertion however. Curiously, as to Officer Edwards' motivation for approaching the Plaintiffs to conduct an investigation, the Plaintiffs unreasonably give no weight to the undisputed record evidence which establishes that Officer Edwards observed Robbie Tolan engage in erratic driving technique in the wee hours of the morning, that Tolan and Anthony Cooper spent an unusual amount of time apparently unloading items from inside the vehicle, that the license plate number Officer Edwards entered into his police computer indicated that the vehicle Robbie Tolan had been driving may have been stolen, or that the Plaintiffs resisted all of the officers' efforts to investigate the circumstances surrounding the event.  Thus, the admissible evidence establishes that the Plaintiffs fail in their burden, regardless of their race, to adduce evidence which shows

---

[10]      But instead of abandoning this patently frivolous claim, the Plaintiffs' seek to continue to prosecute it even though the factual contentions underlying it have absolutely no support whatsoever and the claims are plainly not warranted under any legal authority. *See* FED.R.CIV.P. 11(b)(3).

[11]      The Plaintiffs also submit inadmissible affidavits from a few individuals who have no involvement whatsoever in this case who claim they encountered unidentified police officers of the City of Bellaire police department and who unreasonably speculate they believe they were stopped because of their race, a conclusion no reasonable fact finder could find. These affidavits are not admissible here but even if admitted into evidence, are of absolutely no evidentiary value in resolving any claim in dispute in this case. *See* FED.R.CIV.P. 56; *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

that Officer Edwards' investigative stop was unconstitutional. This failure alone requires summary judgment on all Plaintiffs claims against Officer Edwards under the 14th Amendment.

29.     The specific testimony the Plaintiffs' rely upon is as follows:

> Q.     So, you would say, because you think that Officer Edwards had a good look at you with his headlights on at 2:00 in the morning, from looking at you he would be able to tell your race?
> A.     He would be able to tell that I am not white. I believe so, yes, sir.
> Q.     Was there anything that Officer Edwards said that you heard that indicated to you that he was aware of what you consider your race to be?
> A.     No, sir.
> {*Ex. 15, p. 14, l. 24-p. 15, l. 10*}.

30.     This assertion, however, even if credited cannot reasonably support "an inference of *racially* motivated harassment." *Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008).

31.     Again by his own sworn admission, Robbie Tolan cannot offer a scintilla of even speculative testimony indicating Sgt. Cotton was motivated to act due to any Plaintiff's race.

> Q.     Sgt. Cotton, was there a time that Sgt. Cotton shined any lights on you?
> A.     No, sir. Not that I am aware of.
> Q.     By the way, do you now know how long Sgt. Cotton was at your home; that is, the time that he exited his police car, up until the time that he fired his weapon, do you know what period of time that was?
> A.     I believe so. I think I heard it was about 30 something seconds.
> Q.     Right. You understand that the radio recordings indicate that it's approximately 32 seconds?
> A.     I understand, yes.
> Q.     In that 32 seconds, you understand that that comprises the period of time that Sgt. Cotton was actually physically exiting his vehicle? You understand that?
> A.     Yes, sir.
> Q.     Are you aware of the fact that by the time Sgt. Cotton exited his vehicle, your parents had already exited the home and were out in front with you and Mr. Cooper?
> A.     Yes, sir.
> Q.     So, in other words, you would say, under oath today, I was laying on the ground when my parents exited the front door of the house?
> A.     Yes.
> Q.     Completely laying down?
> A.     Yes.

Q.      Were you up -- from the time, then, that Sgt. Cotton arrived, up until the very moment before he fired his weapon, were you laying on the ground at all times?

A.      Yes.

{*Ex. 15, p. 15, l. 11-p. 17, l. 16*}.

Q.      Do you have any information that Sgt. Cotton was aware of your race at any time that night before he fired his weapon?

A.      Do I have any information that he knew my race?

Q.      Yes, sir.

A.      No, sir, I don't.

Q.      Suppose Sgt. Cotton were to say, you know, from the time that I was en route to the home up until the time that I fired my weapon, I had no idea the race of anybody at the home, do you have some information to the contrary?

A.      No, sir.

Q.      Would you refute that? Dispute that?

A.      No, sir.

{*Ex. 15, p. 17, l. 17-p. 18, l. 6*}.

Q.      Is that your opinion, that any of the police officers had an agenda that night to harass black kids?

A.      I don't know what their agenda was, sir.

{*Ex. 15, p. 18, ll. 13-15*}.

