UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT R TOLAN, MARIAN TOLAN, | § | |
| BOBBBY TOLAN, AND ANTHONY | § | |
| COOPER | § | |
| | § | |
|     Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. H-09-1324 |
| | § | |
| JEFFREY WAYNE COTTON, JOHN C. | § | |
| EDWARDS, AND THE CITY OF BELLAIRE | § | |
| | § | |
|     Defendants. | § | |

**(CORRECTED)  MEMORANDUM AND ORDER ON  JEFFREY WAYNE COTTON'S
AND JOHN C. EDWARDS'S MOTION FOR SUMMARY JUDGMENT**

Pending before the Court is the motion filed by Defendants Jeffrey Wayne Cotton ("Sergeant Cotton") and John C. Edwards ("Officer Edwards") for summary judgment on their defense of qualified immunity. (Doc. 67)  Plaintiffs have filed a response to the motion (Doc. 70), to which Defendants filed a reply (Doc. 72).  Plaintiffs then filed a surreply (Doc. 75), to which Defendants responded (Doc. 77).  These filings and the accompanying exhibits have been reviewed and considered by the Court[1]

Each of the Plaintiffs:  Robert R. Tolan ("Robbie Tolan"),  Marian Tolan, Bobby Tolan, and Anthony Cooper has filed suit pursuant to 42 U.S.C. Sec. 1983 against each of the remaining Defendants,  Cotton, Edwards, and the City of Bellaire  for violation of their Fourth and Fourteenth Amendment rights.[2]

---

[1]  Defendants objected to certain exhibits submitted by Plaintiffs (Doc. 72).  This motion is considered and ruled upon in a separate order.
[2]  Plaintiffs originally brought a number of Texas state law claims against the defendants.  On stipulation of the parties, these state law claims against the individual defendants were dismissed on January 4, 2011 (Doc. 69).  On June 6, 2009 on stipulation of dismissal without prejudice filed by Plaintiffs, all defendants, except Cotton, Edwards,

<u>Undisputed Facts.</u>

There is no dispute that just before 2:00 a.m. on  December 31, 2008, outside a home located at 804 Woodstock Street, in Bellaire, Texas, Plaintiff Robert R. ("Robbie") Tolan was tragically shot by Bellaire Police Sergeant Jeffrey Wayne Cotton.  There were six people who witnessed this shooting:  Robbie Tolan and Sgt. Cotton; Robbie Tolan's parents, Marian and Bobby Tolan; Robbie Tolan's cousin, Anthony Cooper; and Bellaire Police Officer John C. Edwards.  The question before the Court is whether the two police defendants, Sergeant Cotton and Officer Edwards may utilize the defense of qualified immunity from the lawsuit filed against them by Plaintiffs Robbie, Marian, and Bobby Tolan and Anthony Cooper.

In their opening brief Defendants summarize the evidence of what led up to the shooting. (Doc 67, at 2-8)  The summary is undisputed by Plaintiffs and is taken largely from the deposition testimony of Sergeant Cotton and Officer Edwards and the four Plaintiffs. (Doc 67, Exhibits 2, 4, 15, 16, 17, 18).   Briefly, the circumstances were that Officer Edwards was, at around 1:50 a.m. on December 31, 2008, on duty as a City of Bellaire police officer, patrolling in the area of the 5800 block of Bissonnet Street. He was aware that thieves had burglarized twelve vehicles in Bellaire the night before and that street gang graffiti had been placed on the buildings of the Bellaire shopping center located in the vicinity of his patrol.  He was driving a marked City of Bellaire police car.  The police car prominently displayed reflective tape and was equipped with a spotlight, overhead emergency lights, and a video recording system.  The police car was also equipped with a computer and a Mobile Data Terminal (MAD).

While patrolling the vicinity Officer Edwards exited the shopping center parking lot on Evergreen Street and travelled eastbound.  He observed a black Nissan Sports Utility Vehicle (SUV) travelling in front of him on Evergreen Street.  The SUV made an abrupt turn onto

Woodstock Street.   The manner of the turn suggested to Officer Edwards, among other possibilities, that either the driver was unfamiliar with the neighborhood, the driver did not want to be followed by a police car, the driver was a poor driver, the driver had been distracted, or the driver's ability to operate the vehicle was in some way impaired.   Officer Edwards did not follow the SUV, but stopped his police car at the intersection of Woodstock and Evergreen and continued to observe the SUV.   Officer Edwards knew that Woodstock ended in a *cul-de-sac*, and that if the driver wanted to exit Woodstock, the driver would need to return to Evergreen. Officer Edwards observed the male driver park the SUV on the west side of Woodstock and exit the SUV, along with his male passenger.    Officer Edwards did not recognize the two men, but later learned that the driver was Robert "Robbie" Ryan Tolan ("Robbie Tolan") and the passenger, Anthony Cooper ("Cooper").   Robbie Tolan testified in his deposition that as he opened the door of the SUV, he saw headlights reflecting on the door.   Robbie Tolan pointed out the headlights of the police car to Cooper, but Cooper had misplaced his wallet in the SUV and was too busy looking for it.   (Doc. 67, Ex. 15, p. 28, line 25--p. 29, line 3; p. 30, line 25—p. 31, line 15; Ex. 16, p. 40, lines 1-9; Plaintiffs' Complaint, at paragraph 25).   Officer Edwards also noted at that time that Robbie Tolan and Cooper looked in the direction of the police car when they exited the SUV.   He also observed Robbie Tolan and Cooper remove items from inside the SUV.

Still observing the actions of Robbie Tolan and Cooper, Officer Edwards began to drive slowly past the SUV, noting as he drove, the license plate number.   He typed what he believed to be the license plate number of the SUV into the Mobile Data Terminal (MDT), his police car computer, in order to run a routine check on the SUV.   Unfortunately when he entered the license plate number into the MDT he made a mistake.   The actual number of the SUV was

696BGK, but Officer Edwards typed in 695BGK.  The computer in the police car sounded an audible alert tone indicating that the license plate number that had been typed into the MDT matched that of a vehicle that was reported stolen and also audibly and visually announced that the vehicle with the license plate number he typed in was a Black Nissan that had been reported stolen.  The MDT also automatically alerted the Bellaire Police Department dispatcher, who informed Officer Edwards the vehicle had been reported stolen.  Officer Edwards told the police dispatcher the location of the SUV and that two males had occupied the vehicle.

Officer Edwards recognized at this point that he was involved in investigating a reported felony crime, that the two men who had occupied the supposed stolen vehicle were aware a police car was nearby, and that he was outnumbered.  He called for backup from both the Bellaire Police Department and the Houston Police Department.  In an attempt to maintain the *status quo* until backup arrived, Officer Edwards drove through the *cul-de-sac* turn and stopped the police car on the side of the road facing the SUV, but at a distance.  Before backup arrived, however, Bobbie Tolan and Cooper approached as if to enter a residence in the neighborhood; they were carrying several items.  This change in the circumstances prompted Officer Edwards to drive his police car forward and park in front of the SUV.  He shined the police car spotlight to better illuminate Robbie Tolan and Cooper in the poorly lit front yard and driveway of the house.  He exited the police car and removed his handgun from its holster, calling to Robbie Tolan and Cooper, "Police, Come here."   Officer Edwards was wearing a regulation Bellaire Police uniform; he carried his handgun in one hand and a flashlight in the other.  His intention was to detain temporarily Robbie Tolan and Cooper near the SUV in order to make a field investigation of what he believed to be an automobile theft.  When Robbie Tolan and Cooper failed to come to Officer Edwards, but proceeded in an opposite direction, Officer Edwards

repeatedly ordered them to stop and lie on the ground.

In paragraph 37 of the complaint (Doc 1), Plaintiffs allege that, in response to their question of why he wanted them to lie down, Officer Edwards told Robbie Tolan and Cooper that he wanted them to lie down because he had information that the SUV was stolen.  Both Robbie Tolan and Cooper testified in their depositions that they did not comply with Officer Edwards' verbal requests to lie on the ground.  (Doc. 67, Ex. 15, p. 40, line 22—p. 41, line 8; Ex. 16, p. 51, lines 4-7) Robbie Tolan even stepped outside of the officer's view when he put a bag he was carrying behind a sago palm tree in a planter near the door of the house.

While Officer Edwards was ordering Robbie Tolan and Cooper to the ground, two people came from inside the house onto the front porch.  Although Officer Edwards did not know it at the time, they were Robbie Tolan's parents, Robert ("Bobby") Tolan and his wife Marian Tolan. Bobby Tolan testified in his deposition that he told Robbie Tolan and Cooper to "shut the fuck up, be quiet, and get on the ground" (Doc. 67, Ex. 18, p. 48, lines 15-19).  After his father told him this, Robbie Tolan lay down on the porch of the house, with his head in the direction of the door and his feet toward the driveway.  Cooper knelt down on the ground, nearer to Officer Edwards.  While Bobby Tolan was talking to Officer Edwards, Marian Tolan walked about the front yard shouting.  Officer Edwards had four people to watch, and he still had not investigated the automobile theft, so he called the dispatcher again to ask backup to hurry to the scene.

While all of this was transpiring at 804 Woodstock Drive, Sergeant Cotton was at the Bellaire Police Station doing paperwork.  He heard radio transmissions that Officer Edwards had encountered a reportedly stolen vehicle along with two individuals who had occupied that vehicle.  Sergeant Cotton responded in his police car.  He first instructed Bellaire Police Corporal Chris Delk (Delk) to go to Braeburn Street, south of Woodstock Street, in case there

was a foot pursuit.  Sergeant Cotton then drove to 804 Woodstock Street.  As he approached the

Woodstock address Sergeant Cotton heard on the police car radio Officer Edwards's second,

more urgent, call for backup.  Sergeant Cotton arrived at 804 Woodstock at 1:53 a.m., some one

and one-half minutes after Officer Edwards exited his police car.   It is undisputed that at the

time of Sergeant Cotton's arrival Robbie Tolan was lying prone on the porch, Cooper was on the

ground, not necessarily prone, Bobby Tolan was standing next to his Explorer that was parked in

the driveway, close to Officer Edwards, and Marian Tolan was moving around the front yard.

Disputed Facts

        The facts set forth above are not disputed.  At 1:53 a.m., however, some of the facts

become disputed.   The Plaintiffs rely upon these disputed facts to argue that a summary

judgment of qualified immunity is inappropriate in this case.  Sergeant Edwards and Officer

Cotton, however, argue that although there may be details that are in dispute, the material facts

that establish the defense of qualified immunity are not in dispute.  There were six witnesses to

what transpired that early morning of the shooting.  Each of these witnesses has been deposed

about the shooting A review of the depositions in some detail reveal that, although there are

disputes about details and interpretations of the facts, there are no disputes of material fact.

Robbie Tolan's Deposition Testimony

        Robbie Tolan testified that when Sergeant Cotton arrived on the scene he did not see him

because he was lying face down on the porch of the house. Doc. 67, Ex. 15, p. 63, line 19—p 64,

line 1. Although he could not see Anthony Cooper, he had a general idea of where he was.  *Id*. p.

64, lines 7-24.  Before he lay down on the porch he had seen his mother, Marian Tolan, "in the

vicinity of Mr. Cooper." *Id*. p 71, lines 1-23.  He also testified that, although he did not know it

at the time, he knew at the time he gave his deposition that his mother was taking a Blackberry

from Anthony Cooper when she went over to him as he lay on the ground.  *Id*. p 72, lines 2-20.