32.     Indeed, and despite the *mere allegation* in their pleadings and briefing, **all Plaintiffs admit they cannot identify any evidence which could conceivably support a claim of denial of equal protection**. {*Ex. 15, p. 13, ll. 15-16; p. 18, ll./ 7-25; Ex. 16, p. 130, ll. 12-22; p. 130, l. 25 - p. 131, l. 2; p. 132, ll. 6-11; Ex. 18, p. 91, ll. 10-15; p. 92, ll. 3-19; Ex. 17, p. 22, ll. 8-14; p. 22, l. 18 - p. 23, l. 9; p. 25, ll. 1-16; p. 178, ll. 19-24; p. 178, l. 25 - p. 179, l. 5*}. To the contrary, the only evidence on the subject comes from Officer Edwards and Sgt. Cotton, both of whom have testified explicitly that they were not motivated to act against any Plaintiff due to race. {*Ex. 2, p. 34, ll. 13-19; Ex. 4, p. 66, ll. 7-16; p. 79, ll. 5-11; p. 19, ll. 4-12*}.

33.     Of course, on this and any other issue, "in order to survive summary judgment, Plaintiff[s'] cannot rely on conjecture or conclusory accusations." *Arendale*, 519 F.3d at 605. As in *Arendale*, in the instant case "Plaintiff's allegations of racially motivated harassment rest

entirely on several statements which are either conclusory or raise no inference of racial animus."

*Id.*

> Accompanying none of these allegations, however, is actual evidence of racial animus. Rather, Plaintiff supports each allegation only with citation to his own testimony stating his *personal opinion* that he was the victim of racial harassment. Conclusory assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment.

*Id.* (emphasis added)

34.     There is clearly no *evidence* suggesting, let alone showing, that Sgt. Cotton or Officer Edwards treated any Plaintiff differently than other similarly situated persons. *Compare Rolf v. City of San Antonio*, 77 F.3d 823, 828 (5th Cir. 1996). There is no evidence showing that Sgt. Cotton or Officer Edwards' actions were motivated by improper considerations, such as race, religion, or the desire to prevent any Plaintiff's exercise of a constitutional right. *Compare Bryan v. City of Madison*, 213 F.3d 267, 277 (5th Cir. 2000). There is no evidence showing that Sgt. Cotton or Officer Edwards' actions were not rationally related to a legitimate state objective or that either has treated similarly situated individuals of another race differently under similar circumstances. *See Id.*

35.     Thus, in light of the legal standard required to support a claim of denial of equal protection and the undisputed factual evidence within the summary judgment record, no fair minded individual, and certainly no reasonable jury, could find for a Plaintiff on this claim based upon, as required, actual *evidence*. *See Anderson*, 477 U.S. at 252, 106 S. Ct. at 512; *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991); *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1286 (5th Cir. 1990); *Boeing Co. v. Shipman*, 411 F.2d 365, 375 (5th Cir. 1969), *overruled on other grounds by Gautreaux v. Scurlock Marine Inc.*, 107 F.3d 331, 339 (5th Cir. 1997). Accordingly, not only do the Plaintiffs fail to meet their burden under

FED.R.CIV.P. 56 to direct the Court's attention to evidence in the record which demonstrates that they can satisfy a fair-minded jury that any constitutional violation occurred, but also the Defendants have *affirmatively proven* that instead they are entitled to judgment in their favor, as a matter of law, because neither engaged in unconstitutional conduct. *See Siegert*, 500 U.S. at 232, 111 S.Ct. at 1793. Evaluation of the record, from the perspective of a reasonable law enforcement officer on the scene not guided by the 20/20 vision of the Plaintiffs' suggested hindsight, establishes that neither Sgt. Cotton, nor Officer Edwards engaged in unconstitutional conduct under the 4th or 14th Amendment.  Accordingly, both are entitled to summary judgment on this element of the immunity analysis.