Robbie Tolan testified that the first time he saw the man he now knows to be Sergeant Cotton he saw him walking down the driveway.  Robbie Tolan was at that point lying on his stomach on the porch, with his head turned to his left.  *Id*. p. 75, line 10—p. 76, line 8.  He next saw Sergeant Cotton in the area of Cooper, where he saw Sergeant Cotton "grab my mother."  *Id*. p.76, lines 14-25.  He did not hear Sergeant Cotton say anything to his mother, but he heard his mother talking.  He did not "remember exactly what she said."  *Id*. p 77, lines 1-9.  When asked if he recalled "generally" what she said, he responded that "I know she kept saying that this is our house and we live here, and things of that nature."  *Id*. p. 77, lines10-13.  Between the time Robbie Tolan lay down on the porch until Sergeant. Cotton fired his weapon, he remembered his mother saying only things in the nature of "this is our house, that car is not stolen."  *Id*. p 78, lines 12-21.

Robbie Tolan further testified that when Sergeant Cotton grabbed his mother, Sergeant Cotton grabbed her arm, although Robbie Tolan did not recall which arm.  *Id*. p. 79, lines 107.  Robbie Tolan observed Sergeant Cotton then move parallel to the front of the house and then toward the garage door.  *Id*. p.79, lines 11-21.  While Sergeant Cotton was moving from the area where Cooper was located to the garage door area, Sergeant Cotton was holding Marian Tolan's arm, "kind of pushing her a little bit, kind of directing her."  He further testified that "There was no tussle.  I mean, but she – she wasn't exactly running over there either." *Id*. p 80, lines 3-24.  While Sergeant Cotton and Marian Tolan were walking between Cooper and the garage door Robbie Tolan's mother made no noises or sounds, but kept repeating "this is a mistake. . . we live here and things of that nature."  *Id*. p. 81, 3-7.  When Sergeant Cotton and Marian Tolan arrived in front of the garage door, they were "pretty much directly behind [Robbie Tolan]." *Id*.

p. 83, lines 21-15.   Robbie Tolan had continued to turn his head to the left and look backwards to follow what was going on between Sergeant Cotton and Marian Tolan.  He had a good view of them.  He "saw and heard Sergeant Cotton push my mom against the garage door. . . . And it made a loud noise."  *Id*. p. 84, lines 1-25.

The sight and sound of his mother being pushed against a metal garage door "caused [him] to want to get up from the position that [he was] laying in . . . . because [he was] upset about seeing [his] mother being pushed into a garage door."     *Id*. p. 85, lines 1-19. At that point in Robbie Tolan's  deposition, there were the following questions and answers:

> Question:  "[A]m I correct in saying that not only did you want to get up from the position of 'RT' [the position in which he was lying on his stomach on the porch], but you wanted to turned [sic] around to where your mother and Sergeant Cotton were?"
>
> Answer:  "That I wanted to, yes, sir."
>
> Question: "In fact, that's what you were doing at the time you were shot, right?"
>
> Answer:    "True."
>
> Question:  "You were getting up and turning around toward your mother and Sergeant Cotton?"
>
> Answer:     "True."

*Id*., p 85, line 20—p. 85, line 8

Robbie Tolan testified that while he was lying prone on the porch he had his arms out in front of him.  In order to get up he had "to pull [his] arms back towards kind of [his] chest area and push up. . . ."  He "used kind of like a push up maneuver to get [himself] up." *Id*. p 100, lines 13-24.  He was "turning, …pushing up with [his] hands, and turning towards [his] left." *Id*. p. 101, lines 6-8.  At the time he was not thinking about the mechanics of getting up:

> Question:   [Y]ou've been asked to talk about kind of the

mechanics of getting up that night.  Right?

Answer:  Yes.

Question:  Just like we're doing here, we're talking about pulling your hands back, push up with both hands, and at the same time that you're turning around, right?

Answer:  Yes, sir.

Question:  Okay.  But, would it be right for me to say, Mr. Tolan, that at the time that you were getting up that morning, would it be right for me to say you really weren't thinking about how you were doing it, right?

Answer:  Sure.

Question:  In other words, people have asked you, how were you doing it, and you have tried to kind of recreate it in your mind and describe it, right?

Answer:  Yes, sir.

Question:  But in terms of each thing that you were doing at the moment you were doing it, would it be right for me to say it's not something you were thinking about at the moment that you were doing it?

Answer:  Sure

Question:  So when you give us a recreation of it, it is your best guess of how you were doing it, right?

Answer:  Sure.
*Id.*, page101, line 10 -- page 102, line 10

Later in his deposition Robbie Tolan described further the circumstances of his being

shot:

Question:  Now, so as you're getting up and I think you told me you're turning to your left as you're getting up?

Answer:  Yes, sir.

Question:  Okay.  And is Sergeant Cotton -- as you're turning

towards Sergeant Cotton, and getting up, is Sergeant Cotton still holding your mother by the arm?

Answer:  To my knowledge, yes.

Question:  Okay.  And as you're getting up and turning to your left -- by the way, did you get up quickly or slowly?

Answer:  Pretty quickly, I suppose.

Question:  All right.  And as you're getting up, did you scream or raise your voice and say, "Get your fucking hands off my mom?"

Answer:  Yes, sir.

Question:  You were angry by then, right?

Answer:   Yes, sir.

Question:  And, so, if somebody said they saw an angry look on your face, you would say, well, that would probably be right, right?

Answer:  Sure.

Question:   And you would agree with me, wouldn't you, that saying something like "get your fucking hands off my mom" is an aggressive statement?  You would agree with that, wouldn't you?

*Id*., page 105, line 9 -- page 106, line 10

Question:  And in turning, are you -- were you able to see Sergeant Cotton's face as you are turning towards him?

Answer:  Yes, sir.

*Id*., page 106, lines 19-22

Question:   Did you see Sergeant Cotton actually unholster his weapon?

Answer:  Yes, sir.

Question:  And would it be right for me to say that you did not see Sergeant Cotton unholster his weapon until you were beginning to get up and turning [sic] toward him?

Answer:  Yes, sir.

> Question:   In other words, from what you observed, Sergeant
> Cotton's weapon was holstered up until the time that you hollered
> to him and began getting up and turning toward him
> Answer: Sure.
>
> Question:  And then he unholsters his weapon, right?
>
> Answer:  Yes, sir.
>
> Question:   Points it at you, and at the same time, practically
> immediately, is shooting, right?
>
> Answer:  Yes, sir.

*Id*., page107, lines 6-22.

Bobbie Tolan agreed that "the first thing that Sergeant Cotton did after he fired his weapon was to come over to you and check you for weapons. . . . And when he didn't find a weapon, he specifically said to you, what were you reaching for, right?"  *Id*, page 114, lines 8-15.

Deposition Testimony of Anthony Cooper

Anthony Cooper testified that he saw Sergeant Cotton arrive.  "He came from the street, and he was on the side of the Suburban [the Tolans' automobile parked in the driveway].  Doc. 67, Exhibit 16, p. 74, lines 18-24.  About the same time Sergeant Cotton arrived, Cooper went from his knees to lying on the ground.  At some point, either when Cooper was on his knees or lying on the ground, Marian Tolan came over and picked up his Blackberry from the ground. *Id*. p. 75, line 4—p 76, line 24.

Cooper was asked in his deposition whether from the time he and Robbie Tolan first communicated with Officer Edwards, through the time Mr. and Mrs. Tolan came out of the house, to Robbie Tolan's shooting, "was there ever a time that none of you were talking, that you weren't talking, that Robby wasn't talking, that Marian Tolan wasn't talking, and Bobby Tolan

wasn't talking, or was somebody from the Tolan family?  Or are you always talking during that time?"  Cooper answered, "I mean somebody was--every--there were people--everybody was talking."  *Id*., page 141, lines8-22.  He was further asked, "[W]as there ever a time it was quiet-- from the time that Officer Edwards approached you up until the time that Sergeant Cotton shot, was there ever a time that some Tolan or Mr. Cooper was not talking?"  Cooper answered, "No." *Id*., page 142, lines 3-8.

Cooper described the contact Sgt. Cotton made with Marian Tolan:

Question:  "Okay.  So, did you see Sergeant Cotton ever touch Mrs. Tolan?"

Answer:  "Yes."

Question:  "Okay.  And where was Sergeant Cotton when he touched Mrs. Tolan the first time you saw it?"

Answer:  "The Suburban was here."

Question:  "Okay."

Answer:  "And Bobby was on the Suburban.  Marian was –"

Question:  "Put a 'B' for Bobby for—will you, please?"

Answer:  "Bobby was on the Suburban."

Question:  "Uh-huh."

Answer:  "Marian was right where the front porch—she was started from the front porch—"

Question:  "Uh-huh"

Answer:  "-- and she worked her way through the sidewalk right here where—where I was laying at.  This is the sidewalk right here."

Question:  "Yes sir."

Answer:  "And she grabbed the phone."

Question:  "Uh-huh"

Answer:     "And I believe when she grabbed the phone, Sergeant Cotton and – Sergeant Cotton was there, and he told her, or grabbed her, and--"

Question:  "All right.  You're imparting by C3, is that where you saw Sergeant Cotton touch Mrs. Tolan or was it somewhere else?"

Answer:     "That's where he grabbed her."

*Id*. p. 76, line 11—p. 77, line12.

When asked if he saw Sgt. Cotton push Marian Tolan into the garage door, Anthony Cooper responded, "I saw him grab her arm. . .and shoved her against the garage door."  He heard her hit the garage door with "a big bang and she slid down on her butt."  *Id*. p. 77, lines 17-24.

Cooper testified that he heard the shots, "maybe a second after she hit the garage door." *Id*. p 78, lines 8-11.  He remembered that Sergeant Cotton's weapon was out of the holster when he grabbed Marian Tolin.  *Id*. p. 81, lines1-24.  He later remembered, within the next few pages of the deposition that from the time Marian Tolan hit the garage door and hit the ground until he observed Sergeant Cotton fire his weapon, "It was within seconds."  *Id*. p. 82, lines 20-23.  When asked what would be the most seconds he would say it was, he replied, "Maybe five seconds. *Id*. p. 83, lines 5-8.  He also testified that did not remember and knew nothing about Robbie Tolan getting up or trying to get up off the ground.  *Id*. p. 87, lines 1-23.  He agreed, however, that as Robbie Tolan lay on the porch, his head was facing away from where his mother had been pushed into the garage door, so that in order to see the garage Robbie Tolan would have to turn around.  *Id*. p. 88, line 14—p. 89, line 7.  Cooper agreed that Sergeant. Cotton was standing "in the same position or right—right about the same position where he pushed Mrs. Tolan into the garage door, when he fired his weapon," and that Sergeant Cotton did not move toward Robbie

13 / 53

Tolan before he fired. *Id*. p. 111, lines 3-13. Cooper also agreed that up until Sergeant Cotton fired his weapon he never saw Sergeant Cotton off the driveway anywhere. *Id*. p 134, lines 3-7.

<u>Marian Tolan's Deposition Testimony</u>

Marian Tolan testified at her deposition that when she and her husband exited the front door of their house at 804 Woodstock, their son Robbie Tolan was in the process of unlocking that front door. Doc. 67, Exhibit 17, p. 44, line 24—p 45, line 25. Once they walked outside the front door she could see Cooper and Officer Edwards, as well as their son Robbie Tolan. *Id*. p. 47, lines 1-4. She did not believe at that time Sergeant Cotton had arrived at the house. *Id*. p. 47, lines 12-18. There were no police officers there, except Officer Edwards. *Id*. p. 47, lines 23-25. When Marian Tolan and her husband came out of the house Officer Edwards was saying to Anthony Cooper and Robbie Tolan, "Get Down." *Id*. p 48, line 23—p. 49, line 3. She and her husband also told Cooper and Robbie Tolan to get down. *Id*. p. 49, lines 14-20. After the Tolans told Anthony Cooper and Robbie Tolan to get down, perhaps twice, they complied. *Id*. p. 50, lines 6-9.