**III.    Officer Edwards and Sgt. Cotton are Protected by Immunity Even if a Dispute Exists Regarding a Claimed Constitutional Violation**

36.    Even if, *arguendo*, the summary judgment did not demonstrate both individual Defendants are entitled to summary judgment for allegedly violating the constitution, the record nonetheless establishes that Officer Edwards and Sgt. Cotton are entitled to summary judgment based upon their entitlement to qualified immunity, even if this Court finds the Plaintiff has identified sufficient evidence to show that a factual dispute exists as to whether unconstitutional conduct occurred. *See Saucier*, 533 U.S. at 199, 121 S. Ct. at 2155-56. The second necessary step of the proper qualified immunity analysis – which the Plaintiffs wholly fail to address in this case[12] – "focuses not only on the state of the law at the time of the complained of conduct, but also on the particulars of the challenged conduct and/or factual setting in which it took place." *Pierce v. Smith,* 117 F.3d 866, 882 (5th Cir. 1997). The Supreme Court has specifically rejected

---

[12]      As did the Court of Appeals in *Brosseau v. Haugen*, the Plaintiffs here erred when they "acknowledged this statement of the law, but then proceeded to find fair warning in the general tests set out in *Graham v. Connor*, [490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989)] and *Garner*." *Brosseau*, 543 U.S. 194, 199, 125 S.Ct. 596, 599 (2004). Such an approach has been repeatedly, and roundly, rejected since, at the latest, the Supreme Court's clear explication in *Saucier*.

what the Plaintiffs ask this Court to do here; merge the test of "objective reasonableness" of the underlying alleged constitutional deprivation and the determination of whether an officer could reasonably – albeit – mistakenly have believed his actions lawful. *See Saucier supra*. It is error to merely give lip service to the immunity standard and then rely upon the general tests of *Graham* and *Garner* in finding fair notice of a clearly established right. *Id*. In fact, if the court did so, it would not be performing an immunity analysis at all but only considering whether a constitutional violation may have occurred.

37.     The Plaintiffs in the instant case simply argue – as the Ninth Circuit had accepted before being reversed in *Saucier* – that, because a factual dispute allegedly exists as to the underlying alleged constitutional claim, the officers were not entitled to immunity. Supreme Court authority, however, plainly demands much more. *See id*. Such a failure does not acknowledge that "[q]ualified immunity shields an officer from suit when [he] makes a decision that, *even if constitutionally deficient*, reasonably misapprehends the law governing the circumstances [he] confronted." *Brosseau*, 543 U.S. at 198, 125 S.Ct. at 599 (emphasis added). "Because the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.  If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." *Id.* "Qualified immunity operates in this case, then, just as it does in others, to protect officers from the sometimes 'hazy border between excessive and acceptable force' and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful."  *Saucier*, 533 U.S. at 206, 121 S. Ct. at 2158 (quoting *Priester v. Riviera Beach*, 208 F.3d 919, 926-27 (11th Cir. 2000)).

38.     Accordingly, "[t]he relevant, dispositive inquiry…is [not simply whether a constitutional violation may have occurred but, rather] whether it would be clear to a reasonable officer that his conduct was unlawful **in the situation he confronted**."  *Saucier*, 533 U.S. at 202, 121 S. Ct. at 2156 (emphasis added). As such, to defeat Officer Edwards and Sgt. Cotton's claim to qualified immunity, the Plaintiffs must demonstrate, with admissible evidence, that qualified immunity does not protect Officer Edwards or Sgt. Cotton from liability. *See Salas*, 980 F.2d at 306. The Plaintiffs have plainly failed to even properly address this separate element, let alone disprove it, as is their burden.

### A.     There was No Violation of a Clearly Established Right

39.     The summary judgment record establishes that neither Officer Edwards, nor Sgt. Cotton, deprived a Plaintiff of a clearly established right of which a reasonable police officer would have known under the undisputed circumstances presented. *See Harlow v. Fitzgerald*, 457 U.S. 800, 817-18, 102 S. Ct. 2727, 2738 (1982). Aside from using the buzz word "clearly established" in their brief in response to the Officers motion for summary judgment, the Plaintiffs have failed to provide any information identifying a basis for showing that Officer Edwards or Sgt. Cotton could reasonably have been on notice that their conduct would be unlawful in the very situation they confronted, as is required to overcome their immunity.[13] *See Brosseau*, 543 U.S. at 198, 125 S.Ct. at 599; *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000). Although it is not their burden to do so, the Officers have identified both factual and legal bases upon which they can reasonably rely in averring they are protected by qualified immunity.[14]

---

[13]     The Plaintiffs only responded to the issue of the alleged occurrence of a constitutional violation by arguing that disputes exist regarding the constitutionality of each Officer's conduct. As such, the Court may appropriately consider all the cited facts applicable to this prong of the required analysis undisputed for purposes of the motion FED.R.CIV.P. 56(e); *Eversley*, 843 F.2d at 173-174.