Marian Tolan testified that when Sergeant Cotton arrived she could not see him, so she was unable to say if he had his gun drawn and if he placed his gun back into his holster before withdrawing it again to shoot. She only knew that he replaced the gun in the holster after the shooting. *Id*. p. 66, line 18--p. 67, line 12.

Marian Tolan was asked, "Robb[ie] had gotten up from lying down on the ground, as you and your husband had instructed him to do, without anybody giving him permission to do it or telling him it was okay to do it, when Sergeant Cotton shot him, right?" She answered, "Yes." *Id*. p. 92, lines 8-13. Then, she was asked, "He was going from laying on the ground to not laying on the ground?" She answered, "Yes." Then she was asked, "He was in the process of

getting up when he got shot, wasn't he?"  She answered "Yes."  *Id*.  p. 92, line 25—p. 93, line 5.
Later in the deposition she was asked, "At the time that Sergeant Cotton fired at Robb[ie] as
Robb[ie] was getting off the ground, had anyone checked yet to see whether Mr. Cooper or
Robb[ie] Tolan had a weapon?"  She answered, "No."  The next question posed to her was,
"Whether either of those gentlemen had a weapon at the time that Sergeant Cotton responded to
Robb[ie] getting up off the ground, can we agree was uncertain?"  She answered, "It was
uncertain."  *Id*. p. 116, lines 3-12.

Marian Tolan characterized being pushed against the garage door as an assault.  When
asked what she was doing when she was assaulted by Sergeant Cotton, she answered, "Talking."
*Id*. p. 117, lines 19-24.  She was then asked what Sergeant Cotton was asking her to do, and she
responded that he said "Get against the garage—get against the wall," which she did not do.  *Id*.
p. 117, line 25-p. 118, line 8.  She testified that "I could not believe he was asking me to do that.
That is why I responded the way that I did."  *Id*. p. 118, lines 20-21.  She told Sergeant. Cotton,
"Me?  Are you kidding me?  We've lived here 15 years.  We've never had anything like this
happen."  *Id*. p. 118, lines 23-25.

Marian Tolan further testified that after Sergeant Cotton "threw" her into the garage door,
Robbie Tolan started to get up from the ground.  He told Sergeant Cotton "to get his hands off of
his mom."  *Id*. p 174, lines15-25.  She was then asked if he did not actually say, "Get your
fucking hands off my mom," and she answered, "I don't recall him using that word, but he says
he did."  *Id*. p. 175, lines1-4.    She agreed that it was at that point that Sergeant Cotton shot
Robbie Tolan.  *Id*. p. 175, lines 5-7.  She was asked if Sergeant Cotton withdrew his weapon
from its holster before firing.  She responded, "I didn't see it until then."  *Id*. p. 175, lines 8-14.
The three gunshots came immediately after each other, with no delay, and it sounded like one

gunshot to her.  Id. p. 175, line 21—p. 176, line 7.   After the shooting, Sergeant Cotton called paramedics first and then asked Marian Tolan, "Is there anyone else in the house?"  When Marian Tolan said, "No," Sergeant Cotton went over to Robbie, "Turned him over and emptied his pockets and said, 'What were you reaching for?"  Robbie responded, "Nothing."  *Id*. p 176, lines12-25.   From the moment Sergeant Cotton arrived at 804 Woodstock until the time he fired his weapon, Marian Tolan agreed, took 32 seconds. *Id*. p. 178, lines 6-8.

Deposition Testimony of Robert, "Bobby," Tolan

Robbie Tolan's father, Bobby Tolan testified in his deposition that although he did not know it at the time, he has since learned that when Officer Edwards got out of his police car and followed Robbie Tolan and Anthony Cooper toward the house at 804 Woodstock Street, Officer Edwards had heard a report that the automobile whose license plate he had entered into his police car computer was stolen.  Doc. 67, Ex. 18, p 29, lines17-25.    He agreed that as he exited his house and walked to Officer Edwards he told Robbie Tolan and Anthony Cooper to get on the ground and shut up; this took only a few seconds.   *Id*. p. 48, lines 18-19; p. 54, lines 1-8.  He also agreed that he then went from being in front of Officer Edwards to putting his hands on the Suburban in the driveway because Officer Edwards asked him to put his hands on the Suburban; from the time he walked out his front door until he was standing by the Suburban took a few seconds. *Id*. p. 54, line 19—p. 55, line 20.    Bobby Tolan testified that he never saw Sergeant Cotton in his front yard the night of the shooting.  He did not see anything Sergeant Cotton did, nor did he see any interaction between his wife and Sergeant Cotton.  He did hear a bang against the garage door.  *Id*., p. 60, lines 3-25.  Immediately after hearing the sound of something going against the garage door, he heard the gunshot.  When he turned to look he saw his wife with her back to the garage door, sliding down the door.  *Id*. p 62, line 24-p. 63, line 8.  Immediately after

that he was told to go over to the police car.  *Id*. p. 64, line 16-p. 65, line 3.  While Bobby Tolan

was standing next to the Suburban he was unable to see his son Robbie Tolan at any time.  *Id*. p.

65, lines 4-6.  Bobby Tolan did not hear his son Robbie say, "Get your fucking hands off my

mother" before the shot was fired.  *Id*. p. 85, lines 10-13.  Bobby Tolan agreed that there was

"basically a lot of loud commotion in [his] front yard between when [he] first came out and when

the gunshot occurred.  *Id*. p. 85, line 25—p. 86, line 4.  He was asked "Have you seen anything

or heard anything that leads you to believe that Officer Edwards knew of the race of either of the

occupants in the vehicle?"  Bobby Tolan answered, "I have no idea." *Id*. p. 91, lines 22-25.  He

also agreed that he had "no facts" that lead him to believe that the race of anybody involved had

anything to do with shooting, but he has his opinion.  *Id*. p. 92, lines 3-19.  Bobby Tolan

explicitly testified that neither Officer Edwards, nor Sergeant Cotton, used any force against him

at all. *Id*., p. 54, line 24 -- page 55, line 25; page 56, lines 4-12; page 60, lines 3-9.  His wife,

Marian Tolan, agreed.  Doc. 67, Exhibit 17, page 163, lines 12-16.

Deposition Testimony of Sergeant Jeffry Wayne Cotton

Sergeant Cotton admitted in his deposition that he shot Robbie Tolan.  Doc. 67, Ex. 2, p

8, lines 11-15.  The night Robbie Tolan was shot Sergeant Cotton was the shift supervisor at the

Bellaire Police Department; in other words he was in charge of the patrol officers and the

dispatchers for the eight hour shift.  *Id*. p. 14, lines1-13.   As the shift supervisor Sergeant

Cotton was Officer Edward's supervisor.  *Id.*, lines 14-17.  The shift began at 10:30 p.m.  *Id*., p.

15, lines 7-10.

A little before two a.m., while he was working on entering data for an accident report,

Sergeant Cotton heard Officer Edwards call in a suspicious car with two men in it.  *Id*. p. 27, line

16 – p. 28, line 24.  Sergeant Cotton testified that he decided to go to the scene to back up

Officer Edwards.  *Id*. p. 35, line 2-6.  Just as he was leaving the police station he heard the information that the vehicle is stolen.  *Id*. p. 37, lines 104. He drove to the scene without using the siren or flashing lights on the police car.  *Id*. p. 36, lines 1-5.  As he approached the scene Sergeant Cotton heard Officer Edwards advise on his radio that the suspects were moving, and "that he was going to have to take them, meaning he was going to have to—to address the suspects right now before backup was going to be able to get there."  *Id*. p. 37, line 24—p. 38, line 5.   After that transmission Officer Edwards transmitted a message that back up needed to hurry.  *Id*. p. 41, lines 14-20.  Sergeant Cotton noticed some tension in Officer Edwards's voice, and Sergeant Cotton "perceived [Officer Edwards] was in a dangerous situation."  *Id*. p. 42, lines 6-12.

When Sergeant Cotton arrived at the scene, 804 Woodstock, he did not know the race of the suspects.  *Id.*, p. 34, lines 16-19.  He also did not know the race of the Tolans or Anthony Cooper.  *Id*.,  p. 42, line 23—p. 43, line 1.

As soon as Sergeant Cotton parked his police car he got out of it very quickly. *Id*., p. 43, lines 22-25.  He saw Officer Edwards standing in the front yard with a drawn gun.  He saw Bobby Tolan standing to his left in the yard and Marian Tolan "moving around the front yard." He saw "at least" Anthony Cooper lying on the sidewalk.  He did not at first see Robbie Tolan. *Id.,* p. 44, lines 1-10.  Sergeant Cotton testified that Marian Tolan "was in dynamic movement, so I don't remember the –specific spot that she was in.  She was moving around from Officer Edwards' left to in front of him to his right, kind of all in that area in front of him."   Officer Edwards had drawn his weapon.  *Id.*. p. 44, line 25—p. 45, line 6.  It was a hand gun that he was pointing in the direction of Cooper and Robbie Tolan.  *Id*.  p. 45 line 12—p. 46, line 1.

Sergeant Cooper testified that he also drew his hand gun and moved over to Officer

Edwards, touching him on the shoulder with his shoulder.  He asked him something like, "What have you got?"  Officer Edwards responded that "the two on the ground had gotten out of the stolen vehicle."  He could by then see at least part of Robbie Tolan's hands or head sticking out past the planter on the porch.  *Id.* p.46, line 10- 19.   Cooper was on the ground, but Sergeant Cotton could not remember if he was then on his stomach or on his back.    Both suspects appeared to him to be complying, "for the moment" with Officer Edwards directives.  *Id.* p. 46, line 20—p. 47, line 3.

Sergeant Cotton testified that the next thing he believed he needed to do was search and handcuff the suspects, but Marion Tolan was still in front of Officer Edward's pointed gun, "so I needed to get her controlled before I could move into the suspects."  Although Marian Tolan was "putting herself between [Officer Edward's] weapon and Anthony Cooper and Robbie Tolan," Sergeant Cotton did not interpret her actions as trying to block a shot from Officer Edward's gun.  Rather, "she was just moving around kind of not really paying attention to the gun, just very agitated and – and upset and moving kind of all over the scene."  *Id.* p. 47, lines 5-19.  She was also talking as she moved.  Sergeant Cooper paraphrased that what she was saying was "What are you doing here, we live here, you shouldn't be here, those kinds of things."  *Id.* p. 47, line 20—p. 48, line1.   He also remembered that at some point, when he addressed Marian Tolan, that she said, "That's our car."  *Id.* p. 48, lines 5-8.

Sergeant Cotton remembered that the exterior lighting consisted of a gas lamp "out front," which shed "some, but not a lot" of light, "more decorative than—than illuminating" and two spotlights on the driveway.  The area in which Cooper was situated was better lit than the porch, which was "fairly dark."  Sergeant Cotton could, however, see Robbie Tolan lying on the porch.  *Id.* p. 49, lines 4-25.  Sergeant Cotton testified that Robbie Tolan was lying "with his feet

toward the driveway and his head toward the front door," with his arms stretched out in front of him, "more like Superman" than an airplane, and his fingertips "pointing towards the front door." *Id*. p. 50, lines 6-16.

Immediately after speaking to Officer Edwards, Sergeant Cotton's attention was directed toward Marian Tolan, whose behavior "heightened [his] tension." *Id*. p. 50, line 25—p. 51, line 3. "I identified her as being part of a scene that was out of control that was going to have to be controlled before we could move forward." *Id*. p. 51, lines 6-9. "What needed further control was that both the felony suspects needed to be cuffed and searched," and at that point Marian Tolan was "hindering [his] ability to cuff and search the two felony suspects." *Id*. p. 51, lines 13-18. Sergeant Cotton asked Marian Tolan "several times" to move to the garage door. Her response was "noncompliant, kind of argumentative. She was upset and continuing to--to protest." *Id*. p. 51, line 23—p. 52, line 2.