[14]     Tellingly, the Plaintiffs apparently did not even recognize the significance of the Defendants' inquiry into the Plaintiffs' contentions regarding this issue when served with relevant interrogatories. {*Exs. 21-24*}.

40.     The uncontroverted record evidence establishes that Officer Edwards and Sgt. Cotton both followed accepted law enforcement officer training standards.[15] *{Exs. 26-29}.* Those standards show that a competent law enforcement officer could reasonably believe that Sgt. Cotton and/or Officer Edwards' actions were within an acceptable range of legitimate law enforcement procedures. *{Exs. 26-29}.* There is no accepted standard for law enforcement conduct in encounters like Officer Edwards and Sgt. Cotton confronted in this incident which could have reasonably informed any reasonable officer that Sgt. Cotton or Officer Edwards' response to the Plaintiffs' actions would be determined improper. *{Exs. 26-29}.* Instead, Officer Edwards and Sgt. Cotton responded in a manner consistent with the training police officers receive to respond to the type of situation that occurred here. *{Exs. 26-29}.* Officer Edwards and Sgt. Cotton, thus, performed their duties within an acceptable range of appropriate law enforcement responses to the Plaintiffs' conduct and in accordance with contemporary law enforcement officer safety training. *{Exs. 26-29}.*

41.     Similarly, the uncontroverted summary judgment record also establishes that Officer Edwards and Sgt. Cotton followed applicable legal standards. "If the law at the time of a constitutional violation does not give the officer 'fair notice' that his conduct is unlawful, the officer is immune from suit." *Manis*, 585 F.3d at 845-46. The holdings of the Fifth Circuit throughout the last 25 years have instructed officers that it is clearly established that a law enforcement officer may, consistent with the Constitution, defend himself by shooting an individual provided that *any reasonable officer*, knowing only what the Defendant officer knows at the moment, could reasonably have believed his life was in imminent danger, **regardless of**

---

[15]     Similarly, the opinions and conclusions of Lieutenant Rodriguez and Dr. Lewinski which Plaintiffs wholly fail to address, let alone rebut, may be accepted as undisputed for purposes of the motion FED.R.CIV.P. 56(e); *Eversley*, 843 F.2d at 173-174.

**whether that officer's belief, in fact, ultimately proved correct**. *See Young*, 775 F.2d at 1352-53; *Reese*, 926 F.2d at 500-01; *Fraire*, 957 F.2d at 1275-76; *Ontiveros*, 564 F.3d at 384; *Hathaway v. Bazany*, 507 F.3d 312, 320 (5th Cir. 2007): *Manis*, 585 F.3d at 844. "An officer's use of deadly force is presumptively reasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others." *Ontiveros*, 564 F.3d at 382. "Excessive force incidents are highly fact-specific and without cases squarely on point, officers receive the protection of qualified immunity." *Ontiveros*, 564 F.3d at 383 n. 1. This is the applicable body of clearly established law and absolutely nothing in the record stands for the proposition that Officer Edwards or Sgt. Cotton acted outside the standards governing their conduct under this settled body of law.

42.     Furthermore, there is no body of law that officers are trained to follow that could reasonably have informed Sgt. Cotton and/or Officer Edwards that the conduct of either would be deemed unconstitutional. *{Exs. 26-29}*. To the contrary, officers are customarily trained that the actions Officer Edwards and Sgt. Cotton undertook in this instance were objectively reasonable and in compliance with contemporary law enforcement training, including Texas State standards, that embody those established legal standards. *{Exs. 26-29}*. The Plaintiffs have not identified any evidence, authority or even substantive information or argument that legitimately challenges this record which unquestionably supports a judgment based upon immunity. {*Exs. 21-25; Doc. no. 70*}. Thus, "[h]ere, case law does not provide the necessary precedent, either specifically or through broad principles, to clearly establish the right" sufficient to void the application of immunity. *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1292 (11th Cir. 2009). Without a doubt, the Plaintiffs must do more than offer "mere allegations" and use the words "clearly established" to satisfy the burden they bear to rebut Officer Edwards and

29

Sgt. Cotton's claim to immunity in light of the record before the Court but the Plaintiffs have plainly failed to do so here. *See Brosseau*, 543 U.S. at 198, 125 S.Ct. at 599; *Ontiveros*, 564 F.3d at 382. Accordingly, the Officers' immunity remains intact and summary judgment on this separate ground is equally appropriate.