Sergeant Cotton testified that Marian Tolan said, "We live here, what are you doing here, you shouldn't be here, and that that's our car." His only response "was to tell her to calm down, to let us do our investigation, we'll work everything out." She was still noncompliant. He recalled that Marian Tolan "maybe took one or two steps towards the garage door, and then stopped and began protesting again." They were not close to the garage door, but "still on the driveway or kind of on the edge of the driveway to Officer Edwards' right." Id. p. 55, lines 1-20.

"As soon as [he] addressed her, [Sergeant Cotton] holstered [his] weapon and then was trying to gain her compliance. When Marian Tolan would not comply, Sergeant Cotton testified that "I grabbed her right arm, I believe with my right hand, and put my left hand at the small of her back to start escorting her over to the garage door." *Id*. p. 57, lines3-7. Marian Tolan was talking as he was escorting her, and soon after he first touched her, "she flipped her arm up

trying to flip my—hand off of her and said, 'Get your hands off of me.'" *Id*. p. 57, lines 19-23.

She tried to flip up her right arm, and she turned over her right shoulder to say to him, "Get your

hands off me."  All the while he was walking her in the direction of and getting closer to the

garage door. *Id.* p. 58, lines7-18.

     Sergeant Cotton testified that he was gripping her arm, "not as hard as I could, but

enough to—to gain control of another person."  His "intention was certainly not to cause a

bruise. . . ." *Id.* p. 58, line 19--p. 59, line 4.  He did not believe that he had caused bruises.  *Id*. p.

59, line 8.

     As he and Marian Tolan moved toward the garage door Sergeant Cotton passed the

planter on the porch and got a clear view of Robbie Tolan lying on the porch.  *Id*. p. 59, lines 16-

24.  Officer Edwards was still "covering" Robbie Tolan and Anthony Cooper.  *Id*. p. 59, line

25—p. 60, line 4.

     Sergeant Cotton and Marian Tolan were almost to the garage door.  Sergeant Cotton

glanced at Robbie Tolan on the porch and then turned his attention back to Marian Tolan  when

he heard Robbie Tolan yell, "Get your fucking hands off her."  When Sergeant Cotton heard

Robbie Tolan make that statement he also saw Robbie Tolan getting up and turning around.  In

order to address Robbie Tolan and to get Marian Tolan out of the way, he pushed Marian Tolan

away from him.  *Id*. p. 60, line11—62, line 15.

     Sergeant Cotton testified that Robbie Tolan had been lying down on the porch, hands

outstretched towards the front door, but when Sergeant Cotton looked again at Robbie Tolan

when he said "Get your fucking hands off her," Robbie Tolan "was already partially up."

Sergeant Cotton further testified

        [Robbie Tolan] wasn't still—so I did not see all of his getting up.
        When I looked again after hearing him, he was already getting up,

> probably halfway up or so, and was turning to his right rotating
> with his face toward the window.

*Id*. p. 63, lines 8-12

Sergeant Cotton further testified, "When I first looked, he was—still had his back, for the most part, to me in the process of rotating" to look at Sergeant Cotton. *Id*. p. 63, lines 21-25. He also testified that he did not know where Robbie Tolan was when he said the words, "Get your fucking hands off of her." *Id*. p. 64, lines 1-15.

Sergeant Cotton also testified that he did not see Robbie Tolan "pull his hands back towards his midsection to push himself off of the concrete" in order to get up off the ground. *Id*. p. 64, lines 20-24. Rather, after hearing Robbie Tolan yell, Sergeant Cotton turned and saw Robbie Tolan "was up in a crouch kind of in the process of getting up with his feet under him facing kind of away from me while—as he was rotating to his right." *Id*. p. 64, line 25—p. 65, line 5.

When asked where Robbie Tolan's arms were, Sergeant Cotton testified that Robbie Tolan's right hand was at his waistband and he did not know where his left hand was. By "at his waistband," Sergeant Cotton testified that he meant "in the middle of his waist," "in the center of his body," "where his belt buckle would be." *Id*. p. 65, lines 6-15. Sergeant Cotton testified that Robbie Tolan was wearing a dark, zippered hoodie not tucked into his pants. *Id*. p. 65, 16-23.

Sergeant Cotton testified that he thought Robbie Tolan was drawing a weapon from his waistband. Sergeant Cotton could not see his hand, but he could see where his hand was. It was dark, but "I could see his total movement, which is what made me believe that it wasn't necessarily just where his hand was, for instance." He did know that he had his hand in the vicinity of his waistband. *Id*. p. 67, line 4-19.

According to Sergeant Cotton, Robbie Tolan was not running toward Sergeant Cotton,

but he was turning around to face Sergeant Cotton, on both feet. *Id*. p. 67, line 20--p.68, line 3. Sergeant Cotton testified that he thought that Robbie Tolan "was drawing a weapon to shoot me." He was in fear of his life. It was not any one thing that made him afraid, but the "totality of everything that was happening that put me in fear, which included the way he was getting up and where his hand was and –while he was getting up" *Id*. p. 68, line 4—p. 69, line 2.

### Deposition Testimony of Officer John C. Edwards

Officer Edwards testified that when Sergeant Cotton arrived at 804 Woodstock, Anthony Cooper was lying on the ground, "moving from side to side, fidgeting with his phone, with his head towards the street. Doc. 67, Ex. 4, p. 41, lines 20-25. Officer Edwards told Sergeant Cotton that two of the four people in the front yard came out of the house and two came out of the car. Sergeant Cotton then proceeded towards the garage door in the direction of where Marian Tolan was located. At that point Officer Edwards turned his attention to Cooper. *Id*. p. 44, lines1-18. He did this because he thought Sergeant Cotton would watch the person he now knows to be Robbie Tolan, *Id*. p. 45, line 21—p. 46, line 2. Officer Edwards was still telling Cooper to lay still and quit "flipping and flopping around." Bobby Tolan came up to talk to Officer Edwards, but Officer Edwards does not recall what he said. *Id*. p. 46, lines 5-12. Marian Tolan had gone off to the side with Sergeant Cotton. "[S]he was all over the scene basically. She would start over with Anthony, walk into the driveway, back behind Bobby, back towards the front of the house. . . . I can't watch her moving around and – another guy laying on the ground, plus another guy that's partially behind a bush laying on the ground." *Id*. p. 46, line 19—p. 47, line 9. Officer Edwards was aware of her movements, and they made his job more difficult. When Sergeant Cotton arrived, he took Marian Tolan off in a different direction. *Id*. p. 47, lines15-21.

The next thing Officer Edwards remembered happening was, from his right, the area Sergeant Cotton and Marian Tolan were in, he heard "shouting or yelling, getting, I guess, more agitated . . .in the general direction of Robbie." This drew his attention, but Officer Edwards did not at that point look at Marian Tolan and Sergeant Cotton. He testified he needed to focus on Cooper. Robbie Tolan was also his responsibility, but he could not see Robbie Tolan, "except for his hands and part of his head," his shoulders up, because Officer Edwards's view was obscured by the sago palm in the planter on the porch. *Id*. p. 47, line 24—p. 48, line 24. After he heard the noise being made Office Edwards saw Robbie Tolan's hands move, and then Robbie Tolan disappeared from Officer Edwards's view. *Id*. p. 52, lines 3-9. He was "totally obscured" by the sago palm. *Id*. p. 52, lines17-24. "Afterwards, I saw him standing up. . . . fully on his feet. . . in a crouch—as in a charging position is what I said." *Id*. p. 53, lines 15-20. When asked if he saw Robbie Tolan on a knee or on his feet completely, Officer Edwards testified that he could not see his feet. *Id*. p. 54, lines 1-3. He also testified that he could not see if he was reaching in his waistband because the potted sago palm on the porch was obscuring his view. He could see, however, that Bobby Tolan "was in basically a hunched charging position. . . .It looked like he was going to go forward, forward motion." *Id*. p. 54, lines 4-19. Officer Edwards turned to face Robbie Tolan and pointed his gun at him, but he did not fire. He then saw one flash from Sergeant Cotton's gun, but heard two shots. *Id*. p. 54, lines 10-24. Robbie Tolan disappeared from his view again, behind the sago palm. *Id*. p. 58, lines 6-10. Officer Edwards called on his radio to report to the police station that shots had been fired. *Id*. p. 59, lines 1-5.

Officer Edwards testified that he did not know that Robbie Tolan was African-American until after the ambulance had left taking him to the hospital. He testified that he knew Cooper

was African-American when he was lying on the ground in the front yard.  *Id*. p. 68, lines 7-16.

He was not able to see into the Nissan automobile as he was following it before Robbie Tolan

and Anthony Cooper exited the car at 804 Woodstock.  *Id*. p. 69, line15—p.70, line 3.  He also

testified that reason he followed them was not because they were black.  *Id*. p. 65, lines 9-11

Officer Edwards testified that he heard Robbie Tolan say, "Get your fucking hands off

my mother."  *Id*. p. 70, line 24—p. 71, line 3.

### **Summary Judgment**

Defendants Cotton and Edwards have filed a motion for summary judgment, arguing that

they have qualified immunity from the Plaintiffs' claims and that those claims fail as a matter of

law.  Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil

Procedure, which mandates the entry of summary judgment, after adequate time for discovery

and upon motion, against a party who fails to make a sufficient showing of the existence of an

element essential to the party's case, and on which that party will bear the burden at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317,322 (1986); Little v. Liquid Air Corp., 37 F.3d 1069,

1075 (5th Cir. 1994) (*en banc*); *see also Baton Rouge Oil and Chem Workers Union v.

ExxonMobil Corp.*, 289 F. 3d 373, 375 (5th Cir. 2002).  In deciding a motion for summary

judgment, a reviewing court must determine whether the "pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c); *Celotex Corp*., 477 U.S. at 322-23; *Weaver v. CCA Indus., Inc*., 529 F.3d 335, 339 (5th Cir.

2008).

For summary judgment, the initial burden falls on the movant to identify areas essential

to the non-movant's claim in which there is an "absence of a genuine issue of material fact."

*Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).  The moving party, however, need not negate the elements of the non-movant's case.  *Boudreaux  v. Swift Transp.Co.*, 402 F.3d 536, 540 (5th Cir. 2005).  The moving party may meet its burden by pointing out "the absence of evidence supporting the nonmoving party's case." *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc*., 953 F.2d 909, 913 (5th Cir. 1992).

If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial.  *Littlefield v. Forney Indep.Sch.Dist*., 268 F.3d 275, 282 (5th Cir. 2001) (internal citation omitted).

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co*., 478 U.S. at 587-88; *see also Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).   However, factual controversies are resolved in favor of the non-movant "only 'when both parties have submitted evidence of contradictory facts.'" *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) (quoting *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999)).   The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings. *Diamond Offshore Co. v. A&B Builders, Inc*., 302 F.3d 531, 545 n. 13 (5th Cir. 2002).  Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co*., 530 F.3d 395, 399 (5th Cir. 2008).  Instead, the nonmoving party must present specific facts which show "the existence of a genuine issue concerning every essential component of its case."  *American Eagle Airlines, Inc. v. Air*

*Line Pilots Ass'n, Int'l,* 343 F.3d 401, 405 (5th Cir. 2003) (citation and internal quotation marks omitted). In the absence of any proof, a reviewing court will not assume "that the non-moving party could or would prove the necessary facts,' and will grant summary judgment 'in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.'" *Boudreax,* 402 F.3d at 540 (quoting *Little,* 37 F.3d at 1075) (emphasis in original).