### B.   An Officer Could Reasonably Have Believed that Officer Edwards' and Sgt. Cotton's Conduct Was Objectively Reasonable

43.    The summary judgment record also establishes that Plaintiffs have failed in their burden to prove that no competent officer could reasonably have believed that Officer Edwards and Sgt. Cotton's conduct was objectively reasonable. Qualified immunity insulates all but "the plainly incompetent" officer from liability and the record before the Court certainly fails to show, as required, that the conduct of Officer Edwards or Sgt. Cotton was so far beyond the bounds of acceptable police procedure that *all officers would know* that Officer Edwards' or Sgt. Cotton's acts would be found unreasonable. *See Malley*, 475 U.S. at 341, 106 S. Ct. at 1096; *Manis*, 585 F.3d at 846.

44.    The former commander of the Texas Department of Public Safety state law enforcement training academy and the foremost psychological researcher in law enforcement officer actions and reactions in police shooting situations have provided *uncontroverted* testimonial evidence which undisputedly establishes that a reasonable officer *could have believed* Sgt. Cotton's and Officer Edwards' conduct was appropriate. When viewed through the eyes of a well-trained law enforcement officer on the scene not benefitted by information only available through hindsight information, as *required*, the facts show that Officer Edwards and Sgt. Cotton did not violate any Plaintiffs' clearly established rights. Police officers are trained to react as did Officer Edwards and Sgt. Cotton did. *[Exs. 26-29]*.

45.     Even though the Plaintiffs bear the burden of negating the immunity defense, they respond to the powerful uncontroverted evidence and compelling legal authority against them with no more than hollow *allegations* and insupportable *argument* of their counsel. The Plaintiffs certainly fail to substantively address, let alone sustain, **their burden to disprove immunity**. On this record, there can be no reasonable contention that, at a minimum, an *arguable* basis for Officer Edwards and Sgt. Cotton's actions did not exist, so the Plaintiffs have failed to refute the Officers' claim of immunity. *See Haggerty v. Texas Southern University*, 391 F.3d 653, 656 (5th Cir. 2004) and *Vance v. Nunnery*, 137 F.3d 270, 274 (5th Cir. 1998). This record, accordingly, undeniably establishes that Officer Edwards and Sgt. Cotton are entitled to summary judgment in their favor based upon their proven entitlement to qualified immunity.  *See Saucier*, 533 U.S. at 201-02, 121 S. Ct. at 2155-56; *Snyder*, 142 F.3d at 800-01.

## CONCLUSION

46.     The summary judgment record unequivocally establishes that the claims the Plaintiffs' have asserted against Officer Edwards and Sgt. Cotton are not cognizable so the officers are entitled to summary judgment in their favor. The Plaintiffs have failed to satisfy their burden to negate the Officers' immunity by identifying sufficient evidence to rebut the officers' defense. The summary judgment record, when viewed from the perspective of a reasonable police officer on the scene not aided by hindsight, fails to even show that Officer Edwards or Sergeant Cotton engaged in unconstitutional conduct and certainly fails to show that either officer could not reasonably have believed his conduct was permissible in light of clearly established law. Although necessary to avoid dismissal of their claims, the Plaintiffs have not identified any genuine dispute of material fact which could preclude judgment in favor of Officer Edwards and Sergeant Cotton. The record evidence shows that no violation of the 4th or 14th Amendment

occurred. Regardless, even if any constitutional deprivation had occurred, the uncontroverted record nonetheless establishes that neither of them violated a clearly established right and that any officer could reasonably have believed that Officer Edwards and Sgt. Cotton's conduct was objectively reasonable. Accordingly, Officer Edwards and Sgt. Cotton move the Court to enter summary judgment in their favor.

Respectfully Submitted,

CHAMBERLAIN, HRDLICKA, WHITE,
     WILLIAMS & MARTIN
By:    /s/ Norman Ray Giles
    WILLIAM S. HELFAND
    SBOT: 09388250
    NORMAN RAY GILES
    SBOT: 24014084
    1200 Smith Street, Suite 1400
    Houston, Texas 77002
    (713) 654-9630
    (713) 658-2553 (Fax)
    ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been forwarded to the following counsel of record in accordance with the District's ECF service rules on this 7th day of February, 2011, as follows:

Geoffrey Berg
BERG & ANDROPHY
3704 Travis Street
Houston, Texas 77002

/s/ Norman Ray Giles

0816626.02
003856-000226:

32