### Qualified Immunity

Under the doctrine of qualified immunity, public officials, such as police officers, acting within the scope of their authority are shielded "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (5th Cir. 1982); *Gates v. Texas Dep't of Protective and Regulatory Servs.,* 537 F.3d 404,418 (5th Cir. 2008). "Qualified immunity balances two important interests-- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S.223, 231 (2009). The Supreme Court has characterized the doctrine as protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

To determine whether a government official is entitled to qualified immunity for an alleged constitutional violation, courts conduct a two-prong analysis originally set forth in *Saucier v. Katz,* 533 U.S. 194 (2001), overruled in part by *Pearson,* 555 U.S at 236, which held that the court, contrary to *Saucier's* rigid one, two process, could analyze either prong before analyzing the other prong. The first prong of the *Saucier* analysis asks whether, taken in the

light most favorable to the party asserting the injury, the facts alleged show that the official's conduct violated a constitutional right. *See Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1769, 1774 (2007) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).   The second prong is a determination of whether, in the light of the specific context of the case, the right was clearly established. *Id*. The second prong of the *Saucier* analysis asks whether qualified immunity is appropriate because the defendants' actions were objectively reasonable "in light of clearly established law at the time of the conduct in question." *See Hampton Co. Nat'l Sur., L.L.C. v. Tunica County, Miss.*, 543 F.3d 221, 225 (5th Cir. 2008) (quoting *Freeman v. Gore*, 483 F.3d 404, 410-11 (5th Cir. 2007).

In relaxing the two-prong protocol established in *Saucier,    Pearson v. Callahan*, 555 U.S. at 236, has clarified that courts are permitted "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*.  Thus the "rigid *Saucier* procedure" need not be followed in any particular sequence." *Id.*

Chief Judge Edith H. Jones of the Fifth Circuit Court of Appeals explained in *Ontiveros v. City of Rosenberg, Texas*, 564 F.3d 379, 383, footnote 1,

> Even if the plaintiffs established that the officer used excessive force (and thus performed an unreasonable seizure under the Fourth Amendment), the court would perform an entirely separate inquiry applying a different reasonableness standard.  In order to evaluate the "clearly established law" prong of the qualified immunity test, the court must ask whether, at the time of the incident, the law clearly established that such conduct would violate the right.  This inquiry focuses not on the general standard-- when may an officer use deadly force against a suspect?--but on the specific circumstances of the incident--could an officer have reasonably interpreted the law to conclude that the perceived threat posed by the suspect was sufficient to justify deadly force? *Brosseau v. Haugen*, 543 U.S. 194, 199-200 (2004).

The usual summary judgment burden of proof is altered in the case of a qualified immunity defense. *Cf. Gates v. Texas Dep't of Protective and Regulatory Servs.* 537 F.3d 404, 419 (5th Cir. 2008). Although qualified immunity is called an affirmative defense, the defendant asserting qualified immunity does not have the burden to establish it. Rather, it is the plaintiff whose burden it is to negate the assertion of qualified immunity, once it is raised. *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009). An official need only plead his good faith, which then shifts the burden to the plaintiff, who must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law. *See Michalik v. Harmann*, 422 F.3d 252, 262 (5th Cir. 2005) (citing *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001)). The plaintiff, bearing the burden of negating the defense, cannot rest on conclusory allegations and assertions, but must demonstrate genuine issues of material fact regarding the reasonableness of the official's conduct. *Id.* Sergeant Cotton and Officer Edwards have raised qualified immunity in their summary judgment, and "the burden of negating the defense lies with [Marian and Robbie Tolan], even on summary judgment." *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008). In other words the Plaintiffs must satisfy their burden by negating immunity by specifically identifying evidence that rebuts the Defendants' presumed entitlement to dismissal based upon qualified immunity. *Whatley v. Philo*, 817 F.2d 19, 20 (5th Cir. 1987).

To overcome the presumption of a law enforcement officer's qualified immunity, the actions must be viewed from the perspective of a reasonable law enforcement officer on the scene and not in hindsight. "[A] police officer views the facts through the lens of his police experience and expertise." *Ornelas v. United States*, 517 U.S. 690, 699 (1996). Whether a particular use of force is reasonable "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Conner*, 490 U.S. 386,

396 (1989). Only those facts known to the police officer are important to the determination, not facts known only to the plaintiffs and not information subject to a variety of interpretations by individuals who are not experts. *cf. United States v. Banks*, 540 U.S. 31, 39 (2003).

**Fourteenth Amendment Claims**

Plaintiffs have brought their suit pursuant to Title 42 United States Code, Section 1983, which gives an individual cause of action for violation of a United States Constitutional right by a person acting under color of state law. To state a claim under 42 U.S.C. §1983, a plaintiff must demonstrate: (1) a violation of the United States Constitution or of federal law; and (2) that the violation was committed by someone acting under color of state law. *See*. *Atteberry v. Nocona Gen. Hosp*., 430 F.3d 245, 252-53 (5th Cir. 2005) (internal citations omitted).

Section 1983 "is not itself a source of substantive rights." *Baker v. McCollan*, 443 U.S. 137, 145 at fn 3 (1979). It provides "a method for vindicating federal rights elsewhere conferred." *Id.* To support a claim for under Section 1983, then, a plaintiff must allege a specific constitutional right that has been infringed by the defendant. *Cf. County of Sacramento v. Lewis*, 523 U.S. 833, 842 at fn 5 (1998).

The Plaintiffs have alleged that their Fourteenth Amendment rights to substantive due process of law have been infringed. The Due Process Clause protects against an "exercise of power without any reasonable justification in the service of a legitimate governmental objective" and "government power arbitrarily and oppressively exercised." *County of Sacramento v. Lewis,* 523 U.S. 833, 846 (1998). "[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Id*., quoting *Collins v. Harker Heights*, 503 U.S. 115,129 (1992).

When a provision of the Constitution "provides an explicit textual source of

Constitutional protection, a court must assess a plaintiff's claim under that explicit provision and not the more generalized notion of substantive due process." *Cf. Conn v. Gabbert*, 526 U.S. 286, 293 (1999), quoting *Graham v. Conner*, 490 U.S. at 395 (1989).  It has been consistently held that a allegations that a law enforcement officer has used excessive force in the course of an arrest, investigatory stop, or other seizure the case must be analyzed under the Fourth Amendment's reasonableness standard, rather than a Fourteenth Amendment substantive due process approach.  *Cf. Graham v. Conner,* 490 U.S. at 395.  The Plaintiffs' alleged claims for excessive force pursuant to the Fourteenth Amendment must be dismissed as not legally cognizable.

The Plaintiffs have also alleged unconstitutional stops, detentions, and seizures under the Fourteenth Amendment.  These claims too are not cognizable under the Fourteenth Amendment. The Supreme Court of the United States in modern times has reserved the protections of substantive due process to matters relating to marriage, family, procreation, and the right of bodily integrity.  *Cf. Albright v. Oliver*, 510 U.S. 266, 272 (1994).  The Fourteenth Amendment was drafted to protect matters of pretrial deprivations of liberty.  *Id.* at 274.  An unlawful detention claim cannot fall under the umbrella of a violation of substantive due process.  The Plaintiffs' claims for detention brought pursuant to the Fourteenth Amendment must also be dismissed.

Plaintiffs have also brought suit against Sergeant Cotton and Officer Edwards for their alleged violation of their Equal Protection rights under the Fourteenth Amendment.  The Equal Protection Clause requires that similarly situated persons be treated alike.  *Rolf v. City of San Antonio*, 77 F.3d 823, 828 (5th Cir. 1996).   An equal protection challenge to actions under the color of state law pursuant to the Equal Protection Clause can be successful "[o]nly if the

challenged government action classifies or distinguishes between two or more relevant groups of people. *Outb v. Strauss*, 11 F. 3d 488, 492 (5th Cir.), *cert. denied*, 511 U.S. 1127 (1994).  The Plaintiffs "must  prove that similarly situated individuals were treated differently." *Bryan v. City of Madison*, 213 F.3d 267, 276 (5th Cir. 2000).  The Plaintiffs have alleged their personal beliefs that race was a factor in the adverse actions taken against them by the Defendants in this case, but such a personal belief, unsubstantiated, cannot support their claim of denial of equal protection of the laws. *Edwards v. Woods*, 51 F.3d 577, 580 (5th Cir. 1995).  The Plaintiff must allege and ultimately prove facts that show such an improper motivation. *Allen v. Thomas*, 388 F.3d. 147, 149 (5th Cir. 2004), *Jones v. Greninger,* 188 F.3d 322, 325 (5th Cir. 1999).   Officer Edwards testified that he did not know the Robbie Tolan and Anthony Cooper were African American until they refused to submit to temporary detention.  He did not know that Mr. and Mrs. Tolan were African American until they stepped outside on the porch of their house.  Doc. 67, Exhibit 4, p 66, lines 7-16; p. 79, lines 5-11; page 19, lines 4-12.  Sergeant Cotton testified that he did not know of the race of any of the Plaintiffs until after he exited his police car at the Tolan residence.  Doc. 67, Exhibit 2, page 34, lines 13-19.  There is simply no admissible evidence Plaintiffs can point to that contradicts this testimony, nor any admissible evidence that either officer was motivated to act due to the race of any of the Plaintiffs.  To succeed on a claim of denial of equal protection Plaintiffs must show that Sergeant Cotton's or Officer Edwards's actions were not rationally related to a legitimate state objective or that either of them have treated similarly situated individuals of another race differently under the same or similar circumstances. *Cf.  Bryan v. City of Madison*, 213 F.3d at 277.  Again, Plaintiffs have pointed to no admissible evidence to establish this claim.  Plaintiffs' claim for denial of equal protection under the Fourteenth Amendment must be denied.

**Fourth Amendment Claims**

"Fourth Amendment claims are appropriate [only] when the complaint contests the method or basis of the arrest and seizure of the person." *Jones v. City of Jackson*, 203 F.3d 875, 880 (5th Cir. 2000), quoting *Brooks v. George County, Miss.*, 84 F.3d 157, 166 (5th Cir. 1996).

"The Fourth Amendment prohibits unreasonable seizures, not unreasonable or ill-advised conduct in general. Consequently, [the courts] scrutinize only the seizure itself, not the events leading to the seizure, for reasonableness under the Fourth Amendment." *Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir. 1993), quoting *Carter v. Buscher*, 973 F.2d 1328, 1333 (7th Cir. 1992).

<u>Stop and Detention of Robbie Tolan, Anthony Cooper, Marian Tolan, and Bobby Tolan</u>

A police officer has the authority to stop and detain briefly an individual in order to perform an investigation based upon reasonable suspicion of possible criminal activity. *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000), citing *Terry v. Ohio*, 3932 U.S. 1, 30 (1968). Only a minimum level of objective justification, considering the totality of the circumstances, is required for a constitutionally permissible investigative stop and detention. *United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994); *see also United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 fn. 5 (5th Cir. 1999). Whether an investigative detention is justified does not depend upon a confirmation of the officer's suspicions that an offense has been committed, nor does it depend upon how likely it is that the officer's suspicions are correct. *Cf. Jewett v. Anders*, 521 F.3d 818, 823-27 (7th Cir. 2008).

Justification to detain a suspect for any suspected offense is a complete defense to an unlawful arrest claim under Section 1983 if any reasonable police officer could have believed that reasonable suspicion could have existed. *Cf. Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990). During an investigative detention it is lawful for officers to "take such

steps as are reasonably necessary to protect their personal safety and to maintain the *status quo* during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235, (1985); *United States v. Campbell*, 178 F.3d 345, 348-349 (5th Cir. 1999); *United States v. Sanders*, 994 F.2d 200, 210 (5th Cir. 1993).

The Texas Penal Code, Section 38.15, addresses interference with a law enforcement officer's public duties, and under that statute a person commits an offense when, with criminal negligence that person interrupts, disrupts, impedes, or otherwise interferes with a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law. "Indeed, citizens have no right to intervene in lawful police business." *Mouille v. City of Live Oak*, 977 F.2d 924, 928 (5th Cir. 1993).

It is unclear whether the Plaintiffs are even arguing that the investigative detentions they experienced were unreasonable, but under the factual circumstances of the case, the investigative detentions were reasonable.  Officer Edwards was patrolling before two a.m. in an area where there had been a number of car thefts; he was driving behind a Nissan SUV, which he saw making a hurried turn onto Woodstock Street, a street he knew to be a *cul-de sac*; when he saw the SUV park on Woodstock, he followed it down the street.  Officer Edwards typed the SUV's license plate number into his police car computer, and the computer reported the SUV stolen.  Officer Edwards was unaware that he had typed one digit of the number incorrectly.  He called for back up and waited.  He next saw the two male occupants of the automobile, Robbie Tolan and Anthony Cooper, exit it and proceed to walk towards a home on the street.  Officer Edwards then exited his police car, drew his service weapon, and shouted for the two men to "come here," which they did not do; they continued to walk to the house. The two men shouted verbal abuse at Officer Edwards and asked him "why?"  He informed them he believed their automobile to be

stolen.  He also shouted to them to get down on the ground, which the two men also did not do.

He called for backup.  Quickly thereafter two occupants of the home Marian and Bobby Tolan

exited the home, and told the two men to obey the police.  At the request of Officer Edwards the

man from the house, Bobby Tolan, went to stand by the automobile parked in the driveway.  The

woman from the house, Marian Tolan, started to walk around the yard.  She was upset and loudly

protested the police presence.  At some point in this very short space of time Sergeant Cotton

arrived, received a very short briefing from Officer Edwards and proceeded to take Marian

Tolan, in hand.  Up to that point the facts are undisputed in the record.  There was a report of a

stolen vehicle, which the officers had information was the SUV parked in front of the house on

Woodstock Street; this justified the officers to investigate whether the SUV was stolen and

whether the former occupants of the SUV or the former occupants of the house had an

involvement in the theft of the SUV.  Marian Tolan was walking around the yard, getting in the

way of Officer Edwards's pointed weapon, upset, angry, and loudly protesting the innocence of

her son and nephew, and refusing to stand in a safe place next to the garage. The activities

warranted Sergeant Cotton's efforts to calm her and put her into a neutral position.  Reasonable

suspicion existed to temporarily detain the Plaintiffs, the individuals associated with the

reportedly stolen vehicle.  This brief detention did not violate their rights under the Fourth

Amendment.  *Cf. Terry v. Ohio*, 392 U.S. 1 (1968).

Reasonable suspicion also existed to briefly detain the Tolans and Cooper after Robbie

Tolan was shot.  "The permissible scope of a *Terry* stop has expanded [] to include the use of

handcuffs and temporary detention in squad cars."  *United States v. Stewart*, 388 F.3d 1079,

1084 (7th Cir. 2004).   Cooper was handcuffed, searched, and placed in a police car by a Bellaire

police officer other than Sergeant Cotton or Officer Edwards.  At that point Cooper was still a

potential car theft suspect.  Marian and Bobby Tolan were each also placed in police cars by other officers.  The exigent circumstances in the immediate aftermath of the shooting and the need to protect the integrity of the investigation of the stolen automobile and Sergeant Cotton's use of force raised reasonable suspicion to justify the brief detention of the Tolans and Anthony Cooper.  Compare *Mouille*, 977 F. 2d at 928; see also *Illinois v. Lidster*, 540 U.S. 419, 426-427 (2004); *Walker v. City of Orem*, 451 F.3d 1139, 1148 (10th Cir. 2006), discussing unreasonableness of detaining mere witnesses.

After other Bellaire police officers determined their identities and that the automobile in question was not stolen, Mr. and Mrs. Tolan and Anthony Cooper were released.  There is no question that under *Terry* the investigative detention of all four individuals, Anthony Cooper (detained in a police car for approximately an hour) and Marian and Bobby Tolan (detained in police cars for twenty-five minutes) was constitutional.   More importantly however, these post-shooting detentions were made by other Bellaire police officers not by the Defendants, Sergeant Cotton and Officer Edwards.

Use of Excessive Force

An allegation that an officer used excessive force in the course of a seizure does not create a separate unconstitutional detention claim distinct from the excessive force claim.  See. *Flores v. City of Palacios,* 381 F.3d 391, 403 (5th Cir. 2004).  A plaintiff may not support an alleged unlawful detention claim by alleging that an officer used excessive force during the detention.  *Cf. Id*.

In order to prevail on an excessive force claim, a plaintiff must show (1) some injury; (2) which resulted directly and only from a use of force that was clearly excessive to the need; and (3) the excessiveness of which was objectively unreasonable.  *Ontiveros v. City of Rosenberg*,

564 F.3d 379, 382 (5th Cir. 2009).

**BOBBY TOLAN**

Marian and Bobby Tolan both testified that neither Officer Edwards, nor Sergeant Cotton used any force against Bobby Tolan.  His claims against Sergeant Edwards and Officer Edwards for use of excessive force against him must be dismissed.

**ANTHONY COOPER**

Anthony Cooper was also not subjected to use of excessive force.  In his deposition he testified that he thought Officer Edwards had put him in handcuffs, and the handcuffs were uncomfortable. Doc. 67, Exhibit 16, page 90, line 11 -- page 91, line 24.  It is undisputed that another officer put Anthony Cooper in handcuffs, and even if Officer Edwards did, the use of handcuffs in the manner to which Anthony Cooper testified cannot support a claim of use of excessive force.  *Cf. Tarver v. City of Edna*, 410 F.3d 745, 751-52 (5th Cir. 2005).  "An officer may handcuff a suspect when 'reasonably necessary to maintain the status quo and protect [officer] safety during an investigative stop.'"  *Young v. Prince George's County*, 355 F.3d 751, 755 (4th Cir. 2004), quoting *United States v. Taylor*, 857 F.2d 210, 213 (4th Cir. 1988).  Anthony Cooper's claim of excessive force must be dismissed.

**MARIAN TOLAN**

Marian Tolan makes no allegation that Officer Edwards used any force against her.  Doc. 67, Exhibit 17, p. 18, line 25 --page 19, line 7; page 19, line 21-page 20, line 11.  Marian Tolan's claim against Officer Edwards for use of excessive force must be dismissed.

Marian Tolan has made a claim of use of excessive force against Sergeant Cotton in taking her arm and later pushing her against the garage door.  A police officer is not subjected to liability because he uses force while carrying out his duties, and he cannot be held responsible

for unexpected consequences of the use of necessary force.  Hill v. Carrol County, 587 F.3d 230, 237 (5th Cir. 2009).  "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to affect it."  *Graham*, 490 U.S. at 396. "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment.'"  *Id*., quoting *Johnson v. Glick*, 481, F.2d 1028, 1033, cert denied, 414 U.S. 1033 (1973).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation."  *Id*., at 396-397.

Marian Tolan, who was upset, walking around the yard, and shouting, was an individual out of control.  There is no dispute about that.  Sergeant Cotton needed to bring her under control, quiet her down, and have her stand in one place, so that he could hand cuff Robbie Tolan, who was by that time lying prone, on his stomach, on the porch of the home and search him for weapons.  He also needed to hand cuff Cooper, who was lying on his back in the front yard and search him for weapons.  This was a dangerous and uncertain scene.  In such a situation officers must stop and control suspects and other persons' movements so that they can safely confirm the identities of unknown persons before they can safely identify and handcuff, and verify the information and the suspects**.**  *Cf. Jewett v. Anders* , 521 F.3d F3d 827 (7th Cir. 2008).  When Marian Tolan refused to stand next to the garage door as Sergeant Cotton requested, he took her right arm, put his left arm in the small of her back and began to walk her toward the garage.  Robbie Tolan, watching from his prone position, with his head over his left shoulder, testified that while Sergeant Cotton was moving to the garage door area, he was holding Marian

Tolan's arm, "kind of pushing her a little bit, kind of directing her." Robbie Tolan further testified that "There was no tussle. I mean, but she – she wasn't exactly running over there either." *Id*. p 80, lines 3-24. Robbie Tolan's description of these particular events are completely consistent with Sergeant Cotton's recollection. Then, just before Sergeant Cotton and Marian Tolan reached the garage door, Sergeant Cotton pushed Marian Tolan, and she hit the garage door with what several witnesses described as a loud banging sound. Mrs. Tolan believed that Sergeant Cotton had maliciously slammed her into the metal garage door. Sergeant Cotton testified that he pushed her because after he heard Robbie Tolan shout words to the effect of "Get your fucking hands off her," he saw Robbie Tolan getting up and he wanted to get Marian Tolan out of the way so that he could deal with Robbie Tolan. Anthony Cooper testified that when Marian Tolan hit the garage door Robbie Tolan said, "What are you doing to my mom-- doing to my mom?" Doc. 70, Exhibit 7, page 78, lines 17-25. Whether Sergeant Cotton pushed Marian Tolan before or after Robbie Tolan's shout is immaterial to the issue to be determined. Did Sergeant Cotton use excessive force to move Marian Tolan to a neutral place so that he could continue the investigation? Marian Tolan had injected herself into the police investigation by refusing to comply with Sergeant Cotton's requests to move out of the way. She obviously did not see the situation in the same way Sergeant Cotton saw it, but looking at the scene objectively, Sergeant Cotton's actions were reasonable. Taking her arm and walking her toward the garage was not an excessive use of force, nor was pushing Marian Tolan away once he heard the shout and saw Robbie Tolan in the act of getting up from a prone position. Forcefully and intentionally shoving or pushing a woman into a metal garage door could be excessive force under other circumstances, but the circumstances here were tense and unusual. There is no question that within a matter of seconds three things happened: (1) Robbie Tolan shouted at

Sergeant Cotton, "Get your fucking hands off her; (2) Robbie Tolan quickly began to move from his prone position facing the front door 180 degrees around to a position, as he testified, on his knees facing Sergeant Cotton, and (3) Marian Tolan hit the garage door with a loud noise. "There can be a constitutional violation only if injuries resulted from the officer's use of excessive force.  Injuries which result from, for example, an officer's justified use of force to overcome resistance to arrest do not implicate constitutionally protected interests."  Johnson v. Morel, 876 F2d 477, 479-80 (5th Cir. 1989) (*en banc*).  If any of the elements of a claim under this test fails, so does the plaintiff's claim.  *Id*.  Viewed objectively, the force Sergeant Cotton used to push Marian Tolan, it was not excessive to the need, nor unreasonable under the circumstances.  *Cf. Collier v. Montgomery County*, 569 F.3d 214, 219 (5th Cir. 2009).  Marian Tolan's claim of use of excessive force against Sergeant Cotton must be dismissed.

**ROBBIE TOLAN**

There is no allegation that Officer Edwards used any force whatsoever on Robbie Tolan. The only allegation he makes against Officer Edwards is that Officer Edwards negligently typed into his police car computer the wrong license plate number.  Doc. 67, Exhibit 15, page 59, line 18 -- page 60, line 21; page 61, line 11 -- page 62, line 10.  In *Fraire v. City of Arlington*, 957 F. 2d 1268, 1276 (5th Cir. 1996),  Fifth Circuit Judge Jacques Weiner wrote on behalf of the panel, "The constitutional right to be free from unreasonable seizure has never been equated by the Court with the right to be free from a negligently executed stop or arrest."  Robbie Tolan's claim against Officer Edwards for excessive use of force must be dismissed.

Robbie Tolan argues that Sergeant Cotton used deadly force that was objectively unreasonable under the circumstances, when Sgt. Cotton shot him.  Sergeant Cotton testified that he fired the shot in self defense because he feared for his life, believing Robbie Tolan was

pulling a weapon from his waistband area.  Robbie Tolan maintains that there are genuine issues of material fact as to whether Sergeant Cotton's use of deadly force was objectively reasonable. Moreover, he argues "the material fact issues [are] heavily disputed." Doc. 70 at 21.  Robbie Tolan and Sergeant Cotton are the only two people who can provide factual information regarding the observations Sergeant Cotton made, which led him to fire.

Plaintiffs base their main argument that there are material fact questions precluding summary judgment on the differences in details of the testimony of the various eye witnesses on three inter-related subjects:  (1) when Robbie Tolan told Sergeant Cotton to get his hands off his mother, either before or after Mrs. Tolan hit the metal door of the garage, causing a loud metallic banging sound, (2) exactly where Robbie Tolan was vertically located when he was shot, and (3) where Robbie Tolan's hands were as he was getting from his horizontal position, prone and on his stomach on the porch, with his head facing in the opposite direction of the garage, to his vertical position facing Sergeant Cotton at the time he was shot.

Robbie Tolan, Marian Tolan, Anthony Cooper, and Officer Edwards all testified that Robbie Tolan yelled to Sergeant Cotton after Marian Tolan hit the garage door.  Sergeant Cotton testified that Robbie Tolan yelled to him before he pushed Marian Tolan away, and she hit the garage door.  Sergeant Cotton testified, "I do not disagree that the noise [of Mrs. Tolan hitting the garage door] happened. . . . I disagree as to when the noise happened."  *Id.*, Exhibit 1, page 61, line 7 through page 62, line 18.  The fourth eye witnesses, Bobby Tolan, did not hear his son shout at Sergeant Cotton.  This disputed fact is not material to the determination of the issue of qualified immunity.  It is not disputed that Robbie Tolan shouted at Sergeant Cotton and quickly got up from his prone position and turned his body around.

Plaintiffs argue that Sergeant Cotton has been inconsistent in his testimony concerning

where Robbie Tolan's hands were at the time he was shot.  They highlight Sergeant Cotton's deposition testimony, in which, they argue, he does not disagree with the premise that the Tolans' testimony concerning whether Robbie Tolan was reaching for a gun at the time Sergeant Cotton shot him or was "on a knee" when he was shot  was conflicting.  The last quoted question and answer from Sergeant Cotton's deposition reads

> Question:   Well, their statement is different from your statement.
> Do you understand that? . . . .
>
> Answer:  I don't think I can answer entirely--I suppose there are
> some things in their statement that are different.

Doc. 70, Ex. 1, page 73, lines 17-18 and 21-23

Plaintiffs do not quote the objection to the question, "misrepresents the record." *Id.* at page 73, lines lines 19-20.  Nor do they quote the continuation of Sergeant Cotton's answer to the question, "I would have to go back and read--you know I don't think I can answer that here." Doc. 71, Ex. 33, page 73, lines 24--page 74, line 1.  Defendants' Reply to Plaintiffs' Opposition to Defendants' Edwards and Cotton, Motion for Summary Judgment (Doc. 71) quotes extensively from excerpts from Sergeant Cotton's deposition (Ex. 32 and 33) that give the complete back and forth between Plaintiffs' attorney and Sergeant Cotton on the issue of Sergeant Cotton's disagreement with the testimony of  Robbie and Marian Tolan.  *Id*. at  16-19. In none of these excerpts does Sergeant Cotton acquiesce that there is a material difference between his testimony and that of the Tolans.

The Plaintiffs also argue that the testimony concerning where Robbie Tolan was vertically situated just before he was shot creates material fact questions that would prohibit summary judgment on the defense of qualified immunity.  The testimony differs among the witnesses in the case.  Paragraph 21 of Plaintiffs' Opposition to Defendants' Edwards' and Cotton's Motion for Summary Judgment states, "In response to Cotton shoving Marian Tolan

against the garage door, Robbie Tolan yelled at Cotton to get his hands off his mother, brought his arms to his chest, and pushed himself up onto his knees."   Doc. 70 at 6-7.  Robbie Tolan testified to this at the trial of Sergeant Cotton. Doc. 70, Exhibit 3, vol. 2, page149, lines 22-23.

At his deposition Robbie Tolan's testimony was similar to his trial testimony.  He testified that he was lying on the ground[3] on his stomach, with his arms out in front of him and his head turned to the left.  In order to get up he drew back his hands to from where they were to "about mid body" and had to push up with both his hands in a "kind of push up maneuver." As he was pushing up he was also turning towards his left. *Id.*, Exhibit 6, page 100, line 9--page 101, line 8.   Robbie Tolan testified later in the deposition, "I didn't jump up off the ground.  I just simply got up.  Started to get up."  *Id.* Exhibit 6, page 110, lines 12-13.  "Before I could stand up, I was shot." *Id.* Exhibit 6, page 146, line 14.

Marian Tolan, gave similar testimony at Sergeant Cotton's trial:

Question:  When you were slammed into the garage door what happened next Ms. Tolan?

Answer:   Robbie said something like get your fucking hands off my mom or you don't have to shove my mom.  Something to that nature. . . .

Question:  And Robbie was still laying upon the porch with his head next to the door?

Answer:   Yes.  Yes.  But he was still looking.  When I hit the garage door and I looked at him and he looked to the right and then he looked to the left and when he looked to the left is when he addressed him. . . .

Question:  Ms. Tolan Robbie was shot in the front of his chest. How would the bullet get there if he didn't get up?

Answer:  You mean was he standing?

---

[3] He was actually on the porch of the house.  Throughout the trial testimony and deposition testimony it is often referred to by various witnesses as "the ground."

Question:  Was Robbie getting up off of the ground facing you and this officer?

Answer:  Yes.

Question:  Okay

Answer:  On his knees.  He was not standing

Question:  How far up did Robbie make it?

Answer:  I think he -- it seems to me he was on his knees.  He was by then up on his knees.

Question:  Okay.

Answer:  At an angle.

Question:  What happened when he got up on his knees?

Answer:  He was shot.

*Id.*, Exhibit 9, vol. 2, page 104, line 7-- page 105, line 16.

Officer Edwards testified at Sergeant Cotton's trial, "I heard a bang [the sound of something hitting the metallic garage door] and then he--the gentleman [Robbie Tolan] laying behind the Sego Palm either said don't touch my mama or something. . . .which drew my attention back to him because I saw his hands had disappeared." *Id*., Exhibit 4, vol 1, page 64, lines 18-25 through page 65, lines 1 through 16.   After Robbie Tolan's hands disappeared, Officer Edwards testified "His head and shoulders had then disappeared behind the -- [Sego Palm]. . . . I couldn't see him anymore behind that bush." *Id*., Exhibit 4, vol. 1, page 65, lines 16-25.   To the question, "What happened next," Officer Edwards answered, "Then I saw his head and shoulders come up above the bush and he was turned towards--facing Cotton and appeared to be charging or rushing." *Id*., Exhibit 4, vol. 1, page 66, lines 1-4.  Officer Edwards elaborated that he appeared to be charging or running, " 'cause his shoulders and head were kind of hunched when he was getting up. . . . Like fixing to take off." Id., Exhibit 4, vol. 1, page 65,

lines 23 through page 66, line 1.

Sergeant Cotton testified at his deposition that when he had almost gotten Mrs. Tolan to the garage door, she told him to take his hands off her. About that time he looked over at Robbie on the porch, then had his attention back on Mrs. Tolan when he "heard Robbie yelling. . . . get your fucking hands off her." Sergeant Cotton and Mrs. Tolan had not yet made it to the garage door when he heard Robbie Tolan's yelling. It was then that he pushed Mrs. Tolan out of the way, and she hit the garage door with a bang. *Id*., Exhibit 1, page 60, line 7-- page 18. Sergeant Cotton testified that when he heard Robbie Tolan yell, he looked at him, and "[Robbie Tolan] was getting up and turning around. *Id*., Exhibit 1, page 61, line 25--page 62, line 1. Sergeant Cotton did not know where Robbie Tolan was when he yelled at him. *Id*. Exhibit 1, page 62, line 15. Sergeant Cotton further testified that "At some point in the altercation [Robbie Tolan] was leaning in my direction. *Id*., Exhibit 1, page 62, lines 18-19. Sergeant Cotton did not see him move his hands and push himself off the ground in a push-up maneuver. *Id*., Exhibit 1, page 64, lines 20-25. When Sergeant Cotton heard Robbie Tolan yell he looked over and saw that "he was up in a crouch kind of in the process of getting up with his feet under him facing kind of away from me while--as he was rotating to his right." *Id*., Exhibit 1, page 65, lines 2-5. Sergeant Cotton testified that Robbie Tolan was not running toward him, but turning around to face Sergeant Cotton. He was on both feet. *Id*. Exhibit 1, page 65, 20-- 66, line 3.

Contrary to Plaintiffs' argument in their Response, Document 70, paragraph 22, Sergeant Cotton did not testify that Robbie Tolan stood to his full height on his feet. There is no testimony in this summary judgment record that Robbie Tolan was standing up, except his own testimony cited in Defendants' reply to Plaintiffs' response (Doc. 71). Robbie Tolan testified at Sergeant Cotton's criminal trial, "After I was shot the bullet lifted me to my feet and against the

front door." Doc. 71, Exhibit 32, vol. 1, page 96, 12-13. This testimony is not material to a determination of where Robbie Tolan was situated immediately before he was shot.

Similarly, Plaintiffs' argument in paragraph 24 of Document 70 is flawed. Officer Edwards did not testify that Robbie Tolan "charged" Sergeant Cotton. His testimony was Robbie Tolan stood "fully on his feet. . . . in a crouch--as in a charging position. . . ." Doc. 70, Exhibit 5, page 53, lines 15-22. When asked later, however, if Robbie Tolan was on one or both of his knees, Officer Edwards testified that he could not see Robbie Tolan's feet. *Id*, Exhibit 5, page 54, line 3. He maintained nevertheless that Robbie Tolan "was in basically a hunched charging position. . . . It looked like he was going to go forward, forward motion." *Id*., Exhibit 5, page 54, lines 15-19. Officer Edwards later testified, "I couldn't see [Robbie Tolan's] hands--his knees or his feet." *Id*., Exhibit 5, page 56, lines 9-10   In Officer Edwards testimony at the trial of Sergeant Cotton he testified that at first he could see Robbie Tolan's hands above his head and his legs straight out behind him as he lay on his stomach on the porch. Then Robbie Tolan disappeared completely behind the sago palm plant. Then he saw Robbie Tolan's "head and shoulders come up above the bush and he was turned towards -- facing Cotton and he appeared to be charging or rushing." *Id*., Exhibit 4, page 66, lines 2-16. He further testified that Robbie Tolan appeared to be charging or running, " 'cause his shoulders and head were kind of hunched when he was getting up. . . . like fixing to take off." *Id*., Exhibit 4, page 66, line 22--page 67, line 1.[4] Although Officer Edwards refers to Robbie Tolan's position in terms of movement, it is clear that Officer Edwards is not testifying that Robbie Tolan was actually moving towards Sergeant Cotton, but, rather, was in a position to begin movement towards Sergeant Cotton.

What remains is a dispute as to whether Robbie Tolan was on his knees, as he and his mother testified or crouched on his two feet as Sergeant Cotton testified. In any event there is no

---

[4] The remainder of the testimony on page 67 is it is garbled and impossible to understand.

dispute that in a matter of a very few seconds Robbie Tolan went from a prone position lying on the porch with his arms and head facing in the opposite direction to the garage door, the place Sergeant Cotton and Mrs. Tolan were standing, to a position, from Officer Edwards's viewpoint, behind the potted sago palm, with his head and shoulders above the palm, facing Sergeant Cotton and his mother.  He was not yet fully standing up, nor was he moving towards Sergeant Cotton, but he was in the process of standing up.   The facts that he quickly got up from a prone position on the porch, yelled to Sergeant. Cotton to take his "fucking hands" off his mother, and turned around to face Sergeant Cotton are material facts, and about them there is no dispute.

Plaintiffs' argue that "Robbie Tolan did not reach for his waistband area."  Document No. 70 at Paragraph 23.  Robbie Tolan testified that he did not reach for his waistband area, and we now know that he did not have a weapon of any kind.  Document No. 70, Exhibit 3, vol. 2, page 152, lines 8-11. Sergeant Cotton testified at his deposition that as Robbie Tolan was getting up, as he was rotating to his right, his right arm was at his waistband and he did not know where his left arm was.  Doc 70, Exhibit 1, page 65, lines1-8.  He then clarified that "at his waistband" meant "In the middle, middle of his waist. . . . Like where his belt buckle would be."  *Id*., Exhibit 1, page 65, lines 9-15.  Robbie Tolan was wearing a hoodie that was not tucked into his pants, but was hanging over them.  Sergeant Cotton testified that in his experience he found it to be often the case that people carried weapons "in their midsection in their waistband."  *Id*., Exhibit 1, page 65, line 16--page 66, line 1.  He was then asked if he hadn't testified at his criminal trial that "he was digging in his waistband."  *Id*., Exhibit 1, page 66, lines 3-4.  After checking the transcript of his trial testimony Sergeant Cotton answered,

> Yeah.  It says 'like he was digging in his waistband.'  That's a description trying to give a description of what he was doing. . . . 'like' meaning that his hand was in that area. . . . I don't -- but I don't -- I don't mean that to mean, though, that he was reaching

down inside of his pants necessarily.  That's not --that wouldn't be accurately what I saw. . . . It appeared that he was drawing a weapon from his waistband. . . . Oh, I don't know that I could see his hand specifically.  I could see where his hand was, but, you know, his clothing was probably covering the hand.  It was dark.  I could see his total movement, which is what made me believe that it wasn't necessarily just where his hand was, for instance.

*Id.*, Exhibit 1, page 66, line 12 -- page 67, line 16

Plaintiffs argue in Document 70, paragraph 3 that this quoted explanation and clarification of his trial testimony in fact presents a "different version of the facts," and that Sergeant Cotton has disputed the material facts about which he testified previously, which Plaintiffs characterize as ". . . he shot Robbie Tolan because Tolan was 'digging' in his waistband."

In fact, Sergeant Cotton testified at his trial

Answer:  I pushed [Mrs. Tolan] and took probably at least a step away from her and turned to face [Robbie Tolan] and began to draw my weapon.

Question:  What did you see that caused your concern?

Answer:  His hand was coming from his waistband, from the middle of his --

Question:  Can you turn around and demonstrate for the jury?

Answer:  As he was--his hand was like this.  This is where his right hand was in the middle of his waist.

Question:  Okay

Answer:  Like he was digging in his waistband.

Doc. 70, Exhibit 2, page 127, lines 7-17

These two quoted passages, one from his deposition and one from his trial testimony do not present "different versions of the facts."  Sergeant Cotton has not changed his testimony.   In his deposition Sergeant Cotton further testified that he knew that Robbie Tolan's hand was in the

48 / 53

vicinity of his waistband; Robbie Tolan was not running towards him, but was turning around to face Sergeant Cotton; Robbie Tolan was on both feet. *Id.*, Exhibit 1, page 67, line 17 -- page 68, line 3.

There is also no dispute that (1) the situation was tense, (2) Sergeant Cotton was new to the situation, (3) Sergeant Cotton needed to calm and have stay in one place one of the persons on the scene, Mrs. Tolan,  who was being disruptive and getting in the line of fire of Officer Edwards' pointed weapon, (4) Sergeant Cotton had been informed that the two persons "on the ground," and (5) Robbie Tolan, who was lying prone on the front porch of the house, and Cooper, who was lying on his back in the yard, were suspected of felony automobile theft.

In order to conduct the investigation Sergeant, Cotton asked Mrs. Tolan to stand next to the door of the garage.  When she failed to co-operate, he took one of her arms and put his hand on her back and guided her towards the garage door.  In the next few seconds, as they got close to the garage door, either before or after Sergeant Cotton pushed Mrs. Tolan away and into the garage door, Robbie Tolan yelled to Sergeant Cotton, "get your fucking hands off my mother," and Sergeant Cotton saw Robbie Tolan get up from his prone position into a crouching position, either on his knees or feet, and rotate his body around to face Sergeant Cotton.  Robbie Tolan testified at his deposition that he was, in fact, getting up and turning around to face Sergeant Cotton.  At this point in the time line there are no genuine issues of material fact in dispute.

Sergeant Cotton further testified it was at this point in the time line that he also saw Robbie Tolan's hand in the vicinity of his waistband and believed that Robbie Tolan was in the process of pulling out a firearm.  Sergeant Cotton feared for his life and fired three shots, one of which hit Robbie Tolan, severely wounding him.

The fact that Robbie Tolan did not reach for his waistband area is not material to the

determination of whether Sergeant Cotton should be entitled to the defense of qualified immunity. Rather, it is the reasonable officer's perception of the situation that decides qualified immunity. "An officer's use of deadly force is presumptively reasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others." *Ontiveros v. City of Rosenberg*, 564 F.3d at 382 (5th Cir. 2000); accord *Manis v. Lawson,* 585 F.3d 839, 844 (5th Cir. 2009). It is of no moment that a suspect is ultimately found not to have posed a risk of serious harm. "The sad truth is that [the suspect's] actions alone could cause a reasonable officer to fear imminent and serious physical harm" that justifies the use of deadly force. *Reese v. Anderson*, 926 F.2d 494, 500-501 (5th Cir. 1991). "No right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts." *Young v. City of Killeen*, 775 F.2d 1349, 1353 (5th Cir. 1985).

Plaintiffs' contend in their response to the motion for summary judgment that Robbie Tolan angrily shouted, "get your fucking hands off my mother," got up on his knees, rotated his body around to face Sgt. Cotton, and did not make any movements towards his waistband area. Defendants argue that the totality of these circumstances would have led a reasonable officer to perceive that he was under threat of serious harm, regardless of "whether any of the claimed discrete disputed facts existed or occurred." Doc. 71, at 5.

The issue to be decided is not whether Sergeant Cotton, but any reasonable officer could have evaluated the totality of the circumstances confronting Sergeant Cotton that early morning and reached the decision that under the law deadly force was permissible.

Defendants rely upon the sworn statements of two experts, William Lewinski (Doc. 67, Exhibit 27), an expert in the training and evaluation of police officer shootings and the analysis of human perception, memory, and reaction time, and Lieutenant Albert Rodriguez (Doc. 67,

Exhibit 29), an expert in police training.  Lieutenant Rodriguez's deposition is Doc. 67, Exhibit 28.

Lieutenant Rodriguez testified in his deposition concerning the issue of whether a reasonable officer, in the circumstances confronting Sgt. Cotton, would reasonably believe that Robbie Tolan was about to draw a weapon from his waistband:

> Question:  And is moving his arms though they are at his side and pulled toward his body, though they are at his side, that gives the officer in the totality of the circumstances, moving his arms to his side without moving them toward his body, that is enough to make the officer think that the--make Sergeant Cotton think that Robbie Tolan is reaching for his waistband, is that your testimony?
>
> Answer:  Sir, I believe a push-up position is, as he [Robbie Tolan] describes it, a push-up position is somewhere close to his body not out away from his body.  And when he turns, based on the totality of the circumstances, I believe based on how Texas police officers are trained that a reasonable law enforcement officer could have perceived that deadly force, could have had a reasonable belief that deadly force was immediately necessary.
>
> Question:  And is it your testimony that you believe that Robbie Tolan testified that he pulled his arms toward his body?
>
> Answer:  I believe he said his midsection, his hands were brought to about the midpoint of his body in a push-up position.
>
> *   *   *
>
> Question:  Now, since I just read it to you, I am asking whether you concluded from reading that, that his hands moved toward his waistband?
>
> Answer:   Again, my conclusion, sir was based on how law enforcement officers are trained.  And I believe the way Texas police officers are trained that based on a getting up from a prone position, hands have to be close to the body.  And if he turns, those hands are going to be somewhere in the waistband area, if he turns very quickly as he describes.   So I believe that they are going to be-- I believe they are going to be very close to the waistband area. And I believe that he said -- he says that he is turning at the time that he was shot.  So based on how law enforcement officer's -- trained, a reasonable officer could reasonably believe that he is

reaching for the waistband.
Doc. 67, Exhibit 28, page 56, line 24 -- 57, line 57; page 61, line 19 --page 62, line 19.

In his report Lieutenant Rodriguez states:

> 70.  Contemporary law enforcement training does not advocate for police officers to wait until they positively confirm that a suspect has a weapon before the use of deadly force is justified. . . .[A] suspect's actions are going to be faster than the officer's reaction. Law enforcement training specifically addresses the fact that a suspect can access a firearm from the waistband and shoot before an officer can react to shoot.  Officers are trained to understand that even if the officer is able to shoot at the same time that the suspect fires, it is of no advantage to the officer.  Shooting at the same time the suspect does means the officers could also get killed or seriously injured.

Doc. 67, Exhibit 29, paragraph 70, page 23.

Mr. Lewinsky's report is in a similar vein:

> 16.  Someone who is defiantly non-compliant and whose hands are in, going to, or appear to be going to their waistband area, certainly creates a very real threat to the officer.  Even in baseball, the average batter in a pro game has approximately a half a second (travel time of the ball from the pitcher's mound to home plate) to react to the ball.  In this type of situation the officer has half that time or less to read and then react to that situation.

> 17. It is obvious but worthy to note that all thought and action take time.  The more complicated the decisions and actions are or the more dynamic the circumstances of the decision, then the longer the decision and action will usually take to complete.  However, it is clear that the perception of threat, the decision to start shooting, the drawing of a gun from a holster, the alignment of the gun and the actual completion of the trigger pull take time.  Reactive behavior of all kind takes time.  From our peer reviewed research we know that the average officer, under good laboratory conditions can react to a clear stimulus, pull a gun from a level two holster and fire one shot from (depending upon when they start shooting as the gun is coming up) one and one half to one and nine tenth seconds.  Even if the officer has their gun out, their finger on the trigger with the slack taken out of the trigger, with their gun aimed and ready, and the officer attentive and ready to react--the average officer would take just under a third of a second to pull the trigger, in the clearest possible circumstances.  Subsequently even in the

> fastest possible reaction scenarios the officer can be shot at, twice before they can react and shoot back.  This definitely puts the officer behind the reaction curve in this type of situation.

Doc. 67, Exhibit 27, paragraphs 16 and 17.

Plaintiffs offer no summary judgment evidence to rebut this expert evidence, and they have identified no evidence in this record that could prove that there is not one reasonable police officer who would have perceived a threat of serious injury from Robbie Tolan's quick and aggressive actions.  Sergeant Cotton misinterpreted Robbie Tolan's intended actions, but his firing on Robbie Tolan did not violate Robbie Tolan's constitutional rights because Sergeant Cotton feared for his life and could reasonably have believed the shooting was necessary under the totality of the factual circumstances evidenced by the summary judgment record.  Robbie Tolan's claims of excessive force against Sergeant Cotton must be dismissed.

Having considered all issues raised in the Defendants' motion for summary judgment for qualified immunity, the Court finds that the Plaintiffs have not established that Defendants' Jeffrey Wayne Cotton and John C. Edwards violated their constitutional rights.  Accordingly, it is hereby

ORDERED that Defendants' Jeffrey Wayne Cotton's and John C. Edwards's Motion for Summary Judgment (Doc. 67) is GRANTED.

SIGNED at Houston, Texas, this 31st day of March, 2012.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE